No. 25-1627

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

---

**LYNETTE J. KAISER, on behalf of herself and all other persons
similarly situated; UNITED STEEL, PAPER AND FORESTRY,
RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL
AND SERVICE WORKERS INTERNATIONAL UNION, AFL-
CIO/CLC; and ALUMINUM TRADES COUNCIL OF
WENATCHEE, WASHINGTON AFL-CIO,**

*Plaintiffs-Appellees,*

*v.*

**ALCOA USA CORP.; RETIREES GROUP BENEFIT PLAN FOR
CERTAIN HOURLY EMPLOYEES OF ALCOA USA CORP.;
MEDICARE EXCHANGE HEALTHCARE REIMBURSEMENT
PLAN FOR CERTAIN MEDICARE ELIGIBLE RETIREES OF
ALCOA; and ALCOA MEDICARE PART B REIMBURSEMENT
PLAN FOR CERTAIN MEDICARE ELIGIBLE RETIREES OF
ALCOA USA,**

*Defendants-Appellants.*

---

Appeal from the United States District Court for the
Southern District of Indiana, No. 3:20-cv-278-RLY-CSW

---

**OPENING BRIEF OF DEFENDANTS-APPELLANTS**

---

David T. Raimer
  *Counsel of Record*
Bijan M. Aboutorabi
Jones Day
51 Louisiana Avenue, NW
Washington, DC 20001-2113
(202) 879-3939
dtraimer@jonesday.com

*Counsel for Defendants-Appellants*

Save As    Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-1627

Short Caption: Kaiser, et al., v. Alcoa USA Corp., et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

   Alcoa USA Corp.; Retirees Group Benefit Plan for Certain Hourly Employees of Alcoa USA Corp.; Medicare Benefit Exchange Healthcare Reimbursement Plan for

   Certain Medicare Eligible Retirees of Alcoa; Alcoa Medicare Part B Reimbursement Plan for Certain Medicare Eligible Retirees of Alcoa USA

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   Jones Day; K&L Gates LLP; Mark Miller Law Office

(3)    If the party, amicus or intervenor is a corporation:

   i)    Identify all its parent corporations, if any; and

      Alcoa USA Corp. is wholly owned by Alcoa USA Holding Company, which is a direct subsidiary of Alcoa Corporation, which is a
      publicly held company with no parent corporation.

   ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

      No publicly held company owns 10% or more of Alcoa Corporation's stock.

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   N/A

Attorney's Signature: /s/ David T. Raimer          Date: April 18, 2025

Attorney's Printed Name:  David T. Raimer

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ☑   No ☐

Address:  51 Louisiana Avenue, NW

   Washington, DC 20001-2113

Phone Number:  (202) 879-3939          Fax Number:  (202) 626-1700

E-Mail Address:  dtraimer@jonesday.com

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-1627

Short Caption: Kaiser, et al., v. Alcoa USA Corp., et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Alcoa USA Corp.; Retirees Group Benefit Plan for Certain Hourly Employees of Alcoa USA Corp.; Medicare Benefit Exchange Healthcare Reimbursement Plan for

Certain Medicare Eligible Retirees of Alcoa; Alcoa Medicare Part B Reimbursement Plan for Certain Medicare Eligible Retirees of Alcoa USA

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Jones Day; K&L Gates LLP; Mark Miller Law Office

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

Alcoa USA Corp. is wholly owned by Alcoa USA Holding Company, which is a direct subsidiary of Alcoa Corporation, which is a publicly held company with no parent corporation.

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

No publicly held company owns 10% or more of Alcoa Corporation's stock.

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Bijan M. Aboutorabi    Date: June 24, 2025

Attorney's Printed Name: Bijan M. Aboutorabi

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes [ ] No [✓]

Address: 51 Louisiana Avenue, NW

Washington, DC 20001-2113

Phone Number: (202) 879-3939    Fax Number: (202) 626-1700

E-Mail Address: baboutorabi@jonesday.com

rev. 12/19 AK

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................iii

REQUEST FOR ORAL ARGUMENT ....................................................ix

INTRODUCTION ..............................................................................1

JURISDICTIONAL STATEMENT ........................................................5

ISSUES PRESENTED .......................................................................6

STATEMENT OF THE CASE ..............................................................6

    A.    Factual Background. .......................................................6

    B.    The 1993 Cap Agreement and *Curtis*. ................................9

    C.    This Case. ...................................................................12

STANDARDS OF REVIEW ...............................................................21

SUMMARY OF ARGUMENT .............................................................21

ARGUMENT ..................................................................................27

    I.    The District Court Erred by Judicially Estopping
        Alcoa. ......................................................................29

        A.    Alcoa Could Not Have Won *Curtis* on the Basis of
            the Position the District Court Attributed to It. ........32

        B.    The District Court Misunderstood Alcoa's
            Positions in *Curtis*. ...........................................34

            1.    Alcoa Did Not Argue That Post-1993
                Retirees Have Lifetime Benefits........................35

            2.    Alcoa Did Not Argue That, Apart from the
                Cap, the Rights of Pre- and Post-1993
                Retirees Were the Same....................................45

        C.    Even If Alcoa Somehow Relied on an Inconsistent
            Position to Prevail in *Curtis*, an Intervening
            Change in the Law Makes Application of Judicial
            Estoppel Inappropriate. .......................................47

## TABLE OF CONTENTS
(continued)

**Page**

II.   The District Court Erred by Certifying the Class. .............. 49

    A.   The Class Does Not Satisfy Rule 23(a). ...................... 53

        1.   The District Court Erred in Finding
           Commonality. ................................................... 55

        2.   The District Court Erred in Finding
           Typicality. ........................................................ 62

    B.   The Class Does Not Fit Rule 23(b)(2). ....................... 64

        1.   The Class Lacks the Indivisible
           Cohesiveness of a Proper Rule 23(b)(2)
           Class. ............................................................... 64

        2.   The Compensatory Remedies Sought and
           Granted Confirm That Rule 23(b)(2)
           Certification Was Improper. .............................. 67

CONCLUSION ........................................................................ 71

CERTIFICATES OF COMPLIANCE AND SERVICE .......................... 73

# TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant: small-caps">Cases</span>

*1st Source Bank v. Neto*,
   861 F.3d 607 (7th Cir. 2017) ............................................. 21, 30, 42, 46

*Allied Chem. & Alkali Workers v. Pittsburgh Plate Glass Co.*,
   404 U.S. 157 (1971) .................................................... 7, 27, 64

*Allison v. Citgo Petroleum Corp.*,
   151 F.3d 402 (5th Cir. 1998) ............................................... 65

*Allison v. Ticor Title Ins. Co.*,
   979 F.2d 1187 (7th Cir. 1992) ................................................ 30, 39, 43

*Anderson v. Romero*,
   72 F.3d 518 (7th Cir. 1995) ................................................ 37

*Ashcroft v. Mattis*,
   431 U.S. 171 (1977) (per curiam) ......................................... 42

*Astor Chauffeured Limousine Co. v. Runnfeldt Inv. Corp.*,
   910 F.2d 1540 (7th Cir. 1990) ..................................... *passim*

*Bauer v. Kraft Foods Global, Inc.*,
   277 F.R.D. 558 (W.D. Wis. 2012) ......................................... 68

*Bidlack v. Wheelabrator Corp.*,
   993 F.2d 603 (7th Cir. 1993) (en banc) ............................... 1, 8

*Boyle v. Int'l Bhd. of Teamsters Loc. 863 Welfare Fund*,
   579 F. App'x 72 (3d Cir. 2014) ............................................ 68

*Broussard v. Meineke Disc. Muffler Shops, Inc.*,
155 F.3d 331 (4th Cir. 1998)...................................................... *passim*

*Calderon v. Ashmus*,
523 U.S. 740 (1998)........................................................... 40

*Chaveriat v. Williams Pipe Line Co.*,
11 F.3d 1420 (7th Cir. 1993).............................................. 29

*Cherry v. Auburn Gear, Inc.*,
441 F.3d 476 (7th Cir. 2006).............................................. 60

*Chrysler Credit Corp. v. Marino*,
63 F.3d 574 (7th Cir. 1995)........................................... 30, 34

*CNH Indus. N.V. v. Reese*,
583 U.S. 133 (2018) (per curiam)...................................... 8, 47, 59, 61

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)...................................................... 52, 60

*Curtis v. Alcoa, Inc.*,
2011 WL 850410 (E.D. Tenn. Mar. 9, 2011)............................... *passim*

*Curtis v. Alcoa, Inc.*,
2012 WL 12965609 (E.D. Tenn. June 11, 2012).......................... 12, 41

*Curtis v. Alcoa, Inc.*,
2014 WL 2895468 (E.D. Tenn. June 26, 2014)........................... 12, 40

*Curtis v. Alcoa, Inc.*,
525 F. App'x 371 (6th Cir. 2013)............................................ 2, 11, 41

*Dancel v. Groupon, Inc.*,
949 F.3d 999 (7th Cir. 2019)............................................... 21

*Daniel v. Cook Cnty.*,
  833 F.3d 728 (7th Cir. 2016)...........................................................35

*Eagle Found. v. Dole*,
  813 F.2d 798 (7th Cir. 1987).....................................................30, 32

*Ebert v. Gen. Mills, Inc.*,
  823 F.3d 472 (8th Cir. 2016)...........................................................71

*Harmon v. Gordon*,
  712 F.3d 1044 (7th Cir. 2013)........................................................21

*Hovde v. ISLA Dev. LLC*,
  51 F.4th 771 (7th Cir. 2022) .....................................................28, 55

*Howard v. Cook Cnty. Sheriff's Off.*,
  989 F.3d 587 (7th Cir. 2021)...........................................................51

*Illinois v. Archer Daniels Midland Co.*,
  704 F.2d 935 (7th Cir. 1983)...........................................................40

*In re Allstate Ins. Co.*,
  400 F.3d 505 (7th Cir. 2005)...........................................................68

*Jaffee v. United States*,
  592 F.2d 712 (3d Cir. 1979) ...........................................................70

*Jamie S. v. Milwaukee Pub. Schs.*,
  668 F.3d 481 (7th Cir. 2012)................................................... *passim*

*Jarrard v. CDI Telecommns., Inc.*,
  408 F.3d 905 (7th Cir. 2005)................................................... *passim*

*Johnson v. Meriter Health Servs. Emp. Ret. Plan*,
  702 F.3d 364 (7th Cir. 2012)...........................................................67

v

*Kartman v. State Farm Mut. Auto. Ins. Co.*,
    634 F.3d 883 (7th Cir. 2011)..................................................... 27, 69

*Lemon v. Int'l Union of Operating Eng'rs*,
    216 F.3d 577 (7th Cir. 2000)............................................................ 65

*Levinson v. United States*,
    969 F.2d 260 (7th Cir. 1992).................................................. 30, 39, 46

*M&G Polymers USA, LLC v. Tackett*,
    574 U.S. 427 (2015).................................................................. *passim*

*Mondry v. Am. Fam. Mut. Ins.*,
    557 F.3d 781 (7th Cir. 2009)............................................................ 69

*Moor v. Cnty. of Alameda*,
    411 U.S. 693 (1973)........................................................................ 38

*Moore v. Rohm & Haas Co.*,
    2007 WL 5011497 (N.D. Ohio Nov. 19, 2007) ...................................... 8

*New Hampshire v. Maine*,
    532 U.S. 742 (2001)........................................................................ 34

*Noe v. PolyOne Corp.*,
    520 F.3d 548 (6th Cir. 2008)............................................................ 47

*Ogden Martin Sys. of Indianapolis v. Whiting Corp.*,
    179 F.3d 523 (7th Cir. 1999)..................................................... 33, 43

*Pabst Brewing Co. v. Corrao*,
    161 F.3d 434 (7th Cir. 1998)................................................... 2, 7, 54

*Pearson v. Callahan*,
    555 U.S. 223 (2009)........................................................................ 37

*Phillips v. Sheriff of Cook Cnty.*,
828 F.3d 541 (7th Cir. 2016)..............................................................53

*Richards v. Delta Air Lines, Inc.*,
453 F.3d 525 (D.C. Cir. 2006) ...........................................................69

*Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs, Inc.*,
601 F.3d 1159 (11th Cir. 2010) ....................................................54, 55

*Simer v. Rios*,
661 F.2d 655 (7th Cir. 1981).............................................................69

*Sprague v. Gen. Motors Corp.*,
133 F.3d 388 (6th Cir. 1998) (en banc)..............................................55

*There to Care, Inc. v. Comm'r of Ind. Dep't of Rev.*,
19 F.3d 1165 (7th Cir. 1994)..............................................................41

*UAW v. Honeywell Int'l, Inc.*,
954 F.3d 948 (6th Cir. 2020)........................................................47, 48

*UAW v. Kelsey-Hayes Co.*,
854 F.3d 862 (6th Cir. 2017)..............................................................48

*UAW v. Yard-Man, Inc.*,
716 F.2d 1476 (6th Cir. 1983)................................................... *passim*

*United States v. Accra Pac, Inc.*,
173 F.3d 630 (7th Cir. 1999)..............................................................43

*United States v. Verdugo-Urquidez*,
494 U.S. 259 (1990)...........................................................................37

*Vega v. T-Mobile USA*,
564 F.3d 1256 (11th Cir. 2009)....................................................55, 60

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ................................................................ *passim*

*Wallace B. Roderick Revocable Living Tr. v. XTO Energy,
Inc.*,
    725 F.3d 1213 (10th Cir. 2013) .......................................... 33

*Wells Fargo Ins., Inc. v. Land*,
    932 N.E.2d 195 (Ind. Ct. App. 2010) ................................. 38

**STATUTES**

28 U.S.C. § 1291 ....................................................................... 5

28 U.S.C. § 1331 ....................................................................... 5

28 U.S.C. § 2201 ..................................................................... 40

29 U.S.C. § 158 ......................................................................... 7

29 U.S.C. § 185 ......................................................................... 5

29 U.S.C. § 1132 ................................................................. 5, 69

**OTHER AUTHORITIES**

Brief of Defendants-Appellees, *Curtis v. Alcoa, Inc.*, 525 F.
    App'x 371 (6th Cir. 2013) (No. 12-5801), 2012 WL 5179411 ............. 44

Fed. R. Civ. P. 23 ............................................................. *passim*

1 *Newberg and Rubenstein on Class Actions* (6th ed.) .................... 65, 66

Richard A. Nagareda, *Class Certification in the Age of
Aggregate Proof*, 84 N.Y.U. L. Rev. 97 (2009) .................... 52

## REQUEST FOR ORAL ARGUMENT

Defendants-Appellants respectfully request oral argument. *See* Fed. R. App. P. 34(a); Cir. R. 34(f).  This appeal involves important questions concerning the application of judicial estoppel and the propriety of class certification.  Oral argument would substantially aid the Court in its resolution of those questions, the answers to which turn in part on close analysis of both the record below and the record in a separate class action litigated years earlier.

## INTRODUCTION

In 2021, Alcoa USA Corp. ("Alcoa"[1]) modified the healthcare benefits it provided to former employees and their dependents who retired under dozens of distinct collective bargaining agreements ("CBAs") negotiated before 1993. Plaintiffs—the retirees' former unions and one retiree's surviving spouse—brought this class action on behalf of these so-called "pre-1993" retirees, alleging Alcoa's actions breached whatever CBA was in effect at the time each individual class member retired. Specifically, Plaintiffs contend that these decades-old, long-expired CBAs indefinitely obligate Alcoa to maintain the class members' prior healthcare benefits plan as it existed in 2020, unless the retirees' former unions agree to any modifications.

Alcoa's position is that its obligations under those pre-1993 CBAs ended with their expiration—as the law "presume[s]." *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 607 (7th Cir. 1993) (en banc). But the district court judicially estopped Alcoa from even making that argument,

---

[1] Throughout this brief, references to "Alcoa" include Alcoa USA Corp., predecessor and related entities, and the benefits plans that are also Defendants in this case, as appropriate in context.

citing Alcoa's victory in a case involving an entirely different class of "*post*-1993" retirees, an entirely different set of CBAs, and an entirely different set of legal and factual issues. *See Curtis v. Alcoa, Inc.*, No. 3:06-cv-448, 2011 WL 850410 (E.D. Tenn. Mar. 9, 2011), *aff'd*, 525 F. App'x 371 (6th Cir. 2013).

That was legal error. Judicial estoppel is for situations where a party would "win the first suit by demonstrating A and the second suit by establishing *not*-A." *Astor Chauffeured Limousine Co. v. Runnfeldt Inv. Corp.*, 910 F.2d 1540, 1548 (7th Cir. 1990). This is not remotely such a situation. The district court held otherwise only by deriving an implied contradiction between Alcoa's positions in two fundamentally different cases—both by misinterpreting what *Curtis* was about and by ignoring what Alcoa actually argued there. It thus held Alcoa liable based on a contrived extension of a position Alcoa never took or benefited from.

That the district court sought a non-merits shortcut to resolve this case is not surprising, given its earlier decision to certify a class involving thousands of individual contract claims arising from scores of distinct CBAs. Indeed, it is undisputed that each class member's claim arises under "a particular" pre-1993 CBA. *Pabst Brewing Co. v. Corrao*, 161

2

F.3d 434, 439 (7th Cir. 1998). It is also undisputed that there are scores of such agreements, only a subset of which have actually been located, let alone introduced into evidence. Those CBAs, which are not identical, were negotiated at different times, over many years, between an assortment of distinct predecessor and related entities on both sides of the bargaining table.

Despite the disparate nature of Plaintiffs' claims, the district court failed to rigorously analyze what glue, if any, actually holds this multi-decade, multi-contract dispute together. Instead, treating Rule 23 like a mere pleading standard, it certified this class action on the basis of Plaintiffs' theory that extrinsic evidence about Alcoa's *post*-1993 labor negotiations can conclusively prove Alcoa's liability under each and every *pre*-1993 agreement, with no need to even read the latter. What is more, the district court green-lit that evidentiary free-for-all without identifying a single ambiguity in a single pre-1993 CBA—let alone finding that all of those agreements were ambiguous in the same way.

As a result, at summary judgment, the parties found themselves simultaneously debating the language of the 60-odd pre-1993 CBAs in the record, plus the classwide relevance of mountains of extrinsic

evidence that ostensibly bears on the meaning not only of those agreements, but also of dozens more that no party has been able to locate. The district court escaped this quagmire only by dodging the merits and judicially estopping Alcoa across the board.

But that was not the end of the errors below. Despite Plaintiffs explicitly seeking money damages requiring individualized review of an "enormous number" of class-member-specific records, the district court certified this collection of contract claims under Rule 23(b)(2). Yet after obtaining class certification and prevailing on summary judgment, Plaintiffs—perhaps realizing that they had bitten off more than they could chew—decided to pass the buck to individual class members. Claiming to abandon their damages request, Plaintiffs asked the district court to simply enjoin Alcoa to make class members whole for any pocketbook harms they could individually document via an unspecified, post-judgment process. Though that relief is neither genuinely equitable nor "final" as to "the class as a whole," the district court once again acceded to Plaintiffs' request.

In sum, this case has repeatedly jumped the rails. This Court should put it back on track by vacating the decisions below and remanding for appropriate proceedings.

## JURISDICTIONAL STATEMENT

Plaintiffs' class action complaint asserted claims under the Labor Management Relations Act, 29 U.S.C. § 185 (Count One), and the Employee Retirement Income Security Act, 29 U.S.C. § 1132(a)(1)(B), (a)(3) (Count Two). The district court had subject-matter jurisdiction under 28 U.S.C. § 1331, 29 U.S.C. § 185(a), and 29 U.S.C. § 1132(e)(1), (f).

This Court has appellate jurisdiction under 28 U.S.C. § 1291, because this appeal arises from a final judgment disposing of all claims as between all parties. The district court's judgment was entered on March 28, 2025. The notice of appeal was filed on April 11, 2025. No motion for a new trial or for alteration of the judgment, or other motion tolling the time to appeal, has been filed. This is not a direct appeal from a decision of a magistrate judge.

Pursuant to Federal Rule of Civil Procedure 23(f), Alcoa previously petitioned for, and was denied, permission to appeal from the district court's order granting class certification. *See Alcoa USA Corp. v. Kaiser*,

No. 22-8018 (7th Cir.).  Otherwise, there have been no prior or related appellate proceedings in this case.

## ISSUES PRESENTED

**I.**     Whether the district court erred by relying on the proceedings in *Curtis v. Alcoa, Inc.*, No. 3:06-cv-448 (E.D. Tenn.), and No. 12-5801 (6th Cir.), to judicially estop Alcoa from arguing that the pre-1993 CBAs that govern this case impose no obligation to provide healthcare benefits beyond the expiration of those agreements.

**II.**     Whether the district court abused its discretion by certifying a Rule 23(b)(2) class where the class members' individual claims (a) arise under a large number of distinct contracts with no proven cohesiveness, and (b) involve more than incidental, highly individualized claims for retrospective, compensatory monetary relief (i.e., damages).

## STATEMENT OF THE CASE

### A.     Factual Background.

Over the decades, Alcoa and the Plaintiff labor unions [2] have negotiated and entered into many CBAs governing terms and conditions

---

[2] The United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, ALF-CIO/CLC ("USW") and the Aluminum Trades Council of Wenatchee,

of employment for union-represented employees at various Alcoa facilities. Each CBA was in effect for a period of time (typically three to four years), after which it would terminate and a new CBA would be negotiated. JA.335-36 (Material Facts 6, 7), 344.

Federal labor law requires employers to bargain over "pension and insurance benefits for active employees" who will retire during a CBA. *Allied Chem. & Alkali Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 159 (1971); *see* 29 U.S.C. § 158(d). Benefits for *existing* retirees are generally not a mandatory bargaining subject, though employers and unions may bargain over them permissively, *Pittsburgh Plate*, 404 U.S. at 165-182 & n.20, or make them a mandatory subject by agreement, *M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 439 (2015).

Unlike pensions, healthcare benefits promised in CBAs do not "vest[]" by statute. *Id.* at 434. "[I]f they vest at all, they do so under the terms of a particular contract." *Pabst Brewing*, 161 F.3d at 439. Thus, once a CBA has expired, "employers … are generally free" to "modify[] or

---

Washington AFL-CIO ("ATC"). References to the USW include predecessor entities, as appropriate in context.

terminate" such benefits, unless the CBA provided otherwise. *Tackett*, 574 U.S. at 434-35 (cleaned up).

For decades, however, "[e]mployers with national operations [were] subject to multiple and inconsistent" presumptions about vesting. *Bidlack.*, 993 F.2d at 620 (Easterbrook, J., dissenting). This Circuit, among others, "presume[d] that a [CBA] ceases to obligate the employer when" it expires. *Id.* at 607 (majority opinion). By contrast, beginning with *UAW v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983), the Sixth Circuit developed "a unique series of 'Yard-Man inferences'" that "presume[d] lifetime vesting." *CNH Indus. N.V. v. Reese*, 583 U.S. 133, 134-35 (2018) (per curiam). Only in 2015 (after a 32-year circuit split) did the Supreme Court reject that outlier doctrine as inconsistent with "ordinary principles of contract law," including "the traditional principle that 'contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement.'" *Tackett*, 574 U.S. at 441-42. Prior to *Tackett*, this long-running circuit split predictably spurred "blatant forum shopping" by plaintiffs in retiree-benefits cases, who sought "an advantage from Sixth Circuit law." *Moore v. Rohm & Haas Co.*, 2007 WL 5011497, at *7 (N.D. Ohio Nov. 19, 2007).

8

**B.     The 1993 Cap Agreement and *Curtis*.**

In 1993, in multi-facility (or "Master") CBA negotiations with the USW, Alcoa proposed a "Cap" on healthcare benefits for future retirees. *Curtis*, 2011 WL 850410, at *3-8.[3]  The USW agreed, but on conditions— the Cap would not be implemented before the next bargaining round, and post-1993 retirees' benefits would be a mandatory bargaining subject going forward.  *Id.* at *8; JA.116-17 (¶¶ 26-28).  After two more deferrals, the parties agreed to implement the Cap in 2006.  JA.118 (¶¶ 33, 35). Since that agreement, memorialized in the so-called "Retiree Health Care Letter," post-1993 retirees' healthcare benefits have remained a mandatory subject of bargaining in subsequent negotiations between the parties.  JA.119 (¶¶ 36-37), 125-27 (¶¶ 56-60).  In other words, the parties' post-1993 CBAs have continued to provide that Alcoa cannot unilaterally modify post-1993 retirees' healthcare benefits.  JA.127-28 (¶ 63).

---

[3] These negotiations were conducted by Alcoa and the Reynolds Metal Company ("Reynolds") on one side and the USW and the Aluminum, Brick and Glass Workers International Union ("ABG") on the other.  JA.109 (¶ 1).  Alcoa later acquired Reynolds and its obligations, and the ABG merged with the USW.  JA.118 (¶ 34).

After the Cap took effect, the affected class of post-1993 retirees sued Alcoa, claiming vested rights to continue receiving uncapped benefits. *Curtis*, 2011 WL 850410, at *1. Though the post-1993 CBAs expressly contemplated the Cap, the plaintiffs offered two theories as to how it did not apply: (1) the parties had never agreed to a "real" Cap, only an accounting gimmick; and (2) retiree healthcare benefits vested *before* retirement. *See id.*

Alcoa mainly defended *Curtis* by denying both theories: the Cap was real, and no healthcare benefits vested pre-retirement. JA.318-24. Alcoa further clarified that its "position [was] that retiree healthcare benefits do not vest"—even at retirement—while emphasizing "the issue [was] unnecessary." JA.316-18. The evidence "overwhelmingly" showed the Cap was real, so, "*even if* [the] plaintiffs' benefits vested upon retirement," they "would have vested with the Cap already in place." JA.320, 322**.** (emphasis added). In short, whether the plaintiffs' benefits (1) never vested or (2) vested at retirement under the (real) Cap, they were not entitled to the *uncapped* benefits they sought.

The *Curtis* court found that the post-1993 retirees were not entitled to uncapped benefits and entered judgment for Alcoa. 2011 WL 850410,

at *55.  Its dispositive findings were that the Cap was real, *id.* at *45, and the class members had not vested before retirement, *id.* at *42. Following then-binding Sixth Circuit precedent (*Yard-Man*), the court opined that post-1993 retirees *did* vest at retirement—but only in *capped* benefits under the post-1993 CBAs.  *See id.* at *43.  That discrete finding on vesting was contrary to Alcoa's position, but it made no difference to the outcome: the plaintiffs did not get the uncapped benefits they sought. The Sixth Circuit affirmed.  525 F. App'x 371.

Before appealing, however, the plaintiffs asked the court to (1) "clarify[]" its judgment to include a declaration that the *capped* benefits were vested, JA.277-83; and (2) award attorney's fees, arguing that the suit had secured a "substantial benefit" for the class by overcoming Alcoa's position, which "denied that [they] had any right to vested benefits whatsoever," JA.285.  As Alcoa responded, these motions were a transparent attempt by class counsel to obtain fees despite winning "no tangible relief for the class."  JA.298.  After all, the entire point of the litigation was to obtain *uncapped* benefits.  And vested or no, the plaintiffs' benefits remained capped.  Unsurprisingly, therefore, the court ultimately denied both the "clarification" motion and the fees motion.  *See*

*Curtis v. Alcoa, Inc.*, 2012 WL 12965609 (E.D. Tenn. June 11, 2012); *Curtis v. Alcoa, Inc.*, 2014 WL 2895468 (E.D. Tenn. June 26, 2014).

## C.    This Case.

Where *Curtis* involved *post*-1993 retirees, this case concerns *pre*-1993 retirees—i.e., those who were *not* in the *Curtis* class and are outside the scope of the Retiree Health Care Letter, because they retired under earlier CBAs unaffected by the Cap.[4]  Since 1993, the parties have not bargained over pre-1993 retirees' benefits.  JA.336 (Material Fact 10), 344.

**1.    Nature of the Case.**  In 2019, Alcoa explored transitioning these pre-1993 retirees from their existing fixed group plan (the "Prior Plan") to a benefits model based on individual plans.  Alcoa engaged a consulting firm that found that nearly all retirees could obtain the same or better benefits, at lower overall costs, on the individual market.  D.Ct. ECF No. 90-1 at 1-2 (¶¶ 3-5); *see* JA.77-79.  Effective January 1, 2021, Alcoa replaced the Prior Plan with a new arrangement, under which Alcoa funds a health reimbursement account ("HRA") for each

---

[4] Some class members technically retired after 1993, but belong to the "pre-1993" group because of differences in when the Cap was incorporated into different CBAs covering different facilities.  JA.333 n.4.

12

participating retiree, which allows recipients to purchase individual plans and pay qualified medical expenses.  D.Ct. ECF No. 90-1 at 2-3 (¶ 7).

In response, Plaintiffs sued, claiming that modifying pre-1993 retirees' benefits without the unions' agreement breached the CBAs under which those individuals retired.  JA.029 (¶ 1).  Plaintiffs and Alcoa agree that each retiree's healthcare benefits rights (whatever those rights may be) are "governed by the CBA" and any incorporated summary plan description (SPD) in effect "at the particular facility from where the former employee retired at the time of their retirement."  JA.335 (¶ 3); *see* JA.034-35 (¶ 23), 344.

Because the pre-1993 retirees worked at different facilities and retired at different times, their individual rights are thus governed by many distinct agreements negotiated and executed over decades—involving not just Alcoa, but also different predecessor companies.  As the USW's chief technician explained:

> Q: [H]ow many agreements would be applicable to the purported class members in [this] case?

A: …    [T]here are dozens, there are dozens of labor
agreements.  There are dozens—there's more than dozens.
And there are dozens of summary plan descriptions.

Q: Can you ballpark?

A: There are dozens.  Multiple dozens.  There are Reynolds
SPDs, there are Alcoa SPDs, there are Alumax, Amax,
Alumax SPDs.  There are flavors within the Reynolds
universe.  There are flavors within the Alcoa universe.  …
And that they go back—they go back, they go way back.

Q: They go way back.  And as you said before, there are many,
many of them … ?

A: There are many, many.

D.Ct. ECF No. 90-2 at 88:24-89:17.  CBAs for some facilities were
negotiated on a "Master," multi-facility basis, but not all of the retirees in
the class retired from those facilities; many retired from facilities for
which CBAs were negotiated separately.  JA.337-38 (¶ 1); JA.347-51
(¶¶ 8-21).

The parties have not been able to locate all of the pre-1993 CBAs in
effect for the numerous facilities from which class members retired.  In
suing, Plaintiffs admitted they "lack[ed] a comprehensive set of
[applicable] CBAs."  JA.036 (¶ 26).  Over the course of this case, over 60
pre-1993 CBAs found their way into the record, along with four of the

many SPDs issued over the years. JA.068-69 (¶¶ 4-18) (moving for class certification based on 11 CBAs and four SPDs); JA.081-83 (¶¶ 7-33) (attaching another 27 CBAs to the class-certification reply); JA.333 & n.7 (noting that, by summary judgment, Alcoa had located a total of 51 applicable CBAs); JA.347-49 (¶¶ 8, 10, 12-15) (attaching 11 additional CBAs to Plaintiffs' summary-judgment reply). It is undisputed that this is not a complete set of the applicable contracts, and that, by anyone's count, hundreds of class members are subject to "missing" CBAs. JA.350-52 (¶¶ 17-21) (introducing new CBAs in reply and conceding that the CBAs remain missing for about 600 class members). In fact, several hundred retired from facilities for which no applicable CBAs have been found at all. JA.333-34, 351 & n.4 (¶ 18).

No identifiable, express language in the extant pre-1993 CBAs (or any other document) states that any relevant CBA promised retiree healthcare benefits beyond its duration. JA.336-37 (Material Facts 9, 11, 12), 344. Plaintiffs' claim thus has always rested on extrinsic evidence, largely relating to the 1993-2006 Cap negotiations and the subsequent *Curtis* litigation. JA.113-27 (¶¶ 14-60) (devoting 47 of Plaintiffs' 64 material-fact paragraphs to the Cap negotiations, *Curtis*, and later

15

negotiations about post-1993 retirees). Plaintiffs have consistently argued that those negotiations and that litigation about *post*-1993 retirees demonstrate Alcoa's contractual obligations, under the *pre*-1993 CBAs, to not unilaterally modify pre-1993 retirees' benefits. JA.101-04.

**2. Class Certification.** On February 11, 2022, Kaiser moved for class certification and appointment as class representative under Federal Rule of Civil Procedure 23(b)(1)(A), (b)(2), and (b)(3). D.Ct. ECF No. 82. On September 29, 2022, the district court granted certification under Rule 23(b)(2). RSA.12-14. The class definition, which the district court adopted unmodified, is:

> All former employees of Alcoa USA Corp., its predecessors, or affiliated companies (collectively, "Alcoa") who were represented by the [USW, ATC, or their predecessors], together with their eligible spouses, surviving spouses, and other dependents, who as of December 31, 2020 were eligible to receive uncapped health care benefits from Alcoa upon attaining Medicare-eligibility, and whose Alcoa-provided benefits or eligibility for those benefits was terminated as of January 1, 2021.

RSA.14.

The district court found class treatment appropriate because the class members' claims "all share the common question of whether Alcoa first gained the power to unilaterally terminate benefits after 1993."

16

RSA.5; *see also* RSA.06-08, 10-11.[5]  And it reasoned certification was proper under Rule 23(b)(2) because Alcoa "acted identically" toward all class members and "the remedy sought" by Kaiser was uniform "injunctive and declaratory relief" for all class members.  RSA.13.

At that time, Plaintiffs were seeking "monetary damages … to restore [class members] to the position in which they would have been but for [Alcoa's alleged] contractual violations."  JA.054.  The district court concluded, however, that "any monetary recovery" would amount only to "incidental damages" that could "simply be read off" the retirees' plans, making it consistent with Rule 23(b)(2).  RSA.13-14.

**3. Summary Judgment.**  After class certification and discovery, the parties cross-moved for summary judgment on liability, debating whether Plaintiffs' extrinsic evidence was admissible and whether it proved Alcoa's actions breached the expired, pre-1993 CBAs.  *See generally* D.Ct. ECF Nos. 132, 146, 150, 153.  In a single paragraph of their 83 pages of briefing, Plaintiffs suggested that Alcoa should be

---

[5] Alcoa's Rule 23(f) petition was denied on November 21, 2022.  *See Alcoa USA Corp.. v. Kaiser*, No. 22-8018 (7th Cir.).

judicially estopped by statements it made in *Curtis*.  D.Ct. ECF No. 132 at 31-32.

On March 24, 2024, the district court granted summary judgment for Plaintiffs on liability.  *See* RSA.16-35.  In doing so, it took Plaintiffs' estoppel suggestion and ran with it, developing an elaborate rationale to judicially estop Alcoa "from arguing it is not obligated to provide pre-1993 retirees lifetime benefits."  RSA.24.  As the court read *Curtis*, Alcoa: (1) "persuaded the *Curtis* court" that "post-1993 retirees had lifetime healthcare benefits"; (2) also "took the position" that "the only difference between pre- and post-1993 retirees was the cap"; and (3) therefore, implicitly "represented that pre-1993 retirees had lifetime healthcare benefits."  RSA.25-26.  As a result, the court reasoned, "allowing Alcoa to reverse its position" about pre-1993 retirees would suggest "Alcoa hoodwinked the *Curtis* court" and allow Alcoa to "gain an unfair advantage" by contradicting "a position successfully taken in the past."  RSA.27-28 (quotation marks omitted).

The court later acknowledged Alcoa's argument in *Curtis* "that no retiree received lifetime healthcare benefits," but it read that as an inconsistent "alternative" to "Alcoa's [prevailing] argument that [post-

18

1993] retirees had lifetime, capped healthcare benefits." RSA.28. Moreover, and "important[ly]," it held that Alcoa "abandoned" the no-vesting position by not seeking "reconsideration" or "cross appeal[ing]" the *Curtis* court's statements "that post-1993 retirees had lifetime healthcare benefits." RSA.29.

The district court further acknowledged that *Curtis*'s *Yard-Man*-driven vesting finding would not receive issue-preclusive effect in the Sixth Circuit today; it nonetheless denied that *Yard-Man*'s overruling was a "substantive[] change in the law." RSA.30-31 & n.6. Finally, though acknowledging that "pre-1993 retirees' benefits" were "not strictly the issue presented in" *Curtis*, it reasoned that "the legal issues … are not germane to … estoppel." RSA.31.

**4. Remedies Issues and Final Judgment.** Plaintiffs then moved for the entry of final judgment and a permanent injunction that would require Alcoa to reinstate the Prior Plan and maintain it for the lifetime of all class members. D.Ct. ECF No. 167 at 2. Abandoning their compensatory damages claims, Plaintiffs further requested that the court order payment of all past benefits due under the Prior Plan (with interest and retroactive to January 1, 2021) upon the post-judgment

submission—by individual class members—of adequate documentation to Alcoa. *See id.* at 2-7. Alcoa objected to Plaintiffs' effort to belatedly replace their damages claim with a request for retrospective monetary relief via injunction, and it argued that the Rule 23(b)(2) class should be decertified with respect to damages. *See* D.Ct. ECF No. 170 at 12-28.

On March 28, 2025, the district court entered final judgment, RSA.62, and a permanent injunction in substantially the form requested by Plaintiffs, RSA.60-61. In a separate opinion, the district court rejected Alcoa's objections to ordering retrospective, compensatory monetary relief via an injunction and expanded on the procedures for class members' submission of retroactive claims. RSA.44-57. As the district court explained, its injunction contemplates that class members be allowed "to submit claims for expenses incurred while the Prior Plan was terminated and hav[e] a claims administrator determine whether such claims would have been covered under the Prior Plan." RSA.46. Class members bear "the burden" "to investigate their expenses," "take action to submit a claim," and to submit "the supporting documentation necessary to establish a claim was not covered under" a plan selected through the HRA arrangement. RSA.48-49.

## STANDARDS OF REVIEW

This Court reviews judicial-estoppel rulings either "de novo," *1st Source Bank v. Neto*, 861 F.3d 607, 611 (7th Cir. 2017), or "for abuse of discretion," *Harmon v. Gordon*, 712 F.3d 1044, 1054 (7th Cir. 2013). That distinction makes no difference here. "[A] district court necessarily abuses its discretion if its reasoning is based on a legal error," *Dancel v. Groupon, Inc.*, 949 F.3d 999, 1004 (7th Cir. 2019), and the errors below cannot bear scrutiny under any standard.

Similarly, this Court "review[s] the district court's class-certification order for abuse of discretion, but legal determinations … are reviewed de novo." *Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 493 (7th Cir. 2012).

## SUMMARY OF ARGUMENT

**I.** At minimum, the judgment below must be vacated because the district court's application of judicial estoppel was manifestly erroneous. Whatever their evidentiary relevance on the merits, Alcoa's representations in *Curtis* cannot bind the company in this unrelated case.

To trigger judicial estoppel, a party must "win the first suit by demonstrating A," then seek to win "the second suit by establishing *not-*

A." *Astor*, 910 F.2d at 1548. Alcoa's position here is that the pre-1993 CBAs did not impose any continuing, post-expiration obligations to provide retiree healthcare benefits for employees who retired under those agreements. Alcoa did not win *Curtis* by taking the opposite position. There is no way it could have. After all, the rights of pre-1993 retirees were not at isuse in that litigation.

The district court acknowledged this reality, which alone should have quashed any notion that judicial estoppel could apply. Instead, the court latched onto a few stray statements in *Curtis* referencing pre-1993 retirees, inferred from them that Alcoa represented that the rights of pre- and post-1993 retirees were "the same" apart from the Cap, linked *that* representation with Alcoa's supposed "position" in *Curtis* that post-1993 retirees' benefits were for life, and from all that derived an implied representation that pre-1993 retirees' benefits were therefore also for life. The district court never identified how the last, implied step—the only "A" to Alcoa's "not-A" here—helped Alcoa in *Curtis*. And, again, there is no way it could have—representations about whether *pre*-1993 retirees have *vested* benefits could not win a case about whether *post*-1993

retirees had *capped* benefits. But in any event, the district court's basic premises were incorrect.

As to post-1993 retirees, Alcoa did not argue in *Curtis* that their benefits were vested—it explicitly argued the reverse. The district court held otherwise only by reaching conclusions that cannot be reconciled with the record in *Curtis*. Specifically, the court maintained that Alcoa's winning "alternative" arguments were inconsistent with its denial of any vesting (they were not); that Alcoa defeated the *Curtis* plaintiffs' frivolous postjudgment request for an advisory opinion by conceding vesting (it did not); and even that Alcoa should have appealed the *Curtis* judgment in its favor to correct the vesting dicta in the opinion (it could not).

As to pre-1993 retirees, Alcoa did not represent in *Curtis* that the applicability of the Cap was the only difference between their rights and those of post-1993 retirees. The district court imputed that "position" to Alcoa only by overreading statements summarizing what the *plaintiffs* in *Curtis* were arguing. By noting that those plaintiffs apparently sought to make the rights of post-1993 retirees "the same" as the rights of pre-1993 retirees, Alcoa was illustrating the incoherence of a position that would nullify the Cap (the validity of which was the entire point of the

23

*Curtis* litigaiton).  It was not somehow implicitly adopting the plaintiffs' further position that the post-1993 retirees' benefits vested for life.  At the least, the district court's strained inference is far too slender a reed to support application of estoppel.

Further, even if Alcoa had made these representations, persuaded the *Curtis* court to find vesting, and won *Curtis* on that basis, it *still* could not be judicially estopped, because "[t]he law changed in the interim." *Jarrard v. CDI Telecommns., Inc.*, 408 F.3d 905, 915 (7th Cir. 2005). When *Curtis* was litigated in the Sixth Circuit, the governing law on vesting was dramatically different.  *Yard-Man* was still binding, so *Curtis* was litigated under a legal presumption that healthcare benefits automatically vested upon retirement.  Now, *Yard-Man* is gone, and the directly opposite presumption—that obligations cease when a CBA expires—is firmly established.  With its legal underpinnings cut out from under it, the *Curtis* court's vesting finding can no longer tie Alcoa's hands even regarding post-1993 retirees.  There is even less justification for *extending* that defunct finding to estop Alcoa regarding *pre*-1993 retirees. Far from divesting Alcoa of any "'unfair advantage,'" that only gives Plaintiffs an unwarranted windfall.  *Id.*

24

**II.** The Court should also vacate the district court's class-certification order. The class members' individual claims arise under a multitude of distinct contracts, negotiated over decades, governing a range of facilities. What unites the class members, at bottom, is that they retired before the Cap negotiations and were not class members in *Curtis*. From that, it does not follow that their many distinct contract claims can or should be litigated on a classwide basis. Kaiser never met her burden of showing what additional "glue" made that possible or that the requirements of Rule 23 were "*in fact*" satisfied. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 352 (2011).

Far from performing the required "'rigorous analysis'" to make that determination, the district court gave Kaiser a pass. *Id.* at 351. The only "common question" it identified was "whether Alcoa first gained the power to unilaterally terminate benefits after 1993." RSA.05. That was nothing but a description of what Plaintiffs intended to prove (that Alcoa's actions breached every pre-1993 CBA) and the means by which they intended to prove it (by common inferences from post-1993 extrinsic evidence). The district court treated Rule 23 like "a mere pleading standard," *Wal-Mart*, 564 U.S. at 350, and deferred to Plaintiffs' desire to

"amalgamate multiple contract actions into one," *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998). It made no further effort to determine whether Plaintiffs' extrinsic evidence would (or even could) bear on all of the many contracts in the same way, so as to frame a question that could actually "be answered *all at once*" and whose "*single answer*" would "resolve a central issue in all class members' claims." *Jamie S.*, 668 F.3d at 497.

The district court compounded its errors by certifying the class under Rule 23(b)(2). That subrule is designed for the *most* cohesive classes—those alleging indivisible wrongs, calling for correspondingly indivisible remedies. *Wal-Mart*, 564 U.S. at 360. Here, the class members' claims are divisible, at minimum, by the different CBAs governing the rights of "each individual class member." *Id.* Rule 23(b)(2) "does not authorize class certification" in such cases, even where damages are not sought. *Id.* at 360-61.

That Plaintiffs initially sought damages adds another layer of error, and it was not cured by the belated reframing of their request for individualized, retrospective monetary relief in injunctive terms. Rule 23(b)(2) relief must "satisfy the basic requirements" for equitable

remedies, but this sort of pay-what-you-owe injunction does not. *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 892 (7th Cir. 2011). Rule 23(b)(2) relief also "must be 'final' to 'the class as a whole.'" *Jamie S.*, 668 F.3d at 499. "[S]uperficially structured … class-wide injunctive and declaratory relief does not satisfy Rule 23(b)(2) if as a substantive matter" it "merely initiate[s] a process through which highly individualized determinations of liability and remedy are made." *Id.* That is exactly the type of relief that was awarded here.

Accordingly, this Court should vacate the judgment, the permanent injunction, the summary-judgment order, and the class-certification order, and remand this case for appropriate proceedings.

## ARGUMENT

Plaintiffs alleged that Alcoa's modification of retiree healthcare benefits for pre-1993 retirees and their dependents, without prior agreement from the unions, violated the terms of the long-expired pre-1993 CBAs that were in effect when those ex-employees retired. Under federal labor law, the Plaintiff unions do not represent the retiree class members, and have not done so for decades. *Pittsburgh Plate*, 404 U.S. at 165-82. And under federal benefits law, "contractual obligations" in a

27

CBA to provide healthcare benefits normally "cease … upon termination of the bargaining agreement." *Tackett*, 574 U.S. at 441-42 (quotation marks omitted). The key question, then, was whether the pre-1993 CBAs made an exception to those rules by requiring Alcoa to maintain the class members' Prior Plan indefinitely, absent union preclearance.

In principle, that was a matter of contract interpretation, to be resolved with "ordinary principles of contract law." *Id.* at 441. Contract cases should "begin[]"—and usually end—with "the plain language" of the contracts at issue. *Hovde v. ISLA Dev. LLC*, 51 F.4th 771, 776 (7th Cir. 2022).

In practice, the pre-1993 CBAs were an afterthought here, and ultimately, even less than that. From the start, Plaintiffs' arguments in this case rested almost entirely on extrinsic evidence postdating the governing contracts, including the seven-year *Curtis* litigation in which *post*-1993 retirees challenged the validity of the Cap that Alcoa had recently applied to their benefits pursuant to *post*-1993 CBAs. The district court did Plaintiffs one better, circumventing the merits by misinterpreting Alcoa's positions in *Curtis*, extending those

28

misinterpretations to the concededly different issues in this case, and judicially estopping Alcoa on that basis.

If that were the district court's only error, then this Court could reset the case to summary judgment and remand for adjudication on the merits. But that would only put the parties, and the district court, back in the untenable position created at the class-certification stage. The district court allowed Plaintiffs to pursue "a single collective breach of contract action on the basis of multiple different contracts" without first proving that the—numerous—contracts at issue are materially identical and the claims are *in fact* cohesive. *Broussard*, 155 F.3d at 340. That the district court certified the class under Rule 23(b)(2), and ultimately granted relief inconsistent with that subrule (as well as basic equitable principles), both aggravates and underscores its superficial engagement with the relevant legal standards.

## I.   The District Court Erred by Judicially Estopping Alcoa.

The district court's grant of summary judgment to Plaintiffs based on judicial estoppel cannot withstand this Court's review. "Judicial estoppel is strong medicine," *Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1428 (7th Cir. 1993), which must be "applied with caution to avoid

impinging on the truthseeking function of the court," *Levinson v. United States*, 969 F.2d 260, 265 (7th Cir. 1992) (quotation marks omitted).  The district court here threw caution to the wind, resulting in an estoppel that is wrong on every level.

"The principle" of judicial estoppel "is that if you prevail in Suit #1 by representing that *A* is true, you are stuck with *A* in all later litigation growing out of the same events." *Eagle Found. v. Dole*, 813 F.2d 798, 810 (7th Cir. 1987).  Thus, for a party's position in Suit #1 to estop it in Suit #2, "certain clear prerequisites … must obtain"—"(1) the later position must be clearly inconsistent with the earlier position; (2) the facts at issue should be the same in both cases; and (3) the party to be estopped must have convinced the first court to adopt its position." *Neto*, 861 F.3d at 612 (cleaned up).

Crucially, "the party must have prevailed" in Suit #1 "*on the basis of* its earlier position." *Jarrard*, 408 F.3d at 914 (emphasis added).  Where a party did not "win anything" by the prior position, there is no estoppel. *Chrysler Credit Corp. v. Marino*, 63 F.3d 574, 580 (7th Cir. 1995); *accord Allison v. Ticor Title Ins. Co.*, 979 F.2d 1187, 1194 (7th Cir. 1992).

Similarly, there is no judicial estoppel if "the [later] inconsistent position" would not give the party "'an unfair advantage or impose an unfair detriment on the opposing party.'" *Jarrard*, 408 F.3d at 914-15. Both an actual advantage and its unfairness are indispensable. *See id.* at 915. Accordingly, even "facially inconsistent" positions—leading to inconsistent results "favorable to [the party] in each instance"—do not warrant estoppel if "there is nothing fraudulent or otherwise untoward about th[e] shift," such as when "[t]he law changed in the interim." *Id.*

Under these principles, *Curtis*—a case about whether *post*-1993 benefits were *capped*—cannot judicially estop Alcoa from denying liability here—a case about whether *pre*-1993 benefits were *vested*. *Curtis* was a fundamentally different dispute, with completely different retirees, which Alcoa could not have won based on any purported "position" that pre-1993 retirees had vested, lifetime benefits. In any event, Alcoa did not take that position in *Curtis*—or anything like it. And even if Alcoa could somehow be interpreted to have won *Curtis* on that basis, judicial estoppel still would be inappropriate given the radical, intervening change in Sixth Circuit law.

31

### A. Alcoa Could Not Have Won *Curtis* on the Basis of the Position the District Court Attributed to It.

Fundamentally, *Curtis* cannot estop Alcoa "from arguing pre-1993 retirees do not have lifetime healthcare benefits," RSA.31, because Alcoa could not have won *Curtis* "by representing" the opposite: that pre-1993 retirees *do* have lifetime healthcare benefits. *Eagle Found.*, 813 F.2d at 810; *see Astor*, 910 F.2d at 1248 ("A" and "*not*-A"). That proposition was simply not at issue in *Curtis*.

*Curtis* not only involved different retirees, it was a completely different type of dispute. *Curtis* was about whether post-1993 retirees were entitled to uncapped benefits—beyond the capped benefits Alcoa was *already* providing—even though the Cap "was contemplated and authorized by [post-1993] CBAs." 2011 WL 850410, at *1. The answer to that question turned on whether the Cap was real and whether post-1993 retirees had vested in benefits before retiring. *Id.* The issue Alcoa was estopped on here—whether *pre*-1993 CBAs gave *pre*-1993 retirees vested, lifetime benefits[6]—was immaterial to those questions.

---

[6] While that is how the district court framed the issue, Plaintiffs' theory is that Alcoa *can* modify pre-1993 retirees' benefits *if* the unions consent. JA.099-100. In *Curtis*, by contrast, the post-1993 retirees were arguing that their "vested" benefits could not be modified *even with* the

Even the district court conceded this "issue" "was not strictly …
presented" in *Curtis*.  RSA.31.  That alone demonstrates error.  Two
positions cannot be "clearly inconsistent" without addressing the same
issue on "identical" facts.  *Ogden Martin Sys. of Indianapolis v. Whiting
Corp.*, 179 F.3d 523, 528 (7th Cir. 1999); *accord Wallace B. Roderick
Revocable Living Tr. v. XTO Energy, Inc.*, 725 F.3d 1213, 1221 (10th Cir.
2013) (positions not "'clearly inconsistent'" where issue not "identical").
Besides, parties do not win cases "on the basis of" non-presented issues.
*Jarrard*, 408 F.3d at 914.  As such, there is no possible sense in which
allowing Alcoa to deny that pre-1993 retirees have lifetime benefits could
enable it "to win [*Curtis*] by demonstrating A and [this] suit by
establishing *not*-A."  *Astor*, 910 F.2d at 1548.

---

unions' agreement.  JA.251-54 (¶¶  28, 56, 60-61, 64); *see also Curtis*, 2011
WL 850410, at *38 (explaining *Yard-Man*'s rationale for inferring vesting
at retirement—unions do not represent existing retirees and "ha[ve] no
obligation … to negotiate" in their interests, so their benefits should not
be "open to future modification" through bargaining (citing *Yard-Man*,
716 F.2d at 1482)).  Even holding constant the relevant retirees and CBAs,
these are plainly different (indeed, incompatible) interpretations of
Alcoa's contractual obligations.  This is another dimension to the issue
mismatch between *Curtis* and this case.

The district court glossed over this disconnect. It surmised that Alcoa's purported "representations about pre-1993 retirees[]" somehow "helped persuade the *Curtis* court" to rule for Alcoa, but it never explained how. RSA.31. Nor could it have. There was nothing Alcoa could have "w[o]n" in *Curtis* based on the non-issue of pre-1993 retirees' rights under pre-1993 CBAs. *Marino*, 63 F.3d at 580. Therefore, its position here cannot contradict anything "underlying [the] prior judgment," *Astor*, 910 F.2d at 1548, nor can Alcoa be seeking "unfair" or "'inconsistent advantage[s]'" based on "'incompatible theor[ies],'" *New Hampshire v. Maine*, 532 U.S. 742, 749, 751 (2001). That is dispositive— and would be no less so, *even if* Alcoa's *Curtis* representations implied that pre-1993 retirees' benefits were vested.

## B. The District Court Misunderstood Alcoa's Positions in *Curtis*.

In fact, however, Alcoa never took the positions the district court ascribed to it. Alcoa did not argue that "post-1993 retirees have lifetime healthcare benefits." RSA.26. Nor did it maintain that "the only difference" between pre- and post-1993 retirees was the Cap—thus "impl[ying]" that "pre-1993 retirees [also] had lifetime healthcare benefits." RSA.24, 26. Even assuming the validity of this novel estoppel-

by-implication theory, the district court's foundational premises were simply wrong.

### 1. Alcoa Did Not Argue That Post-1993 Retirees Have Lifetime Benefits.

The district court's first premise is incorrect because Alcoa's position in *Curtis* was not that "post-1993 retirees have lifetime healthcare benefits." RSA.26. In fact, it argued the exact opposite:

- Alcoa's pleadings asserted "Plaintiffs do not have vested welfare benefits." *Curtis* ECF No. 11 at 15 (¶ 91) (reproduced at D.Ct. ECF No. 189-5); *Curtis* ECF No. 56 at 15 (¶ 91); *Curtis* ECF No. 176 at 23 (¶ 115).[7]

- At summary judgment, Alcoa expressly denied "any vesting at all." JA.268.

- Alcoa's post-trial brief reiterated: "Alcoa's position is that retiree medical benefits do not vest." JA.316.

Of course, the *Curtis* court found vesting at retirement—but it did so due to *Yard-Man*, not because Alcoa advocated it. 2011 WL 850410, at *38-43.

---

[7] "[T]he contents of filings" in *Curtis* are subject to "judicial notice." *Daniel v. Cook Cnty.*, 833 F.3d 728, 742 (7th Cir. 2016).

The district court acknowledged (albeit belatedly) that Alcoa took this explicit no-vesting position. RSA.28. It nonetheless offered three different rationales to bind Alcoa to the opposite position. None works.

*First*, the district court reasoned as if Alcoa's prevailing "alternative" argument—that, even if vested at retirement, post-1993 benefits were still capped—was somehow *inconsistent* with its no-vesting position. RSA.28. That is logically incorrect and misunderstands the nature of the *Curtis* dispute. *Curtis*, again, was about the legality of applying the Cap authorized by post-1993 CBAs. 2011 WL 850410, at *1. Alcoa explained that, since the Cap in those-CBAs was real, the only "vesting" issue that mattered was that post-1993 retirees "did not vest *prior to* retirement." JA.316-22 (emphasis added). Deciding whether their benefits vested *at* retirement was "unnecessary"; if they did, they would have done so "with the [real] Cap already in place," so the retirees would not be entitled to the uncapped benefits they sought. JA.316, 320. Put differently, Alcoa's positions were (1) the Cap was real, (2) benefits did not vest pre-retirement, and (3) benefits also did not vest at retirement (though (3) was unnecessary because (1) and (2) were dispositive). There was no inconsistency between these positions. All three could easily coexist.

36

Alcoa's arguendo-style framing—*even if* the plaintiffs' benefits were vested, they were not entitled to uncapped benefits—did not in any way concede that the capped benefits were vested.

Indeed, courts routinely employ this kind of "even if X, then Y" reasoning in their decisions, and it is well established that, in doing so, they take no position on X. *E.g.*, *United States v. Verdugo-Urquidez*, 494 U.S. 259, 272 (1990) (explaining that courts often "decide particular legal issues while assuming without deciding the validity of antecedent propositions, and such assumptions … are not binding in future cases that directly raise the questions"); *Anderson v. Romero*, 72 F.3d 518, 523 (7th Cir. 1995) (explaining that a prior court's "'*arguendo*'" assumption that "prisoners enjoy some significant constitutionally-protected privacy interest in preventing the non-consensual disclosure of their HIV-positive diagnosis" was "not a holding that inmates have such a right"). In fact, where Y will resolve a case, courts often adopt arguendo framing precisely to avoid ruling on X. *E.g.*, *Pearson v. Callahan*, 555 U.S. 223, 235 (2009) (allowing courts to resolve qualified-immunity claims by considering whether a right was clearly established before determining whether the right even existed so as to, inter alia, avoid "'unnecessarily …

decid[ing] difficult constitutional questions'"); *Moor v. Cnty. of Alameda*, 411 U.S. 693, 715 (1973) (avoiding resolution of "complex" jurisdictional issue by "assuming, *arguendo*," that jurisdiction existed and holding that the district court "properly declined" to exercise it under the circumstances). There is no reason to hold Alcoa to a different standard here.[8]

Thus, the *Curtis* court "adopted" Alcoa's "position," RSA.26, only in that it found the Cap was real and there was no pre-retirement vesting. When it opined that the post-1993 retirees vested at retirement—in the capped benefits they were already receiving and were challenging as insufficient—it was *rejecting* Alcoa's position on a separate issue that did not affect the outcome. Alcoa "certainly did not prevail in" *Curtis*

---

[8] It is doubtful judicial estoppel could apply even if Alcoa—which, after all, was not the party asking the *Curtis* court for any relief—had "advocated different outcomes" contingent on the court's acceptance or rejection of its top-line no-vesting position. *Cf. Wells Fargo Ins., Inc. v. Land*, 932 N.E.2d 195, 199 (Ind. Ct. App. 2010). But Alcoa did not even do that; its point was that the outcome was *the same* (i.e., no relief) no matter whether the plaintiffs were entirely unvested or vested subject to the Cap.

"because of" those unnecessary and unfavorable dicta, so "[j]udicial estoppel is not applicable." *Ticor*, 979 F.2d at 1194.[9]

*Second*, the district court pointed to the parties' postjudgment briefing, claiming that Alcoa "persuaded the *Curtis* court not to amend its judgment" by conceding post-1993 retirees' "vested" rights. RSA.25. As an initial point, this strand of the district court's reasoning confirms that Alcoa's merits-stage victory in *Curtis* cannot be attributed to any supposed "position" that post-1993 retirees had vested benefits. The basis for the postjudgment motions, after all, was that Alcoa had "denied that [post-1993 retirees] had any right to vested benefits whatsoever,"

---

[9] The district court also made much of Alcoa's summary-judgment-hearing statements indicating that post-1993 retirees would receive capped benefits "for the rest of their lives." RSA.25. But it ignored critical context: even assuming these statements were anything more than an expression of present intent, with the 1993 Cap agreement, the benefits of existing post-1993 (but not pre-1993) retirees became a mandatory bargaining subject going forward. JA.116-19 (¶¶ 26-37). In other words, other than the Cap the unions had agreed to, Alcoa could not make any further modifications to post-1993 retirees' benefits without risking a strike. Alcoa was acknowledging that reality, not inexplicably contradicting its no-vesting position. In any event, nothing suggests that these fleeting pretrial remarks (rather than rote application of *Yard-Man*) "convinced" the *Curtis* court to find that the capped benefits vested. *Levinson*, 969 F.2d at 264. And even if they somehow did, again, Alcoa did not win *Curtis because of* that unnecessary finding.

39

and the court had *disagreed* with Alcoa by finding that they had "vested benefits subject to a cap."  JA.285.

In any case, the district court's interpretation of the postjudgment briefing also rested on a misunderstanding of what was at stake in *Curtis*. As the *Curtis* court itself explained, the plaintiffs' postjudgment motions were a meritless "*post hoc* bid" to reframe the case—from a concrete dispute over whether Alcoa could cap benefits, to an abstract debate over whether Alcoa could "cease" the capped benefits, something Alcoa had not remotely "indicated that [it] intended to" do.  *Curtis*, 2014 WL 2895468, at \*6.  The plaintiffs had not sued for a freestanding declaration that their existing (capped) benefits were vested; if they had, they would have been requesting an advisory opinion, as there was no "actual controversy" about that isolated issue.  28 U.S.C. § 2201(a); *see Calderon v. Ashmus*, 523 U.S. 740, 747 (1998); *Illinois v. Archer Daniels Midland Co.*, 704 F.2d 935, 941 (7th Cir. 1983).  Instead, the plaintiffs had sued for *additional* (uncapped) benefits to which they claimed they were entitled.  The court held they were not, which meant Alcoa had "not breach[ed] its contracts" in any way, and so their claim was "dismissed" without any relief.  *Curtis*, 2011 WL 850410, at \*55.  *That*, not any supposed concession by Alcoa,

40

was why the "clarification" motion was denied.  *See Curtis*, 2012 WL 12965609, at *2 ("[P]laintiffs brought this action to undo the [capped] retiree healthcare plan … and to restore plaintiffs to an 'uncapped' plan. The court rejected plaintiffs' arguments … ; therefore, there was no relief awarded[.]"), *aff'd*, 525 F. App'x at 381 ("The [district] court's Judgment Order did nothing more than deny Retirees the relief they requested— vested, lifetime, and *uncapped* healthcare benefits.").

The district court, however, reasoned as if Alcoa avoided an *otherwise-proper* declaratory judgment only by conceding what that judgment would have declared (that capped benefits were vested).  *See* RSA.26 (describing the *Curtis* court as "acced[ing] to Alcoa's argument that no specific declaration … was necessary because [it] would be duplicative of Alcoa's contractual promises").  That story ignores the much more fundamental problems with the *Curtis* postjudgment motions.[10]  "[C]ourts decide *cases*, not legal issues in the abstract." *There*

---

[10] Moreover, even if this story were somehow true, it could not justify estopping Alcoa as to *pre*-1993 retirees, too.  That inequitably places Alcoa in a worse position, with no offsetting advantage, than if it had stipulated to the declaration concerning post-1993 retirees—which, on this account, it might as well have.

*to Care, Inc. v. Comm'r of Ind. Dep't of Rev.*, 19 F.3d 1165, 1167 (7th Cir. 1994). And Alcoa had already won *Curtis*: the plaintiffs' benefits stayed capped. True, the court's opinion included dicta adverse to Alcoa's no-vesting position. But courts do not convert dicta on isolated, nondispositive issues into freestanding declaratory judgments, as the "clarification" motion requested. *See Ashcroft v. Mattis*, 431 U.S. 171, 172 (1977) (per curiam). As Alcoa's response explained, that motion was based on "the extraordinary proposition that a court must issue an order reflecting all legal conclusions that the court has reached—even those that have no bearing on the outcome of the case." JA.291.

The district court did not grapple with any of that. Instead, it zeroed in on language in Alcoa's response that (at most) acknowledged the *Curtis* court's previous vesting finding as water under the bridge. RSA.25-26 (quoting JA.291, 293). That is no basis for judicial estoppel. Alcoa's *postjudgment* brief did not "convinc[e]" the court that the capped benefits were vested; the court had *already* reached that conclusion on its own (contrary to Alcoa's position). *Neto*, 861 F.3d at 612. Alcoa was simply arguing that there was "no basis for" turning that finding, which did not affect the outcome, into a single-issue declaratory judgment on

42

vesting, which was not the relief the plaintiffs had sued for to begin with. JA.291-93. That basic, irrefutable point was not "clearly inconsistent" with Alcoa's (rejected) position that benefits were unvested. *Ogden Martin*, 179 F.3d at 528. Nor is there any sense in which Alcoa gained an "unfair advantage" from the *Curtis* court's refusal to issue an improper declaratory judgment about a moot issue, no matter what Alcoa said in opposing a request for such an order before a court that had already found vesting. *Jarrard*, 408 F.3d at 915.

*Third*, the district court claimed (and deemed "important") that Alcoa somehow "abandoned" its no-vesting position by not seeking "reconsideration" or "cross appeal[ing]" the *Curtis* court's vesting dicta. RSA.29. For one thing, judicial estoppel is not a forfeiture doctrine triggered by mere "failure[s] to object." *Ticor*, 979 F.2d at 1194. More fundamentally, it is black-letter law that "a litigant may not appeal from unfavorable statements in a judicial opinion, if the judgment was favorable." *United States v. Accra Pac, Inc.*, 173 F.3d 630, 632 (7th Cir. 1999).

Faulting Alcoa for failing to take an impossible appeal again reflects a basic misunderstanding of the *Curtis* dispute and the limited relevance

43

of the "vesting at retirement" issue therein.  As previously noted, *Curtis* was about whether Alcoa had to give post-1993 retirees *uncapped* benefits.  The court said no.  Alcoa "took [that] as a victory" because it was.  RSA.26.  Indeed, it had no option but to do so.

Alcoa also cannot be faulted for declining to reargue its no-vesting-at-all position "in the plaintiffs' appeal."  RSA.29.  Like many appellees, Alcoa urged affirmance on the grounds it had won (the absence of pre-retirement vesting and the Cap's reality), without emphasizing a different issue it had not (the additional absence of vesting *at* retirement). [11]  There was nothing "untoward" in that, so "judicial estoppel does not come into play."  *Jarrard*, 408 F.3d at 915.

---

[11] Nonetheless, Alcoa's brief was clear about what it was defending: "The District Court Correctly Held That Appellants' Retiree Medical Benefits Did Not Vest *Prior To Retirement*."  Brief of Defendants-Appellees at 24, *Curtis v. Alcoa, Inc.*, 525 F. App'x 371 (6th Cir. 2013) (No. 12-5801), 2012 WL 5179411, at *24 (emphasis added) (hereinafter Alcoa *Curtis* Brief).  The district court misread this as "argu[ing] that healthcare benefits had vested," linking sentences six pages apart to infer that Alcoa "asked the Sixth Circuit to affirm" the dicta that capped benefits were vested.  RSA.29 (quoting Alcoa *Curtis* Brief at 24, 30, 2012 WL 5179411, at *24, 30).  The court similarly misread Alcoa's explanation that a freestanding capped-and-vested declaration was inappropriate because it "ha[d] no bearing on the outcome of the case."  Alcoa *Curtis* Brief at 53, 2012 WL 5179411, at *53; *see* RSA.29.

### 2. Alcoa Did Not Argue That, Apart from the Cap, the Rights of Pre- and Post-1993 Retirees Were the Same.

The second premise of the district court's syllogism—that Alcoa maintained that the "the only difference between pre- and post-1993 retirees was the cap"—is equally untenable. RSA.25. The court found Alcoa advanced this argument only by overreading two anodyne statements:

- Opposing a preliminary injunction in *Curtis*, Alcoa stated: "Plaintiffs here seek to receive benefits as if they had retired before June 1, 1993." JA.184.

- At summary-judgment oral argument, Alcoa stated: "Plaintiffs' theory is that th[e] Cap letter had no effect whatsoever, that the rights of the people who retired after 1993 are exactly the same as the rights of people who retired before 1993." JA.272.

*See* RSA.24. Neither supports the district court's conclusion.

At the outset, these were not Alcoa's "positions." They were straightforward descriptions of *the plaintiffs'* claim—which Alcoa disputed—that post-1993 retirees, like pre-1993 retirees, were entitled to uncapped benefits (either because the Cap was fake, or because benefits vested before retirement). To the extent these statements "represented" anything more, it was only the implausibility of any

45

argument that would render the Cap agreement a dead letter, as the *Curtis* plaintiffs were explicitly arguing.  RSA.25.

The district court, however, inferred far more.  It took statements characterizing the plaintiffs' far-fetched position *on the Cap* and read into them a sweeping concession *on vesting*.  In other words, because *the plaintiffs* claimed that post-1993 retirees had a vested, "lifetime" entitlement to the "uncapped benefits" that pre-1993 retirees were receiving, Alcoa's entirely accurate description of their efforts to nullify the Cap "necessarily implie[d]" that *Alcoa* believed pre-1993 retirees' uncapped benefits were vested for life.  RSA.24-26.  But that does not follow, and Alcoa's statements cannot fairly be interpreted to speak to anything but the plaintiffs' attack on the Cap (the entire focus of the *Curtis* litigation)—particularly as Alcoa had unambiguously articulated its position that "retiree healthcare benefits do not vest."  JA.316; *supra* pp. 35-38.  At minimum, estopping Alcoa based on inferences ostensibly implicit in these stray remarks is inconsistent with the command to "cautio[usly]" apply estoppel, *Levinson*, 969 F.2d at 265, even to "clearly inconsistent" positions, *Neto*, 861 F.3d at 612.

### C. Even If Alcoa Somehow Relied on an Inconsistent Position to Prevail in *Curtis*, an Intervening Change in the Law Makes Application of Judicial Estoppel Inappropriate.

Given the above, it is immaterial whether *Yard-Man*'s overruling was a "substantive[] change in the law" that would independently preclude estoppel. RSA.30. But it clearly was. Thus, even assuming Alcoa persuaded the *Curtis* court that retirees' benefits vested on retirement—and somehow won on that basis—it would not be barred from arguing otherwise here.

The district court's contrary conclusion misses the mark. To start, whether *Tackett* changed *Seventh* Circuit doctrine is irrelevant. *See* RSA.31 n.6. *Curtis* was litigated in the Sixth Circuit, so it was Sixth Circuit precedent that controlled and shaped the arguments there. And for *that* circuit, *Tackett* was "'an earthquake.'" *UAW v. Honeywell Int'l, Inc.*, 954 F.3d 948, 954 (6th Cir. 2020). Before, that circuit "presume[d] lifetime vesting" at retirement—unless a CBA expressly said otherwise. *Reese*, 583 U.S. at 134; *see Noe v. PolyOne Corp.*, 520 F.3d 548, 568 (6th Cir. 2008) (Sutton, J., concurring and dissenting) (tracing how *Yard-Man* became "a clear-statement rule" compelling "vest[ing] as a matter of law"). Now, that circuit "almost always conclude[s] that a CBA …

47

*unambiguously* does *not* vest healthcare benefits"—unless it expressly says otherwise. *Honeywell*, 954 F.3d at 954. Identical contracts produce opposite results as a matter of law. Calling that shift "not substantive" blinks reality. RSA.30. *Tackett*, in fact, was such a "significant change in [Sixth Circuit] law" that "pre-*Tackett* decisions" no longer have "preclusive effect" even between the parties. *UAW v. Kelsey-Hayes Co.*, 854 F.3d 862, 872 (6th Cir. 2017), *vacated on other grounds*, 583 U.S. 1154 (2018).

Thus, even if (counterfactually) Alcoa persuaded the *Curtis* court that post-1993 retirees' benefits were vested *and* that finding actually mattered to the judgment, that *still* could not stop Alcoa, today, from arguing that post-1993 retirees' benefits are unvested, if that exact issue were again presented. Certainly not under issue preclusion. *See id.* Nor under judicial estoppel, since "[t]he law changed in the interim." *Jarrard*, 408 F.3d at 915. The *Curtis* plaintiffs sued Alcoa in the Sixth Circuit at a time when *Yard-Man* was still binding precedent. Under those circumstances, if Alcoa had relied on *Yard-Man* to affirmatively argue that benefits vested at retirement (rather than before), it would have been "well within [its] rights" to do so. *Id.* At the same time, it would

48

hardly be "untoward" for it to make different arguments now, after *Tackett* overruled *Yard-Man*. *Id.* Indeed, this Court has made clear that relying on "controlling" precedent in Suit #1, then arguing the opposite position in Suit #2 after that precedent has been repudiated, does not bring judicial estoppel "into play." *Id.* This is particularly true where the change in the law does not even imply that the ultimate position the party persuaded the first court to adopt—here, that the *Curtis* plaintiffs were not entitled to uncapped benefits—was incorrect.

At bottom, then, there is no "fairness argument" for holding Alcoa to the *Curtis* court's *Yard-Man*-based finding that post-1993 retirees vested at retirement. *Id.* Even as to post-1993 retirees, wielding that finding against Alcoa—after its legal underpinnings are gone—would improperly use judicial estoppel "to work an injustice." *Id.* Leveraging that defunct vesting finding in *this* case involving *pre*-1993 retirees— giving Plaintiffs a win-by-estoppel windfall that would not be available to the post-1993 retirees themselves—works even greater injustice.

## II.    The District Court Erred by Certifying the Class.

Erroneous as its judicial-estoppel reasoning was, the district court's search for an escape hatch from the merits was perhaps understandable.

The court set itself an unenviable task when, in certifying this class action, it bundled together thousands of breach-of-contract claims that arise under many distinct agreements, without first establishing that the relevant agreements are materially identical. The court further compounded its mistakes by certifying the class under Rule 23(b)(2), ignoring both the claims' divisibility and the individualized nature of the requested compensatory relief. That the court was forced to employ novel legal theories to bypass this morass not once, but twice—at summary judgment, and again at remedies—demonstrates that its decision on class certification was ill-founded.

"A district court may certify a case for class-action treatment only if it satisfies the four requirements of Federal Rule of Civil Procedure 23(a)—numerosity, commonality, typicality, and adequacy of representation." *Jamie S.*, 668 F.3d at 493. As relevant here, the commonality requirement asks whether "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This language "is easy to misread, since any competently crafted class complaint literally raises common questions." *Wal-Mart*, 564 U.S. at 349 (cleaned up). "What matters to class certification is … the capacity of a class-wide proceeding

to generate common *answers* apt to drive the resolution of the litigation." *Id.* at 350 (cleaned up). Class members' claims, therefore, "must depend upon a common contention … capable of class-wide resolution," such that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* Put differently, "[t]o bring individual … claims together to litigate as a class, the plaintiffs must show that they share some question of law or fact that can be answered *all at once* and that the *single answer* to that question will resolve a central issue in all class members' claims." *Jamie S.*, 668 F.3d at 497.

Similarly, typicality asks whether "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). It is primarily designed to "ensure that class representatives have an 'incentive to litigate vigorously' the claims of the absent class members." *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 606 (7th Cir. 2021). Consequently, the inquiry seeks to determine whether "the named representative's claims have the same essential characteristics as the claims of the class at large," such that "her pursuit

of her own interest will necessarily benefit the class." *Id*. at 605 (quotation marks omitted).

Even after Rule 23(a) is satisfied, the proposed class action must still meet "one of the conditions of Rule 23(b)." *Jamie S.*, 668 F.3d at 493. In this case, the district court relied on Rule 23(b)(2), which applies where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Application of this rule turns on "'the indivisible nature of the injunctive or declaratory remedy warranted— the notion that the [defendant's] conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Wal-Mart*, 564 U.S. at 360 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)).

Significantly, Rule 23 "does not set forth a mere pleading standard." *Id*. at 350. The movant must "'affirmatively demonstrate,'" with "evidentiary proof," that its prerequisites are "'*in fact*'" satisfied. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). The district court must perform

"'a rigorous analysis'" to determine "the propriety of class certification"; if that requires deciding questions that "would also be pertinent to the merits," then the district court must do so. *Id.* at 33-34.

This rigorous analysis was wholly absent from the decision below. In granting certification, the district court rubber-stamped class treatment for thousands of individual contract claims based on scores of distinct agreements (some of which cannot be found) without first making any meaningful assessment of what actually binds the claims together, much less what class adjudication could hope to achieve. Its examination of commonality and typicality was superficial, and it flouted the unique requirements of Rule 23(b)(2). Accordingly, this Court should order the class decertified.

## A.    The Class Does Not Satisfy Rule 23(a).

A rigorous Rule 23 analysis "often requires a precise understanding of the nature of the plaintiffs' claims." *Phillips v. Sheriff of Cook Cnty.*, 828 F.3d 541, 552 (7th Cir. 2016). That is emphatically true here. Plaintiffs alleged that, in terminating the Prior Plan, Alcoa simultaneously breached a multitude of distinct contracts—literally all of the parties' pre-1993 CBAs. JA.099-101. "At bottom then, this lawsuit

centers on a dispute … over the interpretation of different [CBAs] and over [Alcoa's] performance under those [CBAs]." *Broussard*, 155 F.3d at 345.

The problem for Plaintiffs is that each class member's *individual* claim arises only "under the terms of a *particular* contract." *Pabst Brewing*, 161 F.3d at 439 (emphasis added). The parties have always agreed that each pre-1993 retiree's "rights to retiree healthcare benefits," whatever they are, are "governed by the CBA … that was active at the particular facility from where the former employee retired at the time of their retirement" ("or, in the case of spouses and dependents, when the [retiree] retired or died"). JA.333, 335 (¶ 3); *see* JA.034-35 (¶ 23), 344.

This crucial point raises glaring cohesiveness questions. A would-be class representative cannot "advance a single collective breach of contract action on the basis of multiple different contracts." *Broussard*, 155 F.3d at 340. Courts routinely reject class treatment—on many overlapping Rule 23 grounds—for mere aggregations of breach claims relating to diverse contracts, absent proof that the contracts are materially identical. *E.g.*, *Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs, Inc.*, 601 F.3d 1159, 1175-76 (11th Cir. 2010) (no

commonality in the interpretation of "a variety of" "substantial[ly] var[ying]" contractual terms, creating "potentially disparate contractual rights"); *Vega v. T-Mobile USA*, 564 F.3d 1256, 1268-79 (11th Cir. 2009) (no commonality or typicality, among other deficiencies, where there was no common identified contract); *Broussard*, 155 F.3d at 340-41 (no commonality or typicality due to differing contract language, "rais[ing] the distinct possibility that there was a breach of contract with some class members, but not with other[s]"); *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397-99 (6th Cir. 1998) (en banc) (no commonality or typicality for oral contracts based on diverse representations). Generally, that requires identical contract language, since "[a]ny review of a contract begins with its plain language." *Hovde*, 51 F.4th at 776. Critically, too, such proof must come "at the threshold." *Sacred Heart*, 601 F.3d at 1171. Otherwise, the movant has not "affirmatively demonstrate[d]" that Rule 23's requirements are "*in fact*" satisfied. *Wal-Mart*, 564 U.S. at 350.

### 1.    The District Court Erred in Finding Commonality.

Here, the district court did not even purport to find that all of the relevant pre-1993 CBAs have any materially identical language that gives rise to "questions of law or fact common to the class." Fed. R. Civ.

55

P. 23(a)(2). Such a finding would have been impossible: only some of the relevant CBAs are in the record even now, and the number was significantly smaller at the class-certification stage. *See* JA.068-69; JA.080-82. Of that subset, the district court's class-certification analysis focused exclusively on the 11 CBAs accompanying Kaiser's motion (with no mention of either the four SPDs in the record or the 27 additional CBAs submitted with Kaiser's class-certification reply) and quoted only two brief snippets from those documents. *See* RSA.02 & n.2, 07. Even a cursory look at the underlying passages is enough to show that the district court's clipped quotations misunderstood their meaning.

Specifically, the district court quoted the underlined language from these two passages:

> [I]f subsequent governmental legislation provides for the reduction or elimination of the premium for Medicare Part B for any person, the Company shall make a corresponding reduction or elimination to the benefit payment for such Medicare premiums for that person and such governmental action shall not require further modification or adjustment[.]
> …
> [I]f, during the term of this Agreement, any employee covered by this Agreement becomes entitled to apply for or to obtain health care … benefits by reason of the enactment by the United States or any state … of a Governmental System of health security … for active employees, the parties shall promptly meet and undertake to negotiate a modification of

the benefits under this Article … of the type and character provided or available under such Governmental System in order to achieve or to assure the following results: (a) <u>No employee covered</u> by this Article <u>shall suffer any reduction in the level of any of the several health care benefits</u> of this Article.

JA.074-75; *see* RSA.07.   On their face, these provisions are plainly contingent: each addressed how Alcoa's obligations would be affected by some hypothetical legislative change to background healthcare law.  The district court, however, misread the first passage to say "that Alcoa could *only* reduce or eliminate benefits" if subsequent legislation reduced or eliminated Medicare Part B premiums, and the second as a blanket, context-independent "guarantee[]" that benefits would *never* be reduced for any reason.  RSA.07 (emphasis added).  Moreover, even apart from these misinterpretations, before the district court ruled, Kaiser herself had submitted additional, applicable CBAs that did not include the same language.  *E.g.*, JA.086-98 (relevant terms of 1988 Reynolds-USW CBA, filed in full at D.Ct. ECF No. 97-10).  These terms, then, cannot be the "glue" binding the class claims together.  *Wal-Mart*, 564 U.S. at 352.

Instead, the district court certified the class based on Kaiser's promise to prove Alcoa's breach of every applicable CBA (including the

57

missing ones) through the *ex post* extrinsic evidence of the 1993 Cap negotiations and *Curtis*. The court found exactly one "common question": "whether Alcoa first gained the power to unilaterally terminate benefits after 1993," or, put differently, whether the 1993 negotiations "gave Alcoa the new power to terminate or diminish health insurance benefits." RSA.05-06.

That "common question," however, is an aggregate of many individualized questions about many individual contracts, disguised as a single inquiry by the words "first" and "new." Its answer is "yes" if, and only if: (a) the 1993 negotiations allowed Alcoa to modify health benefits; and (b) none of the many pre-1993 CBA did so. Merely constructing this synthetic "common 'question[]'" says nothing about "the capacity of a class-wide proceeding to generate common *answers*." *Wal-Mart*, 564 U.S. at 350.

Moreover, this composite question is not itself "central" to any claims. *Jamie S.*, 668 F.3d at 497. For each class member's claim, the "central issue" is the meaning of the particular contract applicable to that class member. *Wal-Mart*, 564 U.S. at 350. Different pre-1993 CBAs that apply to *other* class members might or might not have similar terms;

either way, it is the applicable contract for *that* class member that determines whether her claim succeeds or fails.   The district court reasoned that an affirmative answer to its aggregate question would mean that Alcoa's actions "violated each class member['s] right to lifetime benefits," RSA.06-07, but that is only because it is nothing more than another way of asking whether *all* of the pre-1993 CBAs prohibited Alcoa's actions with respect to the particular class members who retired under *each* of them.   Such "superficial common questions … are not enough." *Jamie S.*, 668 F.3d at 497; *see Wal-Mart*, 564 U.S. at 349-50.

Ultimately, the district court's commonality analysis amounted to a rubber-stamp for Plaintiffs' common *argument* that the same post-contractual extrinsic evidence demonstrates Alcoa's liability under every pre-1993 CBA.   But "courts … consult extrinsic evidence" only "when a contract is ambiguous." *Reese*, 583 U.S. at 139.   And while the district court gestured at the possibility that "[o]therwise unambiguous language can be rendered ambiguous by the surrounding circumstances," it did not find that the "surrounding circumstances" here actually created ambiguity in any (let alone all) of the pre-1993 CBAs. RSA.08.   Indeed, it refused to delve into that question, which it viewed as an improper

"merits" inquiry.  RSA.08.  It thus committed the classic error of "refusing to entertain arguments … b[earing] on the propriety of class certification, simply because those arguments would also be pertinent to the merits." *Comcast*, 569 U.S. at 34.

Even if the district court had attempted to drill deeper, it is impossible to see what "single specific common question of law or fact" would be answered by Plaintiffs' arguments about post-contractual extrinsic evidence.  *Vega.*, 564 F.3d at 1269.  Whether each pre-1993 CBA is ambiguous, due to either a "patent" textual ambiguity or a "latent" ambiguity shown by "real-world context," would need to be answered individually for each contract, which would require considering "the language of the contract itself."  *Cherry v. Auburn Gear, Inc.*, 441 F.3d 476, 481-82 (7th Cir. 2006).  And the same individualized inquiry would be required to determine the effect and weight of the extrinsic evidence in *resolving* whatever ambiguity might be found to exist in any given contract.  Absent proof that the relevant CBAs all have materially similar language, there is no reason to believe that ambiguity could be identified, let alone resolved, for all the contracts at once, "in one stroke."  *Wal-Mart*, 564 U.S. at 350.

To illustrate, some of the extant pre-1993 CBAs "do[] not specify a duration for healthcare benefits in particular." *Reese*, 583 U.S. at 140. Their insurance-benefits clauses state (for instance) that "the Company will provide" healthcare benefits to eligible retirees, with no further, express language addressing the duration of that specific obligation. *E.g.*, JA.074. Yet some of the CBAs *do* specify a duration—stating, in the same sentence promising insurance benefits, that those benefits "shall … continue in effect *for the life of this Agreement*." *E.g.*, JA.088 (emphasis added). Any argument that extrinsic evidence nonetheless creates ambiguity in those contracts would have to grapple with this direct, on-point language about the precise issue of duration, making the ambiguity question for those contracts different from the ambiguity question for the others that are merely silent about duration. *See Broussard*, 155 F.3d at 340 (variations in contractual language, raising "distinct set[s] of interpretive issues," produce "uncommon questions").

Further, even assuming every class member's claims could be resolved through extrinsic evidence alone, the universe of relevant extrinsic evidence is not identical for each pre-1993 CBA. The contracts were negotiated at different times, by different people, sometimes

61

representing different predecessor entities, and for different facilities—some on a multi-facility or "Master" basis, others not. In different negotiations, different things might have been said, different documents might have been generated, and so on. Even if extrinsic evidence alone could resolve all class members' claims, it could not possibly do so "*all at once*," for all CBAs, through one "*single answer*" to any specific question. *Jamie S.*, 668 F.3d at 497.

## 2. The District Court Erred in Finding Typicality.

The district court's superficial commonality analysis fueled its equally superficial typicality finding. Kaiser's individual claim arises only under the CBAs in effect at the "Warrick Operations facility in Newburgh, Indiana," at the times when her late husband retired from that facility in early 1993 and passed away in 2016. JA.032 (¶ 15). To that extent, it is not typical of other class members' claims that arise under other, potentially different CBAs. "The premise of the typicality requirement"—"as goes the claim of the named plaintiff, so go the claims of the class"—"is not valid here." *Broussard*, 155 F.3d at 340 (quotation marks omitted).

The district court found typicality because "Kaiser advances an identical legal theory to the putative class": "[n]amely, the 1993 collective bargaining negotiations indicate that both parties understood the pre-1993 agreements to guarantee undiminishable health insurance plans." RSA.10.  Again, that was merely a description of Plaintiffs' common argument, with no finding or explanation of its "capacity … to generate common *answers*." *Wal-Mart*, 564 U.S. at 350.

Further, that is the absent class members' "theory" only in the sense that it is the theory Kaiser proffered on their behalf.  If an individual class member sued only on her own claim, with no need to "amalgamate multiple contract actions into one," that case would look very different. *Broussard*, 155 F.3d at 340.  The analysis of the claim would begin, and presumptively end, with the language of the particular contract at issue, which might or might not resemble Kaiser's.  If that contract was found to be ambiguous, extrinsic evidence would be considered, but it would not be the starting point and would not dominate in the free-floating manner it did here.[12]

---

[12] It should be added that, if the absent class members had sued, it is by no means certain that they all would have chosen to pursue Kaiser's

**B.    The Class Does Not Fit Rule 23(b)(2).**

The district court also independently erred by certifying the class under Rule 23(b)(2).  At the outset, Kaiser failed to establish an "indivisible" wrong that "perforce" demanded an equally "indivisible" equitable remedy.  *Wal-Mart*, 564 U.S. at 360-61.  And in any event, Plaintiffs' request for individualized, retrospective, monetary relief—however labeled—is fundamentally incompatible with Rule 23(b)(2).

### 1.    The Class Lacks the Indivisible Cohesiveness of a Proper Rule 23(b)(2) Class.

The district court endorsed Rule 23(b)(2) certification because Alcoa "acted identically" toward all class members and "the remedy sought" by Kaiser was uniform "injunctive and declaratory relief" for all class members.  RSA.13.  In that sense, "the proposed relief [was] indivisible

---

theory that the pre-1993 CBAs allow Alcoa to modify their benefits if the unions consent.  Some might have preferred to argue (like the *Curtis* class) that their benefits were vested *in them* and could not be bargained away by unions that no longer represent them, possibly "for improved wages or other conditions favoring active employees."  *Pittsburgh Plate*, 404 U.S. at 173.  This aspect of Kaiser's theory is not a necessary feature of the class members' potential individual claims against Alcoa.  It is purely a result of Kaiser bringing this action in conjunction with the unions.

so that Alcoa either acted lawfully or unlawfully as to every class member." RSA.13.

However, the district court never asked whether Alcoa's "'conduct,'" itself, was "'such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them,'" which is what "'warrant[s]'" "'indivisible'" equitable relief in the first place. *Wal-Mart*, 564 U.S. at 360 (quoting Nagareda, *supra*, at 132). For Rule 23(b)(2) to apply, the class must be "homogeneous and cohesive" "by its very nature," not just because of how the named plaintiff frames her request for relief. *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 413 (5th Cir. 1998); *accord Lemon v. Int'l Union of Operating Eng'rs*, 216 F.3d 577, 580 (7th Cir. 2000). What matters is the "group nature" of the class's "common injury," *Citgo*, 151 F.3d at 413, such that "the relief sought *must perforce* affect the entire class all at once," *Wal-Mart*, 564 U.S. at 361-62 (emphasis added). By contrast, where injuries could be remedied separately, Rule 23(b)(2) plays no role. *See id.* at 360; *see also* 1 *Newberg and Rubenstein on Class Actions* § 1:3 (6th ed.) (explaining "[t]he (b)(2) class action addresses the negative externality of an individual injunctive suit where," "[s]hould the individual plaintiff prevail and secure an injunction, the

65

spillover effect is that the resulting injunction will likely touch other persons not parties to the lawsuit," as in the classic antidiscrimination cases).

The class here does not possess the inherent and indivisible cohesiveness that Rule 23(b)(2) presumes. It is entirely conceivable that Alcoa's conduct was lawful as to some class members and unlawful as to others. At minimum, that depends on what the different CBAs said. If there are any group injuries here at all—as opposed to a collection of individual injuries to class members' respective rights—they would only be shared, at most, by each distinct subgroup of class members whose rights were secured by the same contract.

For example, if participants governed by a particular CBA sued and received damages or equitable relief against Alcoa, that would fully remedy their injuries, *Wal-Mart*, 564 U.S. at 360, with no necessary "spillover effect" on non-suing class members whose rights were governed by different CBAs, 1 *Newberg and Rubenstein on Class Actions* § 1:3. In such circumstances, there is no need—or justification—for a mandatory Rule 23(b)(2) class. *See Wal-Mart*, 564 U.S. at 361-62.

66

2. **The Compensatory Remedies Sought and Granted Confirm That Rule 23(b)(2) Certification Was Improper.**

The district court's choice of Rule 23(b)(2) was even more problematic when made. At that time, Plaintiffs were openly seeking individualized "monetary damages … to restore [class members] to the position in which they would have been but for [Alcoa's alleged] contractual violations." JA.054. And, because damages would have been "based on evidence specific to particular class members," this was never a case in which they could be properly characterized as "incidental." *Johnson v. Meriter Health Servs. Emp. Ret. Plan*, 702 F.3d 364, 370 (7th Cir. 2012).

Indeed, as Plaintiffs themselves previously explained, "calculat[ing] the monetary losses suffered by thousands of retirees as a result of Alcoa's actions   would require "analyz[ing] and synthesiz[ing]" an "enormous number" of "individual records" of retirees' "claims" and "out-of-pocket expenses," in the forms of "premiums, deductibles, copayments, and coinsurance." JA.058-59 & n.3. That is the opposite of the purely "mechanical" "computation of damages," "without the need for individual calculation," that may be permissibly "incidental" in the Rule 23(b)(2)

67

context. *In re Allstate Ins. Co.*, 400 F.3d 505, 507 (7th Cir. 2005) (cleaned up). That should have precluded certification under Rule 23(b)(2). *See Bauer v. Kraft Foods Global, Inc.*, 277 F.R.D. 558, 562-63 (W.D. Wis. 2012) (rejecting Rule 23(b)(2) certification, where retirees sought injunction to restore health insurance plans and damages to "make whole all of the [class members] for all losses proximately caused by the violations"); *Boyle v. Int'l Bhd. of Teamsters Loc. 863 Welfare Fund*, 579 F. App'x 72, 76 (3d Cir. 2014) (same, where retirees sought restoration of medical benefits and "individualized" "monetary relief … based on [each class member's] specific alleged harms caused by the lapse in health benefits"). In certifying the class nonetheless, the district court recited that "any monetary recovery" could "simply be read off from the plan," ignoring Plaintiffs' own explanations of how that was anything but true. RSA.14 (quotation marks omitted).

Much later, after winning summary judgment, Plaintiffs tried to retroactively patch this bug by abandoning the absent class members' individualized damages claims. Instead, they proposed that Alcoa be *enjoined* to compensate class members' retrospective monetary losses, with the amounts to be determined out of court by Alcoa and individual

class members.  *See* D.Ct. ECF No. 167 at 2-7.  The district court granted

that request.  RSA.60-61.  But this substituted remedy—damages in all

but name—both fails on its own terms and confirms Rule 23(b)(2)'s

inapplicability.  An injunction that a defendant compensate out-of-pocket

losses caused by its breach of contract "cannot satisfy the basic

requirement[]" that "monetary damages" must be "inadequate to remedy

the injury" for equitable relief to issue.  *Kartman*, 634 F.3d at 892.  "It

follows that class certification under Rule 23(b)(2) [was] necessarily

improper."  *Id.*; *see also Simer v. Rios*, 661 F.2d 655, 668 n.24 (7th Cir.

1981).

In fact, in granting Plaintiffs' requested injunction, the district

court all but conceded that the provisions for retrospective monetary

relief were not genuinely equitable.  *See* RSA.49-51.  The district court

distinguished cases denying pay-money injunctions for "claims under 29

U.S.C. § 1132(a)(3)" *because* that provision is limited to "'equitable relief.'"

RSA.49 (distinguishing, *e.g.*, *Mondry v. Am. Fam. Mut. Ins.*, 557 F.3d 781,

804 (7th Cir. 2009)).  But that, of course, is the only kind of relief the court

should be awarding under Rule 23(b)(2).  The court then distinguished

other cases—all explaining the general principle that orders to pay

compensatory monetary sums are not proper injunctions—based only on their different "procedural stages," *including* "class certification under Rule 23(b)(2)." RSA.50-51 (distinguishing, *e.g.*, *Jaffee v. United States*, 592 F.2d 712, 714-15 (3d Cir. 1979); *Richards v. Delta Air Lines, Inc.*, 453 F.3d 525, 530 (D.C. Cir. 2006)). By the district court's own reasoning, then, its injunction cannot be squared with its Rule 23(b)(2) basis for certification.

That is true not only because individualized monetary losses are compensable by damages, but also because such a "superficially structured" pay-what-you-owe injunction is not "'final' to 'the class as a whole.'" *Jamie S.*, 668 F.3d at 499. As to retrospective harm, the district court's injunction "merely establishes a system for eventually providing individualized relief." *Id.* It enjoins compensation for class members' losses, but only after each class member, Alcoa, and the claims administrator collectively figure out whether that class member had any losses and, if so, what the amounts are. RSA.44-49, 60-61. The district court, in short, ordered "a process through which highly individualized determinations of liability and remedy [would be] made." *Jamie S.*, 668 F.3d at 499. "[T]his kind of relief" is "class-wide in name only," "certainly

[is] not final," and thus "does not come close to" complying with Rule 23(b)(2). *Id.*

This last-minute remedies swap confirms that Rule 23(b)(2) was never the right vehicle. As Plaintiffs' complaint recognized, retrospective, compensatory money damages—the prototypical breach-of-contract remedy—are an essential component of the relief class members would be entitled to for any breach. But that relief is inherently individualized, frustrating the indivisible "cohesiveness" that "is the touchstone of a (b)(2) class." *Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 480 (8th Cir. 2016); *see Wal-Mart*, 564 U.S. at 362.

## CONCLUSION

For the reasons discussed above, this Court should vacate the judgment, the permanent injunction, the summary-judgment order, and the order granting class certification, and then remand for further appropriate proceedings.

Dated: June 26, 2025                    Respectfully submitted,

                                        */s/ David T. Raimer*
                                        David T. Raimer
                                          *Counsel of Record*
                                        Bijan M. Aboutorabi
                                        JONES DAY
                                        51 Louisiana Avenue, NW
                                        Washington, DC  20001-2113
                                        (202) 879-3939
                                        dtraimer@jonesday.com

                                        *Counsel for Defendants-Appellants*

## CERTIFICATES OF COMPLIANCE AND SERVICE

I certify that the foregoing brief complies with the typeface and type-volume requirements of Federal Rule of Appellate Procedure 32 and Circuit Rule 32, because it is proportionally spaced, has a typeface of 14 points, and (excluding the portions specified by Federal Rule of Appellate Procedure 32(f)) contains 13,983 words, as calculated by Microsoft Word for Microsoft 365.

I certify that on June 26, 2025, I electronically filed the foregoing brief and Required Short Appendix with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.  I further certify that all counsel of record are users of the appellate CM/ECF system and will be served by that system.

Dated: June 26, 2025               Respectfully submitted,

                                   */s/ David T. Raimer*
                                   David T. Raimer

                                   *Counsel for Defendants-Appellants*

# REQUIRED SHORT APPENDIX

## CIRCUIT RULE 30(d) CERTIFICATION

In accordance with Circuit Rule 30(d), I certify that all materials required by Circuit Rules 30(a) and (b) are included in the Required Short Appendix and the Joint Appendix.

Dated: June 26, 2025                    Respectfully submitted,

*/s/ David T. Raimer*
David T. Raimer

*Counsel for Defendants-Appellants*

# TABLE OF CONTENTS

**Page**

Entry Granting Plaintiffs' Motion for Class Certification, D.Ct. ECF No. 108 (filed Sept. 29, 2022) .............................................RSA.01

Entry Granting Plaintiffs' Partial Motion for Summary Judgment as to Liability and Granting in Part and Denying in Part Defendants' Cross-Motion for Summary Judgment, D.Ct. ECF No. 166 (filed Mar. 25, 2024).......................................................RSA.16

Entry Granting Plaintiffs' Motion for Entry of Order of Judgment, D.Ct. ECF No. 180 (filed Mar. 28, 2025) ....................................RSA.36

Order Granting Permanent Injunction, D.Ct. ECF No. 181 (filed Mar. 28, 2025) ..............................................................................RSA.60

Final Judgment, D.Ct. ECF No. 182 (filed Mar. 28, 2025)............RSA.62

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| LYNNETTE J. KAISER, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:20-cv-00278-RLY-MPB |
| | ) | |
| ALCOA USA CORP., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY GRANTING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

In 2021, Defendant Alcoa USA Corp. terminated its Fixed Group Health Plan (or

the "old plan") for pre-1993 retirees, surviving spouses, and dependents' health insurance

benefits and instituted an allegedly less favorable Health Reimbursement Arrangement.

The old plan had been guaranteed pursuant to pre-1993 collective bargaining agreements

between Alcoa and the retirees' Unions—the United Steel, Paper and Forestry, Rubber,

Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-

CIO/CLC ("USW"), the Aluminum Trades Council of Wenatchee, Washington AFL-CIO

("ATC"), and their predecessors.

Plaintiff, Lynnette J. Kaiser, was entitled to benefits under the Fixed Group Health

Plan as a surviving spouse of a pre-1993 Alcoa retiree.  She challenges that old plan's

elimination of retiree healthcare coverage.  She believes the collective bargaining

agreements that established the old plan guaranteed that coverage under the old plan

could not be unilaterally terminated.  For this proposition she points to bargaining

**RSA.01**

between Alcoa and the Unions in 1993 which, for the first time, gave Alcoa the right to unilaterally terminate benefits.  Because there are approximately 3,153 retirees, surviving spouses, and dependents who retired before the 1993 agreement and are not subject to that agreement, Plaintiff Kaiser seeks class certification.  After reviewing the parties' submissions and the evidence, the court **GRANTS** Plaintiff's motion for class certification.

## I.      Background

Beginning in 1977, Alcoa and the Unions negotiated a series of collective bargaining agreements for Alcoa employees and retirees that would provide healthcare benefits to Union retirees, their spouses, and their dependents.  (Filing No. 42, Answer ¶ 3; *see also generally* Filing No. 83-1, 1977 Master Agreement).  These collective bargaining agreements, also known as "master agreements," stated that Alcoa would provide health insurance coverage for employees that became known as the Fixed Group Health Plan.  (Answer ¶ 1).  They also guaranteed that "[n]o employee covered by this article shall suffer any reduction in the level of any of the several healthcare benefits of this Article."  (*See, e.g.*, Filing No. 83-9, 1988 Master Agreement at 98–99).[1]  Alcoa could only diminish or eliminate benefits when "subsequent governmental legislation provides for the reduction or elimination of the premium for Medicare Part B for any person."  (*Id.*)

---

[1] The other master agreements have substantively identical language.  (*See generally* Filing Nos. 83-1 to 11).

**RSA.02**

By 1993 Alcoa faced an "increase in the companies' total retiree-healthcare costs" from both higher payments to healthcare providers and a newly recognized accounting obligation that heightened the Company's projected retiree-healthcare costs. *Curtis v. Alcoa, Inc.*, 525 Fed. App'x 371, 373 (6th Cir. May 9, 2013). Accordingly, Alcoa and the Unions bargained over placing limitations on retiree healthcare benefits. *Id.* Ultimately, after fierce negotiations, they agreed to prospectively cap lifetime healthcare benefits in exchange for increased pension and 401(k) benefits. *Id.* Alcoa and the Unions implemented this cap in 2007 to apply only to employees that retired after May 31, 1993. *Curtis v. Alcoa, Inc.*, No. 3:06-cv-448, 2011 WL 850410, at *1 (E.D. Tenn. March 9, 2011).

Plaintiff Kaiser argues the implication of the 1993 negotiations and the 2007 implementation is that both the Unions and Alcoa believed all the prior collective bargaining agreements contained guaranteed and uncapped lifetime benefits. (Pl's. Br. at 10–11). The Sixth Circuit thought similarly. *Curtis*, 525 Fed. App'x at 373 ("Under the parties' 1988 CBA that expired in 1992, the companies provided lifetime, uncapped retiree-healthcare benefits."). Alcoa and their agents even treated pre-1993 retirees' healthcare benefits as a single group of "Uncapped" retirees. (Ackerman Decl. at 87, 89). On January 1, 2020, Alcoa terminated its Fixed Group Health Plan for pre-1993 retirees and created a new Health Reimbursement Arrangement which provides more limited funds and allows Alcoa to terminate the Fixed Group Health Plan at will. (Compl. ¶¶ 1, 8; *see also* Filing No. 49-1, HRA Plan Description at 13).

3

**RSA.03**

The putative class of plaintiffs are retirees, their spouses, and their dependents, who were represented by the Unions, retired before the 1993 master agreement came into effect, and had been receiving benefits under Alcoa's Fixed Group Health Plan prior to its termination. (Compl. ¶¶ 80–86). According to Alcoa, the putative class contains approximately 3,153 individuals. (Filing No. 90-1, Ackerman Decl. ¶ 12). Plaintiff Kaiser seeks to certify this class and alleges that each of these putative class members had a right to lifelong healthcare benefits that could not be unilaterally diminished by Alcoa. (Compl. ¶¶ 1, 2). She is the spouse of a retiree from Alcoa's Warrick facility in Newburg, Indiana, who USW represented during his employment. (Answer ¶¶ 3–4). Plaintiff Kaiser had been entitled to healthcare benefits under the old plan prior to its termination. (Compl. ¶ 15).

## II.    Legal Standard

To determine whether class certification is proper, the "court may not simply assume the truth of the matter as asserted by the plaintiff." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). Therefore, the plaintiff must "prove that there are *in fact* sufficiently numerous parties [and] common questions of law or fact" by a preponderance of the evidence. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis original). While this "will entail some overlap with the merits," *id.*, it does not provide a "license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Ct. Ret. Plans and Tr. Funds*, 568 U.S. 455, 466 (2013). Accordingly, the court may consider the merits "only to the extent that they are relevant to determining whether the Rule 23 prerequisites for class certification are

4

**RSA.04**

satisfied." *Id.* This brief survey of the merits may not evaluate the probable outcome of a merits question; it only serves to determine if the Rule 23 factual predicates exist. *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 677 (7th Cir. 2001); *see also Amgen* 568 U.S. at 466.

### III.   Discussion

To meet her burden for class certification, Plaintiff Kaiser must show the proposed class satisfies "the requirements of Federal Rule of Civil Procedure 23(a), as well as one of the three alternatives in Rule 23(b)." *Messner*, 669 F.3d at 811. Rule 23(a) requires that the class satisfy the requirements of commonality, numerosity, typicality and adequacy of representation. Fed. R. Civ. P. 23(a). Following that analysis, Rule 23(b) allows class certification if (1) separate actions would establish "incompatible standards of conduct for the party opposing the class" or individual adjudication would "be dispositive of the interests of the other members not parties to the individual adjudication," (2) "the party opposing the class has acted or refused to act on grounds that apply generally to the class" so that injunctive relief "is appropriate respecting the class as a whole," or (3) "questions of law or fact common to class members predominate," Fed. R. Civ. P. 23(b)(1–3).

The court concludes all the Rule 23(a) requirements are satisfied, and the class can be certified under Rule 23(b)(2). The putative class of 3,153 retirees all share the common question of whether Alcoa first gained the power to unilaterally terminate benefits after 1993 which satisfies the first three Rule 23(a) requirements. The court also finds Plaintiff Kaiser is adequate to represent the class. And because the issue here is that

**RSA.05**

Alcoa has acted in a generally applicable way to each member of the class and any

potential relief is indivisible as to each member of the class, certification under Rule

23(b)(2) is proper.

### 1.    Commonality

Commonality focuses on whether "there are questions of law or fact common to

the class." *Chi. Tchrs. Union, Loc. No. 1 v. Bd. of Educ. of City of Chi.*, 797 F.3d 426,

434 (7th Cir. 2015).  In that regard, the focus is on whether the members of "the proposed

plaintiff class are the victims of a common wrong rather than many individualized

wrongs," Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84

N.Y.U. L. Rev. 97, 156 (2009), rather than whether plaintiffs merely suffer "as a result of

a violation of the same provision of law." *Chi. Tchrs.*, 797 F.3d at 434.  The claims

"must depend on a common contention" that is "capable of classwide resolution"

meaning the resolution of the question will "resolve an issue that is central to the validity

of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350.  Although, a proposed

class need not show "the answer to that question will be resolved in its favor." *Bell v.

PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 376 (7th Cir. 2015).

Plaintiff Kaiser demonstrates that whether the 1993 agreement gave Alcoa the new

power to terminate or diminish health insurance benefits is a common question.

Plaintiffs' claim is that prior to 1993, Alcoa guaranteed its employees "lifetime, uncapped

retiree-healthcare benefits" and that Alcoa violated that contractual right.  (*See* Compl.

¶ 39); *see also Alcoa*, 525 F. App'x 371, 373 (6th Cir. May 9, 2013).  If that were true,

Alcoa's termination of the old health insurance plan would have violated each class

**RSA.06**

members' right to lifetime benefits.  That creates commonality.  Because the courts

determination of the novelty of the power to diminish retiree benefits will greatly further

the resolution of each class members' claim, that question is a common question to the

class.

A peek at the merits confirms this is a common question because the pre-1993

collective bargaining agreements seem to place no limitations on the retirees benefits

while limitations first appear during the 1993 bargaining cycle.  Specifically, the master

agreements contain language identical or similar to language guaranteeing that "[n]o

employee covered . . . shall suffer any reduction in the level of any of the several

healthcare benefits" provided by the contract.  (*See, e.g.*, 1988 USW Master Agreement

at 98–99).  The contracts further provide that Alcoa could only reduce or eliminate

benefits "if subsequent governmental legislation provides for the reduction or elimination

of the premium for Medicare Part B for any person."  *Id.*  The Sixth Circuit, considering

the merits, described a pre-1993 agreement as guaranteeing that Alcoa would "provide[]

lifetime, uncapped retiree-healthcare benefits."  *Curtis v. Alcoa*, 525 F. App'x 371, 373

(6th Cir. 2013).  Only after "an increase in the companies' total retiree-healthcare costs"

and hard bargaining in 1993 did the unions concede to Alcoa the ability to implement a

cap or otherwise diminish future retiree health benefits.  *Id.*  While this is not a

conclusive determination, *Bell*, 800 F.3d at 376 ("[C]ourt may not resolve merits

questions at the class certification stage"), Plaintiff Kaiser has submitted evidence

supporting her contention that there is a common question.  Accordingly, she

**RSA.07**

demonstrated "that there are *in fact* . . . common questions of law or fact." *Dukes*, 564 U.S. at 350.

Alcoa's argument to the contrary fails.  It contends that the putative class's argument for commonality improperly focuses on evidence extrinsic to the individual collective bargaining agreements, which cannot be properly considered as a matter of contract law.  According to Alcoa, because the individual collective bargaining agreements that give class members their rights unambiguously do not contain a right to unchanging benefits, there is no common question.  *See, e.g.*, *M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015) ("Where the words of a [bargaining agreement] in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent.").  This argument has two problems.

First, it ignores Seventh Circuit precedent.  Otherwise unambiguous language can be rendered ambiguous by the surrounding circumstances, such as by later bargaining indicating the parties understood a contract in a way different than the language may suggest.  *See Int'l Union v. ZF Boge Elastmetall LLC*, 649 F.3d 641, 649 (7th Cir. 2011); *see also Gilmer v. Stone*, 120 U.S. 586, 590 (1887) ("The law is not so unreasonable . . . as to deny to the reader of [a contract] the same light which the writer[s] enjoyed.").

Second, this is essentially a merits argument.  To accept Alcoa's argument would require the court to examine the contracts and find that they are, in fact, unambiguous such that other evidence cannot be used.  This sort of "dress rehearsal for the trial on the merits" is the exact process the court cannot engage in during class certification proceedings.  *Messner*, 669 F.3d at 811.

**RSA.08**

### 2.   Numerosity

Federal Rule 23(a)(1) requires that the proposed class be "so numerous that joinder of all members is impracticable."  *Mulvania v. Sheriff of Rock Island Cnty.*, 850 F.3d 849, 859 (7th Cir. 2017).  In practical terms, that means that a group of 40 plaintiffs is generally sufficient to satisfy the numerosity requirement, even though the number may be less in certain circumstances.  *Swanson v. Am. Consumer Indus., Inc.*, 415 F.2d 1326, 1333 n.9 (7th Cir. 1969); *see also Riordan v. Smith Barney*, 113 F.R.D. 60, 62 (N.D. Ill. 1986) (collecting cases of class certification with fewer than 29 class members).

The putative class also satisfies the numerosity requirement because it numbers approximately 3,153 members, which renders joinder impracticable.  By Alcoa's own approximation, the class numbers 3,153 retirees, surviving spouses, and dependents. (Ackerman Decl. ¶ 12).  And each of those members benefits from an answer to the question discussed above.  Were there any doubt that this is sufficiently numerous, the joinder of that many plaintiffs would cause significant practical problems or would "clog the docket with numerous individual suits."  *Eggleston v. Chi. Journeymen Plumbers' Loc. Union No. 130, U.A.*, 657 F.2d 890, 895 (7th Cir. 1981).  As the point of class certification is to avoid those problems where appropriate, there can be no doubt that numerosity is satisfied.

### 3.   Typicality

Typicality is the measure of whether the named "plaintiff's interests are aligned with those of the proposed class in such a way that the representative, in pursuing his own claims, will also advance the interests of the class."  *Harris v. Cir. City Stores, Inc.*,

**RSA.09**

No. 07 C 2512, 2008 WL 400862, at *6 (Feb. 7, N.D. Ill. 2008).  A claim is typical if it "arises from the same event or practice or course of conduct that gives rise to the claims of other class members and . . . her claims are based on the same legal theory." *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983) (quoting H. Newberg, *Class Actions* § 1115(b) at 185 (1977)).  The most important component is the similarity of the named plaintiff's and class's legal theories because identical legal theories on the same question of law may warrant certification "even in the face of differences of fact." *Id.*

The named Plaintiff also satisfies the Rule 23(a)(3) requirement that they be "typical of the claims or defenses of the class."  To the extent there are minor differences of fact between Plaintiff Kaiser's and the putative class members' claims, they do not make her claims atypical.  Plaintiff Kaiser advances an identical legal theory to the putative class.  Namely, the 1993 collective bargaining negotiations indicate that both parties understood the pre-1993 agreements to guarantee undiminishable health insurance plans to retirees and their surviving spouses and dependents.  Further, all the claims, putative class representative included, arise from a singular event: Alcoa's decision to terminate the old health insurance plan.  In other words, Plaintiff Kaiser's claims assert the same legal theories and are based on the same conduct as the claims of the class.

Alcoa's only quibble with this analysis is that Plaintiff Kaiser's spouse—from whom she derives the right to healthcare benefits—retired from just one of the 48 different facilities that compose the class.  That fact does nothing to change the result here.  As discussed in relation to commonality, Plaintiff alleges that 1993 was the first

10

**RSA.10**

time Alcoa could modify benefits regardless of the facility involved.  Accordingly, which facility the class representative comes from is not relevant to the common question at issue and, thus, not relevant to whether the named plaintiff is typical.  Accordingly, Plaintiff Kaiser's claims are typical of the class.

### 4.   Adequacy

Finally, Plaintiff Kaiser is an adequate representative under Rule 23(a)(4).  That Rule requires that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  To protect the interests of the class fairly and adequately, the representative must not have antagonistic or conflicting interests with the class.  *See Sebo v. Rubenstein*, 188 F.R.D. 310, 316 (N.D. Ill. 1999).

Here, Plaintiff Kaiser has the same stake in the case as other class members.  Her fortune rises and falls on the same legal theory as the rest of the class.  As a result, she has a strong incentive to vigorously pursue the claim common to each member of the class.

Alcoa believes that Plaintiff Kaiser is not adequate to represent the interests of the class because there is an intra-class conflict—between class members like Plaintiff Kaiser who prefer the old plan and some unidentified class-members who prefer the new plan— that prevents Plaintiff Kaiser from adequately representing the entire class.  That is unpersuasive for two reasons.  First, "[t]o deny class certification now, because a potential conflict of interest that may not become actual, would be premature."  *Kohen v. Pac. Inv. Mgmt.*, 571 F.3d 672, 680 (7th Cir. 2009).

**RSA.11**

Second, Alcoa's argument is premised on the idea that Plaintiff Kaiser wants "to dismantle the HRA program and force everyone back onto the prior fixed group plan." (Filing No. 90, Defs.' Br. in Opp. at 2). But Plaintiff Kaiser seeks relief that has nothing to do with eliminating the Health Reimbursement Arrangement; she is instead seeking an "[o]rder . . . to reinstate the retiree healthcare coverage and Medicare Part B premium reimbursement" and a declaration "that Defendants cannot unilaterally terminate or modify the contractually-provided retiree healthcare coverage." (Compl. ¶¶ B–C). That would not require Alcoa to dismantle the new program. Alcoa could continue to provide undiminished benefits to pre-1993 retirees, spouses, and dependents and offer the new program simultaneously. In other words, Alcoa is threatening to create a class conflict by eliminating the new plan when it need not do so. But it has not cited any case where a court has denied class certification based on a manufactured a class conflict. Thus, Alcoa's threatened action does not render Kaiser an inadequate class representative.

Alcoa does not dispute that the law firms Feinstein Doyle Payne & Kravec, LLC and Macey Swanson LLP are adequate class counsel. On the court's independent investigation, the court finds that counsel has extensive experience in class actions and complex litigation with concomitant knowledge of the applicable law and has done significant work to develop the claims here. (Filing Nos. 90-7, 90-8). This satisfies the factors laid out in Rule 23(g)(1) for adequate class counsel.

### 5.    Rule 23(b)

The class satisfies the requirements to be certified under Rule 23(b)(2). A (b)(2) class requires that "the party opposing the class has acted or refused to act on grounds

**RSA.12**

that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).

Rule 23(b)(2) focuses on "the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them."  *Dukes*, 564 U.S. at 360.  Thus, Rule 23(b)(2) classes are acceptable where "a single injunction or declaratory judgment would provide relief to each member of the class."  *Id.*  That is the case here.

The putative class seeks relief that would provide identical relief to each class member.  In terminating the retirees' old healthcare benefits, Alcoa acted identically to each class member.  And the remedy sought by the class for Alcoa's action is a declaration and an injunction regarding Alcoa's contractual authority to modify benefits.  (Compl. ¶¶ B–C).  Because the focus of the injunctive and declaratory relief is on Alcoa's powers, the proposed relief is indivisible so that Alcoa either acted lawfully or unlawfully as to every class member.  Certification under Rule 23(b)(2) is proper.

Alcoa contends that Rule 23(b)(2) certification is not proper because Plaintiff Kaiser is actually seeking individualized money damages for class members.  *See Dukes*, 564 U.S. at 360–62 ("[W]e think it clear that individualized monetary claims belong in Rule 23(b)(3).").  In its view, because the injunction requested by Plaintiff Kaiser would require reinstating company-paid life insurance which would pay out benefits based on an individual's plan, her claim is really one for individualized, rather than incidental, damages.  That conclusion is not consistent with Seventh Circuit precedent on the issue.  Instead, "[t]he present case is one of incidental damages because if the plaintiffs get the

13

**RSA.13**

[injunction] they are seeking, the benefits to which the . . . plan entitles them will simply be read off from the plan." *In re Allstate Ins.*, 400 F.3d 505, 507 (7th Cir. 2005). If the class prevails, any monetary recovery will have already been set by their individualized facility-level collective bargaining agreements and can "simply be read off from" those plans. *Id.*

As Alcoa's other counterarguments simply recast its previously discussed merits contentions, the court certifies the main class under Rule 23(b)(2).

## IV.  Conclusion

For the reasons discussed above, the court **GRANTS** Plaintiff's motion for class certification (Filing No. 81). The court, thereby, certifies a Rule 23(b)(2) class, represented by Plaintiff Lynnette J. Kaiser, of:

> All former employees of Alcoa USA Corp., its predecessors, or affiliated companies (collectively, "Alcoa") who were represented by the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, ALF-CIO/CLC ("USW"), Aluminum Trades Council of Wenatchee, Washington AFL-CIO ("ATC"), the Longview Federated Aluminum Council, or a predecessor union, together with their eligible spouses, surviving spouses, and other dependents, who as of December 31, 2020, were eligible to receive uncapped health care benefits from Alcoa upon attaining Medicare-eligibility, and whose Alcoa-provided benefits or eligibility for those benefits was terminated as of January 1, 2021.

The court appoints the law firms Feinstein Doyle Payne & Kravec, LLC and Macy Swanson LLP as class council for the aforementioned class.

The parties are **ORDERED to confer and produce a proposed notice of class certification within 45 days of the date of this Entry**. If the parties are unable to agree

**RSA.14**

on a proposed notice, **competing proposals are due 60 days from the date of this**

**Entry**.


**IT IS SO ORDERED** this 29th day of September 2022.



RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana



Distributed Electronically to Registered Counsel of Record.

**RSA.15**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

LYNNETTE J. KAISER, on behalf of herself )
and all others similarly situated, *et al.*, )
)
Plaintiffs, )
)
v. )        No. 3:20-cv-00278-RLY-CSW
)
ALCOA USA CORP., *et al.*, )
)
Defendants. )

**ENTRY GRANTING PLAINTIFFS' PARTIAL MOTION FOR SUMMARY
JUDGMENT AS TO LIABILITY AND GRANTING IN PART AND DENYING IN
PART DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

On January 1, 2021, Defendant Alcoa USA Corporation[1] unilaterally terminated

the health benefits it provided to Medicare-eligible retirees through a fixed group health

plan and replaced that plan with a health reimbursement arrangement.  Plaintiffs are a

group of former Alcoa employees and Union members[2] who retired from Alcoa plants

prior to the 1993 collective bargaining agreement taking effect and their dependents.[3]

They contend Alcoa guaranteed them lifetime healthcare benefits that could not be

unilaterally diminished by Alcoa and that the new health reimbursement arrangement

---

[1] The other Defendants are three ERISA plans sponsored and administered by Alcoa for the
retiree plaintiffs.
[2] Two national Unions that engaged in bargaining with Alcoa for the collective bargaining
agreements at issue in this case are also plaintiffs.
[3] Because Alcoa has merged (and then later separated from) other companies over the years, not
all retirees in the class are "Alcoa" retirees.  The court refers to all members of the class as
"Alcoa retirees" because no party disputes that Alcoa provides all members of the class their
retirement benefits.  Moreover, none of the current litigants have discussed any differences
between different groups of retirees, nor proposed any subclasses for the resolution of issues
particular to one group of retirees, but not any other.

1

**RSA.16**

operates to reduce their healthcare benefits in violation of those guarantees. This court certified a Rule 23(b)(2) class to answer the common question of whether Alcoa first received the ability to limit retirees' future benefits in the 1993 collective bargaining agreement. Following the close of discovery, Plaintiffs and Defendants moved for summary judgment. The court heard oral argument on those motions on January 25, 2024. For the reasons that follow, the court now **GRANTS** Plaintiffs' motion for partial summary judgment as to liability and **GRANTS in part** and **DENIES in part** Defendants' cross-motion for summary judgment.

## I.      Background

Alcoa, like many corporations, bargains with collective groups of employees who have formed unions. (*See, e.g.*, Filing No. 147-9, 1988 Alcoa-USW Collective Bargaining Agreement). These negotiations have resulted in collective bargaining agreements stretching at least as far back as 1968. (*See* Filing No. 97-1, 1968 Alcoa-USW Collective Bargaining Agreement). Each of these agreements contains promises by Alcoa to provide employees healthcare benefits during their retirements. (*See, e.g.*, 1988 Alcoa-USW Collective Bargaining Agreement at 98). The exact scope of these promises is the issue in this case.

Beginning with the 1993 changes to the generally accepted accounting principles, Alcoa faced increasing healthcare costs. *See, e.g.*, *Curtis v. Alcoa, Inc.*, No. 3:06-cv-448,

**RSA.17**

2011 WL 850410, at ¶ 7 (E.D. Tenn. March 9, 2011)).[4]  This led to Alcoa proposing a

cap on the healthcare expenditures it would expend on behalf of the retirees around the

same time.  (Filing No. 136-8, Porter Dep. at 28–37).  After much gnashing of teeth by

the Unions and concessions from Alcoa, the Unions allowed Alcoa to implement a cap

but required deferring the cap's implementation until after the next round of collective

bargaining.  (*Id.*).  At first, the parties could not agree to when the cap would engage but

ultimately agreed to implement the cap on January 1, 2007.  (Filing No. 136-11,

Kovaloski Dep. at 26–32).

        When Alcoa attempted to implement the cap, a group of retirees who retired after

the 1993 cap agreement brought suit.  *Curtis*, 2011 WL 850410.  In their view, the cap

was not supposed to be real, but was for accounting purposes only.  *See id.* at ¶ 264.  The

post-1993 retirees sought a preliminary injunction, which Alcoa defeated in part on the

ground that the post-1993 retirees—who were seeking lifetime, uncapped benefits—

"seek to receive benefits as if they had retired before June 1, 1993."  (Filing No. 132-4 at

22).  Alcoa also sought summary judgment on the explanation that plaintiffs' "theory is

that this cap letter had no effect whatsoever, that the rights of the people who retired after

1993 are exactly the same as the rights of people who retired before 1993."  (Filing No.

132-21 at 59).  After the *Curtis* court denied summary judgment, the case proceeded to an

---

[4] The court takes judicial notice of the *Curtis* trial and appellate docket pursuant to Federal Rule
of Evidence 201.  *See Daniel v. Cook Cnty.*, 833 F.3d 728, 742 (7th Cir. 2016) ("Courts routinely
take judicial notice of the actions of other courts.").

**RSA.18**

eight-day bench trial where Alcoa explained it "will [pay healthcare benefits] for the rest of these people's lives." (*Id.* at 72).

Ultimately, the *Curtis* district court, in a comprehensive decision, found for Alcoa and explained the promise of healthcare benefits was a promise of healthcare benefits for life, but those lifelong benefits were subject to the healthcare cap. *Curtis*, 2011 WL 850410, at ¶ 237 ("[P]laintiffs' health benefits are lifetime benefits . . . subject to the cap."). Yet that court's judgment did not contain any declaration that the plaintiffs had lifelong healthcare benefits. (*Curtis*, Docket at Filing No. 524 ("**IT IS ORDERED AND ADJUDGED** that the plaintiffs take nothing . . . .") (emphasis in original)). The post-1993 retirees sought to amend that judgment to add an express declaration that "Plaintiffs' healthcare benefits under the Alcoa Inc. plan(s) are vested lifetime benefits in accordance with ¶¶ 236 and 237 of the Court's Findings of Fact and Conclusions of Law filed March 9, 2011." (Filing No. 132-25, at 1). Alcoa opposed the motion on the ground that "[e]ven before this Court's ruling, Alcoa was committed to providing benefits to members of the plaintiff class at the 2006 cap level; as such, a formal order that those benefits are vested would provide members of the class with nothing more than what Alcoa has agreed to give them." (Filing No. 132-27 at 2). The *Curtis* court denied the retirees' motion. (*Curtis*, Docket at Filing No. 541).

The retirees appealed; Alcoa did not cross-appeal nor contest the district court's findings. (*See generally Curtis v. Alcoa*, No. 12-5801, 6th Cir. Docket). Based on Alcoa's arguments that the district court correctly found the post-1993 retirees' benefits had vested but were subject to the cap, the Sixth Circuit affirmed and explicitly

reaffirmed that the retirees had lifelong healthcare benefits. *Curtis v. Alcoa*, 525 F. App'x 371, 381 (6th Cir. 2013) (explaining the district court did not commit error in finding "plaintiffs are entitled to *lifetime*, capped *healthcare benefits*") (emphasis in original). Alcoa did not seek a modification of that order, a rehearing *en banc*, or cross-petition for a writ of certiorari.  (*See generally Curtis v. Alcoa*, 6th Cir. Docket).

Things proceeded amicably until Alcoa announced it would transition pre-1993 retirees from their old, fixed group health plan to a newer health reimbursement arrangement.  (Filing No. 90-1, Ackerman Decl. ¶¶ 2, 7).  Willis Towers Watson provided some analysis indicating this would provide cost savings for retirees in the short term.  (Ackerman Decl. ¶ 3–5).  However under the health reimbursement arrangement, Alcoa could terminate healthcare benefits "at any time," 33% of post-1993 retirees are not receiving healthcare benefits, and the burden of inflation shifts from Alcoa onto the retirees.  (Filing No. 49-1, New Plan SPD at 3; Filing No. 90, Alcoa's Br. in Opp. to Class Certification at 5; Filing No. 150-5, Allen Dep. at 176).  Believing this new plan reduced their benefits and that Alcoa had promised them lifelong benefits that could not be unilaterally reduced (as Alcoa stated in the *Curtis* litigation), Plaintiff Lynette Kaiser brought suit on behalf of a putative class of pre-1993 retirees and their dependents and spouses to enjoin Alcoa from removing the old plan.  (Filing No. 1, Compl.).  The court certified this class as proposed.  (Filing No. 108).

## II.   Legal Standard

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(a).  That requires reviewing the record in the "light most favorable to the nonmoving party and draw[ing] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009).  When reviewing cross-motions for summary judgment, "we construe all inferences in favor of the party against whom the motion under consideration is made." *Schlaf v. Safeguard Prop., LLC*, 899 F.3d 459, 465 (7th Cir. 2018) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

The mere existence of an alleged factual dispute is not sufficient to defeat a motion for summary judgment.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).  That is because "[i]t is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which [it] relies." *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008).

## III.  Discussion

The retirees bring a civil action under 29 U.S.C. §§ 1132(a)(1)(B) and 1132(a)(3) to enforce the collective bargaining agreements the retirees retired under.  In their view, the collective bargaining agreements promised them lifelong healthcare benefits, which were abridged when Alcoa transitioned them from the old, fixed group health plan to the new health reimbursement arrangement plan.  The parties spill a considerable amount of ink discussing the exact contours of the specific bargaining agreements and why these agreements do or do not provide healthcare benefits for the rest of the retirees' lives.  The court, however, begins with whether the doctrine of judicial estoppel prohibits Alcoa

from arguing the retirees do not have lifelong healthcare benefits.  Finding that it does, the court need proceed no farther into the analysis of whether the retirees have lifelong healthcare benefits, and thus turns to Alcoa's non-estopped arguments for summary judgment: the retirees have not shown the new plan is not reasonably commensurate with the old plan, and the retirees' claim under 29 U.S.C. § 1132(a)(3) is barred by their claim under 29 U.S.C. § 1132(a)(1)(B).  The court takes these arguments in turn.

A.     **Judicial Estoppel**

"[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position . . . ."  *Davis v. Wakelee*, 156 U.S. 680, 689 (1895).  This rule is judicial estoppel, and its purpose is to "prevent the perversion of the judicial process."  *In re Cassidy* 892 F.2d 637, 641 (7th Cir. 1990).  Due to its purpose, judicial estoppel "is an equitable doctrine invoked by a court at its discretion."  *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001).  And because the doctrine may be invoked *sua sponte*, the court need not accept a waiver of it.  *See Bethesda Lutheran Homes & Servs., Inc. v. Born*, 238 F.3d 853, 858 (7th Cir. 2001).

Three factors guide the court's discretion in applying judicial estoppel.  *In re Knight-Celotex, LLC*, 695 F.3d 714, 721 (7th Cir. 2012) (citing *New Hampshire*, 532 U.S. at 750–51).  First, whether the party against whom estoppel is sought has taken a position "clearly inconsistent" with its earlier position.  *United States v. Hook*, 195 F.3d 299, 306 (7th Cir. 1999).  Second, whether the party succeeded in persuading a court to accept that party's earlier position.  *See Frazier-Hill v. Chi. Transit Auth.*, 75 F.4th 797,

7

**RSA.22**

804 (7th Cir. 2023) ("Having convinced the district court otherwise, the doctrine of
judicial estoppel prevents [Plaintiff] from having it both ways). And third, whether the
party seeking to assert an inconsistent position would derive an unfair advantage or
impose an unfair detriment on the opposing party if not estopped. *In re Knight*, 695 F.3d
at 721–22.

This is not a set of "inflexible prerequisites or an exhaustive formula" for applying
judicial estoppel, *New Hampshire*, 532 U.S. at 751; rather, these three factors are
"general guideposts that must be considered in the context of all the relevant equities in
any given case," *In re Knight*, 695 F.3d at 722. Thus, other considerations, such as the
magnitude of the interpretative task left to the district court in the original proceeding,
can influence the analysis. *See In re Airadigm Commc'ns, Inc.*, 616 F.3d 642, 662–63
(7th Cir. 2010) (finding judicial estoppel "particularly appropriate in the setting of this
case, in which the parties . . . assist[ed] the bankruptcy court in interpreting the meaning
of" a reorganization plan). For example, in *Airadigm*, a bankruptcy court was challenged
with interpreting a complicated, seven-year-old plan of reorganization. *Id.* at 647. In
considering that plan, the bankruptcy court heard argument from the financier of the
reorganization, who argued in the papers and at oral argument that a different "Back-up
plan" controlled a creditor's claim which did not allow for recovery by the creditor. *Id.* at
662. The bankruptcy court agreed, which saved the financier $47 million on the $49
million claim. *Id.* On appeal and after the creditor assigned its claims to the financier,
the financier reversed course and argued it was entitled to the $49 million claim under the
primary plan of reorganization. *Id.* at 661. The Seventh Circuit applied judicial estoppel

8

**RSA.23**

because the "bankruptcy court was faced with no small task" due to "numerous interpretative difficulties." *Id.* If the court allowed a beneficiary to that agreement to change course, "it would give the impression that, rather than helping the bankruptcy court to interpret the plan, [the financier] hoodwinked that court." *Id.*

The application of judicial estoppel is appropriate here to bar Alcoa from arguing it is not obligated to provide pre-1993 retirees lifetime benefits. First, Alcoa's position in this litigation is diametrically opposed to its position in *Curtis v. Alcoa, Inc.*, No. 3:06-cv-448, 2011 WL 850410 (E.D. Tenn. Mar. 9, 2011). That litigation concerned the healthcare benefits cap Alcoa and the Unions negotiated in 1993 for post-1993 retirees. When Alcoa sought to implement the cap, in accord with its agreement with the Unions, a group of employees sued arguing that "the cap [was] not real," and was, instead, to disguise Alcoa's retiree obligations for accounting purposes. *Id.* at *45, 49. That court found for Alcoa after an eight-day bench trial and held "that plaintiffs are entitled to lifetime, capped healthcare benefits." *Id.* at 55.

In *Curtis*, Alcoa made multiple statements relevant to proceedings here. For example, in opposing the *Curtis* plaintiffs' motion for a preliminary injunction, Alcoa explained that the post-1993 retirees—who were seeking lifetime, uncapped benefits— "seek to receive benefits as if they had retired before June 1, 1993," which necessarily implies that pre-1993 retirees had lifetime, uncapped benefits. (Filing No. 132-4 at 22). And this was not merely a blunder; Alcoa explained the *Curtis* plaintiffs' "theory" was untenable because that theory would mean "that th[e] cap letter had no effect whatsoever, that the rights of the people who retired after 1993 are exactly the same as the rights of

9

**RSA.24**

people who retired before 1993."  (Filing No. 132-21 at 59).  In other words, Alcoa took

the position before the *Curtis* district court that without the cap, "the rights" of pre- and

post-1993 retirees "are the same," (i.e., the only difference between pre- and post-1993

retirees was the cap).  (*Id.*).

Alcoa further represented that retiree health benefits were guaranteed for life.  For

example, it explained to the *Curtis* court that it would continue to pay retirees' healthcare

benefits for the rest of their lives, which necessitated the cap in the first instance.  (*Id.* at

87 ("Alcoa's paying almost $8,000 per person pre-Medicare.  We'll continue to do that for

the rest of their lives.")).  Further context makes clear that Alcoa made this comment in

reference to the written CBA between Alcoa and the Union.  (*Id.* at 72 ("We are forced to

return to the written . . . deal.  Alcoa is living up to that deal.  Alcoa . . . will [pay

healthcare benefits] for the rest of these people's lives.")).  Further, after the district court

entered judgment for Alcoa, the plaintiffs sought to amend that judgment to add an

express declaration that "Plaintiffs' healthcare benefits under the Alcoa Inc. plan(s) are

vested lifetime benefits in accordance with ¶¶ 236 and 237 of the Court's Findings of Fact

and Conclusions of Law filed March 9, 2011."  (Filing No. 132-25, at 1).  Alcoa opposed

the motion, but not on whether Plaintiffs were entitled to vested benefits: "Even before

this Court's ruling, Alcoa was committed to providing benefits to members of the plaintiff

class at the 2006 cap level; as such, a formal order that those benefits are vested would

provide members of the class with nothing more than what Alcoa has agreed to give

them."  (Filing No. 132-27 at 2).  That, ultimately, persuaded the *Curtis* court not to

amend its judgment.

**RSA.25**

These representations are clearly inconsistent with Alcoa's position in this case. Alcoa now contends it never promised any retirees that it would provide healthcare benefits for the rest of their lives.  (*But see* Filing No. 132-21 at 87 ("Alcoa's paying almost $8,000 per person pre-Medicare.  We'll continue to do that for the rest of their lives")).  Moreover, Alcoa quite clearly explained in *Curtis* that it believed there to be a singular difference between pre-1993 and post-1993 retirees: the cap.  If, as Alcoa represented to the *Curtis* court, post-1993 retirees have lifetime healthcare benefits, Alcoa necessarily represented that pre-1993 retirees had lifetime healthcare benefits because, according to Alcoa, the only difference between the two groups was the presence of the cap for post-1993 retirees.

Most importantly, these representations persuaded the *Curtis* court.  That court adopted the exact position suggested by Alcoa that post-1993 retirees were "entitled to lifetime, capped healthcare benefits."  *Curtis*, 2011 WL 850410, at \*55; (*cf.* Filing No. 132-21 at 72 ("The Union agreed to th[e] cap. . . . We are forced to return to the written . . . deal.  Alcoa is living up to that deal.  Alcoa . . . will [pay healthcare benefits] for the rest of these people's lives.")).  Alcoa certainly took this as a victory when it explained that "[t]he Court agreed with Alcoa—that Plaintiffs' benefits had vested 'subject to the cap' . . . ."  (Filing 132-27 at 7).  The district court even acceded to Alcoa's argument that no specific declaration that post-1993 retirees had lifetime healthcare benefits was necessary because such a declaration would be duplicative of Alcoa's contractual promises when it denied Plaintiffs' motion to amend the judgment.  *See Curtis v. Alcoa, Inc.*, No. 3:06-cv-448, Filing No. 541 (E.D. Tenn. June 11, 2012).  Alcoa's

11

**RSA.26**

representations and concessions that retirees had lifetime healthcare benefits were so

pervasive that the Sixth Circuit remarked off-hand that "[u]nder the parties' 1988 CBA

that expired in 1992, [Alcoa] provided lifetime, uncapped retiree healthcare benefits."

*Curtis v. Alcoa, Inc.*, 525 F. App'x 371, 373 (6th Cir. 2013).  Put differently, based on

Alcoa's representations that it agreed with the *Curtis* plaintiffs' position on the length of

benefits, it was simply unquestioned that pre-1993 retirees had lifetime healthcare

benefits.

     Allowing Alcoa to reverse course and argue that pre-1993 employees have no

guaranteed lifetime retiree healthcare benefits would provide Alcoa an unfair advantage.

As the Seventh Circuit has explained, "[j]udicial estoppel is designed to prevent parties

from obtaining an unfair advantage *by* taking a present position that is inconsistent with

one successfully taken in the past."  *Massuda v. Panda Exp., Inc.*, 759 F.3d 779, 783 (7th

Cir. 2014) (emphasis added).  Alcoa would quite clearly gain an unfair advantage by

taking the position that pre-1993 retirees do not have lifetime healthcare benefits, which

is inconsistent with a position "successfully taken in the past."  *Id.*

     The complexity of the interpretive question posed to this court and the *Curtis* court

also weighs in favor of applying judicial estoppel.  The *Curtis* court was tasked with

sifting through decades of continuous bargaining between the Unions and Alcoa.  The

parties submitted around 9,382 pages of documentary exhibits at trial.[5]  *See Curtis*, Filing

Nos. 565–77.  Alcoa was also the only entity with any experience at the bargaining table;

---

[5] This does not include deposition excerpts and trial testimony, which easily stretch multiple
hundred more pages.  *See Curtis*, Filing Nos. 547–64.

**RSA.27**

the plaintiffs were not parties to the early negotiations between Alcoa and the Unions (who were not themselves a party).   This is similar to the position of the bankruptcy court in *Airadigm*.  Like the situation there, allowing Alcoa to reverse its position would give the impression that Alcoa hoodwinked the *Curtis* court instead of assisting it in sifting through the voluminous record and lengthy bargaining history.

Alcoa brings forward two arguments for why judicial estoppel would be inappropriate.  Neither is persuasive.  First, Alcoa argues its statements were taken out of context; its position in *Curtis* was actually that no retiree received lifetime healthcare benefits.  Second, judicial estoppel would be inappropriate because the Sixth Circuit does not give preclusive effect to judgments prior to the Supreme Court's decision in *M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427 (2015).  *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Kelsey-Hayes Co.*, 854 F.3d 862, 872 (6th Cir. 2017) ("[G]iven the Court's strong language in *Tackett*, we will not give pre-*Tackett* decisions on these exact issues preclusive effect.").

Alcoa's first argument is not exactly correct—the supposedly missing context is that Alcoa argued both positions in the alternative and, in doing so, maintained both positions before the *Curtis* district court (instead of only one as Alcoa suggests).   But the relevant inquiry is not just the arguments Alcoa made, but which argument persuaded the district court.  Because it was Alcoa's argument that retirees had lifetime, capped healthcare benefits that persuaded the *Curtis* court, judicial estoppel locks Alcoa into that position.  This accords with the treatment given by the Courts of Appeal that have considered this topic.  *See Gabarick v. Laurin Mar. (Am.) Inc.*, 753 F.3d 550, 554 (5th

**RSA.28**

Cir. 2014) (explaining that "the fact that a party's previous position was an alternative argument is not determinative" such that "[o]nce a court has accepted and relied upon one of a party's several alternative positions, any argument inconsistent with that position may be subject to judicial estoppel"); *see also In re B&P Baird Holdings, Inc.*, 759 F. App'x 468, 479 (6th Cir. 2019) (explaining judicial estoppel "does not bar a party from contradicting itself, but from contradicting a court's determination that was based on that party's position") (quoting *Teledyne Indus., Inc. v. NLRB*, 911 F.2d 1214, 1217 n.3 (7th Cir. 1990)).  This makes sense: if a party seeks to maintain an alternative argument before a court, it must be prepared to be locked into that position should it prove persuasive.

Equally important to the exercise of the court's discretion here is that Alcoa abandoned its argument that retirees did not have lifetime healthcare benefits.  The *Curtis* district court was quite clear in its opinion that post-1993 retirees had lifetime healthcare benefits.  *See Curtis*, 2011 WL 850410, at *52 ("[T]he court finds that . . . plaintiffs are entitled to lifetime, capped healthcare benefits.").  Alcoa never sought reconsideration of this portion of the opinion, nor did it cross appeal or raise that issue in the plaintiffs' appeal.  (*See Curtis v. Alcoa*, No. 12-5801, Docket at Filing No. 41).  To the contrary, it repeatedly asked the Sixth Circuit to affirm the district court's "correct" findings and argued that healthcare benefits had vested.  (*See, e.g., id.* at 24–30 ("The district court found that Appellants' benefits vested only at retirement . . . . The district court's findings were not in error."); *see also id.* at 53 (citing the district court's finding that Alcoa provided certain healthcare benefits to retirees and stating that "Alcoa provides

**RSA.29**

Appellants more than the vested benefits to which they were entitled under the CBAs in existence when they retired.")).  Indeed, when the Sixth Circuit affirmed that plaintiffs had lifetime benefits explicitly, *see Curtis*, 525 F. App'x 371 at 381, Alcoa did not cross-petition for a writ of certiorari or seek *en banc* review of that determination. (*See Curtis v. Alcoa*, No. 12-5801, Docket at Filing Nos. 67 (Plaintiff's Petition for Rehearing *En Banc*), 73 (Alcoa's Opposition to the Petition for Rehearing *En Banc*), and 92 (Plaintiff's Petition for a Writ of Certiorari)).  So while there may be some situations where it may not be appropriate to discretionarily estop a party from asserting a position it previously asserted as an alternative argument, this case does not present one of those situations.

Second, that the Sixth Circuit would not give preclusive effect to the *Curtis* decision does lend much weight toward not applying judicial estoppel.  Judicial estoppel is about "the fact of inconsistency itself" rather than "the fact of adjudication," which means "[j]udicial estoppel has little to do with preclusion by judgment, even when it requires reliance by a court on a prior inconsistent position."  Wright & Miller, *Federal Prac. & Proc.*, § 4477 (3d ed.).  To be sure, judicial estoppel may be inappropriate where "the defendants' change in position resulted from circumstances outside their control—namely, a change in controlling . . . law." *Jarrard v. CDI Telecom., Inc.*, 408 F.3d 905, 915 (7th Cir. 2005).  But that principle applies when a party cannot maintain its prior position due to substantive changes in the law. *Id.* (refusing to apply judicial estoppel because Defendant "could not have argued their prior position without running afoul of controlling Indiana caselaw").  Any legal change here is essentially evidentiary, not substantive.  Just because the method the Sixth Circuit uses to interpret the parties'

**RSA.30**

intentions changed,[6] does not mean the parties' intentions actually changed or that the parties are no longer permitted to agree to vest benefits.  The switch in position here is not necessary for reasons outside Alcoa's control.

Having decided judicial estoppel is appropriate, the remaining issue is the scope of the estoppel, meaning what Alcoa is barred from arguing.  Plaintiffs argue Alcoa should be barred from arguing pre-1993 retirees do not have lifetime healthcare benefits because Alcoa explicitly tied pre- and post-1993 retirees' benefits to each other, with the only difference being that post-1993 retirees' lifetime benefits were subject to a cap.  Alcoa contends that estoppel should only bar it from arguing post-1993 retirees' health benefits were lifelong because the *Curtis* case involved different issues—whether the cap was real—and different plaintiffs.  Plaintiffs get the better of the argument because the legal issues and the specific plaintiffs are not germane to the issue of estoppel.  Alcoa did make representations about pre-1993 retirees' benefits that helped persuade the *Curtis* court, even if that was not strictly the issue presented in that case.  For that reason, Alcoa is barred from arguing pre-1993 retirees do not have lifetime healthcare benefits.[7] Accordingly, the class has established, as a matter of law, that they had a right to lifetime healthcare benefits from Alcoa.

---

[6] As the Seventh Circuit has noted, the Supreme Court's decision in *Tackett* is entirely consistent with its precedent on vesting in collective bargaining agreements, so it is not clear there was a change in controlling law at all.  *See Stone v. Signode Indus. Grp., LLC*, 943 F.3d 381, 385 (7th Cir. 2019) ("*Tackett* and *Reese* are consistent with the approach we have taken for decades.").
[7] At no point did Alcoa indicate there were any differences between different sects of pre-1993 retirees; it continuously discussed pre-1993 retirees as one monolithic group.  Indeed, the undisputed evidence confirms this.  (*See, e.g.*, Filing No. 90-1, Willis Towers Watson Analysis at 89 (comparing "uncapped" pre-1993 retirees as a single group to other groups of retirees)).

**RSA.31**

## B.   Comparability of the New Plan

Alcoa argues the new health reimbursement arrangement plan is reasonably commensurate with the retirees' prior insurance plan, which Alcoa contends means it did not violate its contractual promises.  Plaintiffs respond that they do not need to show the new plan was not reasonably commensurate under governing law and, in the alternative, that the undisputed facts show the health reimbursement arrangement plan is not reasonably commensurate with the old, fixed group health plan.  Because no reasonable jury could find the health reimbursement arrangement plan is reasonably commensurate with the old, fixed group health plan, the court does not address whether a plaintiff needs to show the new plan is not reasonably commensurate to prevail.

The health reimbursement arrangement is not reasonably commensurate with the old plan for three reasons.  First, the new plan expressly provides that Alcoa can terminate the benefits "at any time," which is a substantial decrease from the retirees' current lifelong benefits.  (Filing No. 49-1, New Plan SPD at 3).  Second, 33% of the class is receiving no benefits because they are not eligible for the new plan, despite Alcoa guaranteeing them healthcare benefits for life.[8]  (Filing No. 90, Alcoa's Br. in Opp'n to Class Certification at 5 (conceding that only "67% of the proposed class" was receiving

---

[8] Alcoa frames this as a decision to "affirmatively decline to participate," but provides no reason why that matters.  Alcoa promised to provide lifetime benefits and it is not currently providing any benefits under the new plan.  That the new plan would allow a retiree to have no benefits means the new plan represents a significant reduction in the benefits available to that retiree.  No evidence suggests that the retirees' decision not to enroll in the new plan was a decision to forego healthcare benefits instead of a decision not to deal with the difficulties a health reimbursement account might present.

**RSA.32**

benefits under the new plan)).  Third, the new plan diminishes retiree benefits by shifting

the burden of rising healthcare costs onto the retirees instead of being borne by Alcoa,

which eats away at the real benefits retained by the retirees.  (*See* Filing No. 150-5, Allen

Dep. at 176).  All this demonstrates that Alcoa's changes "significantly reduced" the

"general level of benefits" available to the retirees.  *Diehl v. Twin Disc, Inc.*, 102 F.3d

301, 311 (7th Cir. 1996) (explaining a new plan is not reasonably commensurate if it

significantly reduces the general level of benefits).

To be sure, Alcoa has come forward with some evidence suggesting employees

may be better off in some ways over the short term, but this does not create a genuine

dispute as to the above diminution of rights.  For example, even if the new plan provided

less out-of-pocket costs in its first year of operation, (*see* Filing No. 90-1 at ¶¶ 3–5

(analyzing retiree out-of-pocket costs under the old and new plan)), that Alcoa

unilaterally transformed retirees' lifetime benefits into gratuitous benefits at Alcoa's

leisure represents a significant decrease in retirees' benefits regardless of the short-term

monetary gain.  Accordingly, the retirees' have shown, as a matter of law, that Alcoa

breached their collective bargaining agreements by unilaterally reducing their healthcare

benefits despite the contractual promise for lifelong healthcare benefits.

### C.     Plaintiffs' § 1132(a)(3) Claim Is Barred

Plaintiffs brought suit under 29 U.S.C. § 1132 to enjoin Alcoa from removing the

old, fixed group health plan.  They did so through two subsections of that statute:

§ 1132(a)(1)(B) and § 1132(a)(3).  Section 1132(a)(1)(B) allows a "participant or

beneficiary" to bring a civil action "to recover benefits due to him under the terms of his

plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." Section 1132(a)(3), alternatively, allows a participant, beneficiary, or fiduciary "to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan" or "to obtain other appropriate equitable relief." Alcoa moves for summary judgment on the ground that § 1132(a)(3) relief is barred because Plaintiffs can adequately obtain relief through § 1132(a)(1)(B). *See Dean v. Nat'l Prod. Workers Union Severance Tr. Plan*, 46 F.4th 535, 544 (7th Cir. 2022) ("[A] participant generally cannot pursue both a [§ 1132(a)(1)(B)] claim and a [§ 1132(a)(3)] claim if the two claims seek the same relief or are based on the same allegations."). Plaintiffs have not responded to this argument but continue to seek the injunction identified in their complaint. Thus, on the understanding that Alcoa argues Plaintiffs may receive their requested injunction under § 1332(a)(1)(B) which bars an injunction under § 1132(a)(3), judgment for Alcoa on Plaintiffs § 1132(a)(3) claim is proper. *Cf. Stone v. Signode Indus. Grp., LLC*, 943 F.3d 381, 385 (7th Cir. 2019) (affirming a district court's grant of a permanent injunction for a claim brought under 29 U.S.C. § 1332(a)(1)(B)).

## IV.    Conclusion

For the foregoing reasons, the court **GRANTS** Plaintiffs' Partial Motion for

Summary Judgment as to Liability (Filing No. 131) and **GRANTS in part** and **DENIES**

**in part** Defendants' Cross-Motion for Summary Judgment (Filing No. 145).  Defendants'

Cross-Motion is granted only with respect to Plaintiffs' claim under 29 U.S.C.

§ 1132(a)(3) and denied on every other ground.

**IT IS SO ORDERED** this 25th day of March 2024.


RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana


Distributed Electronically to Registered Counsels of Record.

**RSA.35**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| LYNNETTE J. KAISER, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:20-cv-00278-RLY-CSW |
| | ) | |
| ALCOA USA CORP., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY GRANTING PLAINTIFFS' MOTION FOR
ENTRY OF ORDER OF JUDGMENT**

On January 1, 2021, Defendant Alcoa USA Corporation unilaterally terminated
the healthcare benefits it provided to Medicare-eligible retirees through a fixed group
healthcare plan and replaced that plan with a healthcare reimbursement arrangement.
Plaintiffs, retired Alcoa employees, their dependents, and their unions, sued Alcoa and
three ERISA plans sponsored and administered by Alcoa, asserting that Alcoa's
termination of their prior healthcare benefits violated the Labor Management Relations
Act ("LMRA") and the Employee Retirement Income Security Act ("ERISA"). On
March 25, 2024, the court granted Plaintiffs' Motion for Partial Summary Judgment as to
Liability and granted in part and denied in part Defendants' Cross-Motion for Summary
Judgment. With liability now established, Plaintiffs now move for entry of an order of
judgment. For the reasons set forth below, the court **GRANTS** Plaintiffs' motion.

1

**RSA.36**

I.      **Background**

A.      **Alcoa's Healthcare Plans**

For years, Alcoa provided supplemental Medicare coverage to retirees and their eligible spouses and dependents through a fixed group healthcare plan ("the Prior Plan"). (Filing No. 30-1, Allen Decl. ¶ 2).  The Prior Plan included medical and prescription drug coverage.  (*Id.*).  Retirees submitted claims of healthcare expenses for payment when they used an out-of-network provider.  (Filing No. 175-5, 2002 Retiree SPD[1] at 38).  Retirees could submit claims "by the end of the year following the year in which the expense was incurred."  (*Id.*).  Additionally, Alcoa reimbursed retirees' Medicare Part B premiums. (Allen Decl. ¶ 2; *see, e.g.*, Filing No. 10-10, 1979 Retiree SPD at 33–34).

Effective January 1, 2021, Alcoa terminated the Prior Plan.  (*See* Filing No. 90-1, Ackerman Decl. ¶ 7).  Alcoa replaced the Prior Plan with a new arrangement whereby Alcoa provides retirees and eligible spouses with funds through a healthcare reimbursement account ("HRA") to purchase their own healthcare plan from an insurance exchange secured and identified by Alcoa.  (Allen Decl. ¶ 4).  Unused HRA funds rollover each year.  (*Id.*).  During the 2021 plan year, Alcoa's annual contributions for class members varied from $2,500 to $3,400, depending on when and from what facility the employee retired.  (Ackerman Decl. ¶ 15).

Retirees can use the HRA funds to pay for "any qualified medical expense, such as their healthcare and prescription drug premiums or out-of-pocket medical costs such as a

---

[1] An SPD is a summary plan description that describes benefits and is incorporated into a collective bargaining agreement.  (*See* Filing No. 132, Pls.' Summ. J. Br. at ECF pp. 9–10).

**RSA.37**

deductible or copayment."  (Allen Decl. ¶ 4).  Prior to enrollment, retirees were informed:
"Alcoa determines reimbursable expenses, which vary by program.  That is why we don't
provide you a list in this guide."  (Filing No. 10-16, Benefits Letter at ECF p. 3).  Retirees
would receive a list of reimbursable expenses around two weeks after coverage started.
(*Id.*).

Under the HRA Plan, Alcoa stopped directly reimbursing retirees for their
Medicare Part B premiums.  A letter to retirees explained: "Alcoa's reimbursement of
your Medicare Part B premium, if you were receiving it, will end because it is now a part
of Alcoa's contribution."  (Filing No. 30-6, Enrollment Letter at ECF p. 3).

Retirees initially had only one opportunity to enroll in the HRA Plan, with a
deadline of December 31, 2020.  (*See* Allen Decl. ¶ 5).  At the time of class certification,
Alcoa estimated the class consisted of approximately 3,153 individuals.  (Ackerman
Decl. ¶ 12).  By the end of the enrollment deadline, 2,091 class members enrolled in the
HRA Plan.  (*Id.* ¶ 13).  794 class members "affirmatively declined to enroll."  (*Id.*).  268
individuals could not be reached and did not enroll.  (*Id.* ¶ 14).

### B.    Litigation History

On December 10, 2020, Plaintiffs filed suit, alleging that collective bargaining
agreements ("CBAs") provided lifetime healthcare benefits to retirees and their
dependents and that Alcoa's unilateral termination of the Prior Plan violated the LMRA,
29 U.S.C. § 185(a), and ERISA, 29 U.S.C. § 1132(a)(1)(B), (a)(3).  (Filing No. 1, Compl.
¶¶ 1, 9–10).

On December 16, 2020, Plaintiffs moved for a preliminary injunction enjoining

**RSA.38**

Defendants from terminating retiree healthcare coverage. (Filing No. 8). The parties

subsequently reached an agreement for Plaintiffs to withdraw their motion for a

preliminary injunction. (Filing No. 68, Joint Status Report). In exchange for Plaintiffs'

withdrawal of the motion, Defendants agreed, among other things, to: (1) permit putative

class members who did not enroll in the HRA Plan for 2021 to enroll for 2022 during the

open enrollment period; (2) provide class members who enroll in eligible coverage for

2022 a minimum HRA contribution of $3,400 for 2022; and (3) allow Medicare Part B

premiums to be a reimbursable expense for all class members who enroll in eligible

coverage for 2022. (Filing No. 70, Order Implementing Settlement Agreement). During

the 2022 plan year enrollment period, an additional 29 individuals enrolled in the HRA

Plan, raising the number of class members enrolled to 2,120. (Ackerman Decl. ¶ 14).

On February 11, 2022, Plaintiffs moved for class certification. (Filing No. 81).

The court granted the motion and certified, under Rule 23(b)(2), a class of Alcoa retirees

and their eligible spouses and other dependents who were previously eligible to receive

uncapped healthcare benefits from Alcoa and whose benefits were terminated as of

January 1, 2021. (Filing No. 108 at 14).

On February 1, 2023, the parties filed a Motion to Approve Joint Proposed

Scheduling Plan. (Filing No. 125). In the motion, they represented that "economy and

efficiency will be best promoted if discovery relating to the calculation of Plaintiffs'

claimed damages, including expert reports and expert discovery, if any, [takes] place

after the Court's ruling on the Parties' dispositive motions." (*Id.*). They requested leave

to propose additional dates for damages discovery after the court ruled on dispositive

motions. (*Id.*). The court granted the motion. (Filing No. 129, Order Approving Joint

Proposed Scheduling Plan). Pursuant to that order, the parties were to propose additional

dates related to damages discovery within 21 days after the court's order on dispositive

motions. (*Id.*).

The parties filed cross-motions for summary judgment. (Filing Nos. 131, 145).

The court granted Plaintiffs' Motion for Partial Summary Judgment as to Liability and

granted in part and denied in part Defendants' Cross-Motion for Summary Judgment.

(Filing No. 166, Summ. J. Entry). The court held that class members had a right to

lifetime healthcare benefits from Alcoa and that the HRA Plan is not reasonably

commensurate with the Prior Plan. (*Id.* at 16–17). As such, Alcoa breached retirees'

CBAs by unilaterally reducing their healthcare benefits. (*Id.* at 18). The court granted

summary judgment for Defendants with respect to Plaintiffs' § 1132(a)(3) claim because

Plaintiffs could adequately obtain relief under § 1132(a)(1)(B). (*Id.* at 18–19).

Following the court's summary judgment ruling, the parties did not file proposed

dates for damages discovery as required by the court's Order Approving Joint Proposed

Scheduling Plan. (*See* Filing No. 129). Instead, Plaintiffs filed a Motion for Entry of

Order of Judgment, requesting a permanent injunction that they submit "will obviate the

need for damages discovery." (Filing No. 167, Pls.' Mot. for Entry of Order of J. ¶ 3).

## II.    Legal Standard

Pursuant to Federal Rule of Civil Procedure 58(a), every judgment must be set out

in a separate document. Fed. R. Civ. P. 58(a). Under Rule 58(d), "[a] party may request

**RSA.40**

that judgment be set out in a separate document as required by Rule 58(a)." Fed. R. Civ.

P. 58(d).

## III. Discussion

Plaintiffs brought an ERISA claim under 29 U.S.C. § 1132(a)(1)(B), which

provides: "A civil action may be brought . . . by a participant or beneficiary . . . to recover

benefits due to him under the terms of his plan, to enforce his rights under the terms of

the plan, or to clarify his rights to future benefits under the terms of the plan." Because

the remedy provided in § 1132(a)(1)(B) "is designed 'to protect contractually defined

benefits,'" "the cause of action offers typical contract forms of relief, including recovery

of benefits accrued or otherwise due, declaratory judgments to clarify plan benefits, and

injunctions against future denial of benefits." *Larson v. United Healthcare Ins.*, 723 F.3d

905, 911 (7th Cir. 2013) (quoting *Mass. Mut. Life Ins. v. Russell*, 473 U.S. 134, 148

(1985)). "In fashioning relief for a plaintiff who has sued to enforce her rights under

ERISA," courts focus "on what is required in each case to fully remedy the defective

procedures given the *status quo* prior to the denial or termination of benefits." *Schneider*

*v. Sentry Grp. Long Term Disability Plan*, 422 F.3d 621, 629 (7th Cir. 2005) (internal

quotation marks omitted).

Plaintiffs request an injunction requiring Alcoa to reinstate the Prior Plan and

maintain it for the lifetime of the class members. (Pls.' Mot. for Entry of Order of J. ¶ 3).

Plaintiffs submit that the Prior Plan should be reinstated retroactive to January 1, 2021.

(*Id.*). The court first addresses the prospective effect of Plaintiffs' proposed injunction

before turning to its retroactive effect.

**RSA.41**

### A.    Prospective Reinstatement

Defendants "do not dispute that Plaintiffs have the right to an injunction to reinstate the prior plan in light of the Court's ruling on liability." (Filing No. 170, Defs.' Resp. at 2). Despite this acknowledgment, Defendants spend considerable time discussing the "significant administrative disruption and harm to" class members Defendants contend will result once the court reinstates the Prior Plan prospectively. (*Id.* at 9–12). Additionally, Defendants note that they intend to appeal, that implementing the injunction prior to Seventh Circuit review could result in further harm, and that they will file a motion to immediately stay any injunction to reinstate the Prior Plan pending appeal. (*Id.* at 9). Given Defendants' acknowledgment that prospective reinstatement of the Prior Plan must follow from the court's summary judgment order, the court does not consider Defendants' arguments regarding potential disruption and harm to class members at this time. The court will consider Defendants' arguments if they raise them in a motion to stay the injunction.

Additionally, in their surreply, Defendants allege Plaintiffs changed the scope of their requested injunction and ask that the court "order the reinstatement of the Prior Plan as an option for Class Members who want it." (Filing No. 176, Defs.' Surreply at 2). Their request stems from Plaintiffs' statement that they "have repeatedly explained that Alcoa is free to offer the HRA as an option so long as it maintains the Prior Plan to which the retirees have a lifetime right." (Filing No. 175, Pls.' Reply at ECF p. 2). Plaintiffs made this statement to respond to Defendants' contentions about harm that will befall class members upon reinstatement of the Prior Plan: "[N]o retiree will be harmed by

7

**RSA.42**

Plaintiffs' requested remedy and any harm that results from the termination of the HRA will be the fault of Alcoa, not Plaintiffs." (*Id.*). The court does not understand Plaintiffs to have changed the scope of injunctive relief they are seeking—reinstatement of the Prior Plan for all class members. (*See* Pls.' Mot. for Entry of Order of J. ¶ 3). Indeed, Plaintiffs later explained that "Plaintiffs' position is what it always has been, which is that Alcoa should be ordered to reinstate the Prior Plan and make it available for all Class Members for the rest of their lives." (Filing No. 179, Pls.' Reply in Supp. of Mot. to Strike Alcoa's Surreply at 5 n.2; *see also id.* ("If Alcoa chooses to maintain the HRA and give Class Members the option to enroll in that instead of the Prior Plan, great . . . .")).

Plaintiffs are entitled to reinstatement of the Prior Plan in light of the court's summary judgment ruling that class members had a lifetime right to healthcare benefits under the Prior Plan. Plaintiffs' request for reinstatement did not change throughout the briefing. As such, the court concludes that the appropriate prospective remedy is a permanent injunction requiring that Alcoa reinstate and maintain the Prior Plan for all class members for the rest of their lives.

## B. Retroactive Reinstatement

Plaintiffs request that the court reinstate the Prior Plan retroactive to January 1, 2021, "the effective date of the unlawful termination." (Pls.' Mot. for Entry of Order of J. ¶ 3). There are three components to Plaintiffs' request for retroactive reinstatement. First, they maintain that class members should be able to submit claims for payment of health and prescription drug expenses they incurred while the Prior Plan was terminated. (*Id.*). Second, they request that Alcoa be ordered to pay class members the Medicare Part

**RSA.43**

B premiums that would have been reimbursed if Alcoa had not terminated the Prior Plan.

(*Id.*). Third, they submit that both payment of claims for medical expenses and Medicare

Part B premiums should be made with interest. (*Id.*). The court addresses each

component of Plaintiffs' proposed injunction in turn.

        *1.    Submission of Claims for Coverage Under the Prior Plan*

Plaintiffs request that, in connection with retroactive reinstatement, class members

"should be permitted to submit for payment claims for health and prescription drug

expenses incurred from January 1, 2021 through the time Alcoa reinstates the Prior Plan."

(*Id.*). Plaintiffs submit that "Alcoa should notify Class Members of their ability to submit

claims for health care and prescription drug expenses incurred, retroactive to January 1,

2021." (*Id.* ¶ 5).

In deciding the appropriate remedy in ERISA benefits cases, courts have noted a

distinction between cases involving an initial denial of benefits and cases involving a

termination of benefits. *See Hackett v. Xerox Corp. Long-Term Disability Income Plan*,

315 F.3d 771, 775 (7th Cir. 2003). "The distinction focuses on what is required in each

case to fully remedy the defective procedures given the *status quo* prior to the denial or

termination." *Id.* at 776. Where "the plan administrator did not afford adequate

procedures in its initial denial of benefits, the appropriate remedy respecting the *status*

*quo* . . . is to provide the claimant with the procedures that she sought in the first place."

*Id.* "If the claimant prevails on remand before the plan administrator, then the claimant

would be entitled to retroactive benefits from the time at which the initial denial

occurred." *Id.* On the other hand, "where the plan administrator terminated benefits

9

**RSA.44**

under defective procedures," the appropriate remedy respecting the status quo is "the
continuation of benefits." *Id.*; *see also Schneider*, 422 F.3d at 630 ("[R]etroactive
reinstatement of benefits is the proper remedy when, for instance, a plan's claims
procedure did not comply with ERISA's requirements for full and fair review." (internal
quotation marks omitted)).

Consistent with the principle of restoring the status quo, courts have entered
permanent injunctions requiring employers to make class members whole for expenses
incurred due to changes in healthcare benefits. In *Hargrove v. EaglePicher Corp.*, the
court found that the employer violated ERISA by unilaterally modifying vested
retirement healthcare benefits. 852 F. Supp. 2d 851, 856 (E.D. Mich. 2012). The court
ordered the defendant to "promptly restore the *status quo ante* and provide class
members" with the previous healthcare benefits. *Id.* at 857. The court further ordered:
"Defendant shall promptly take such action as necessary to identify, and make whole
class members for, the expenses incurred by class members due to the defendant's
unilateral changes imposed on the class members during the period from January 1, 2010
until the date that the *status quo ante* is restored." *Id.* In another case involving
unilateral changes to the healthcare coverage provided by the CBA, the court entered a
permanent injunction that required the defendants to "[p]romptly take such action as
necessary to make whole each class member for, expenses incurred by the class member
due to defendants' unilateral changes, until each class member is made whole and the
*status quo ante* is fully restored." *United Steel, Paper & Forestry, Rubber, Mfg., Energy,*

**RSA.45**

*Allied Indus. & Serv. Workers Int'l Union, AFL-CIO-CLC v. Kelsey-Hayes Co.*, No. 11-15497, 2013 WL 2435079, at *4 (E.D. Mich. June 5, 2013).

The court finds that allowing class members to submit claims for health expenses incurred after Alcoa terminated the Prior Plan is appropriate and will best restore the status quo. Under the Prior Plan, retirees submitted healthcare expenses for payment when they used an out-of-network provider. (2002 Retiree SPD at 38). Thus, by allowing class members to submit claims for expenses incurred while the Prior Plan was terminated and having a claims administrator determine whether such claims would have been covered under the Prior Plan, class members will be permitted to do what they would have done all along had the Prior Plan not been terminated. This is as close to the status quo as possible. Furthermore, this remedy is analogous to the common ERISA remedy of remand and akin to the injunctions in *Hargrove* and *Kelsey-Hayes Co.* requiring employers to identify and make class members whole for expenses incurred due to unlawful changes to healthcare benefits.

Moreover, permitting class members to submit claims respects several other ERISA principles. In ERISA cases, courts adhere to a general principle that claims for benefits should typically be resolved by a plan administrator before courts adjudicate such claims. *See Pakovich v. Broadspire Servs., Inc.*, 535 F.3d 601, 607 (7th Cir. 2008) ("[W]hen the plan administrator has not issued a decision on a claim for benefits that is now before the courts, the matter must be sent back to the plan administrator to address the issue in the first instance."); *Hackett*, 315 F.3d at 776 ("[T]he court is not in the place to make the determination of entitlement to benefits. The court must not substitute its

11

**RSA.46**

own judgment for that of the administrator.").  This principle is also reflected in the

requirement that an ERISA plaintiff must exhaust administrative remedies before filing

suit.  *See Zhou v. Guardian Life Ins. Co. of Am.*, 295 F.3d 677, 679 (7th Cir. 2002).

Additionally, allowing for submission of claims will enable class members to "enforce

[their] rights under the terms of the plan," § 1132(a)(1)(B), by allowing them to exercise

their right to a "full and fair review by the appropriate named fiduciary" of a decision

denying a claim for benefits, § 1133(2).

Defendants assert that submission of claims for medical expenses is an improper

remedy for five reasons.  First, they claim that Plaintiffs' proposed injunction ignores the

coverage that class members received under the HRA Plan and would result in double

recovery for class members who already received coverage for the same claims under the

HRA Plan.  In reply, Plaintiffs clarify that they "do not seek such a double recovery

because if a retiree has already received full coverage under another plan, they have

incurred no expenses and there is no claim to submit."  (Pls.' Reply at ECF p. 16; *see also*

Filing No. 175-1, Ackerman Dep. at ECF pp. 56–57 (agreeing that class members could

only submit claims for expenses for which they had not already been reimbursed)).  As

such, the court does not find that the ability to submit such claims would result in an

improper double recovery.

Second, Defendants maintain Alcoa lacks "the administrative capability or medical

expertise" necessary to process claims for healthcare expenses.  (Defs.' Resp. at 14).

They also assert that "Alcoa does not have visibility into the individual plans purchased

by Class Members under the HRA Plan or their out-of-pocket expenses, due in large part

**RSA.47**

to HIPAA restrictions." (*Id.* at 15–16). However, the plans that provided health benefits under the Prior Plan are defendants in this case,[2] (Compl. ¶¶ 20–21), and have the medical expertise needed to process the claims. Moreover, having to engage a claims administrator to process such claims is not inherently burdensome on Alcoa because Alcoa must engage a claims administrator anyway to adjudicate prospective claims under the Prior Plan. (Ackerman Dep. at ECF p. 55).[3] Indeed, the Prior Plan permitted retirees to submit claims "by the end of the year following the year in which the expense was incurred," so even if the Prior Plan was reinstated only prospectively, class members would be able to submit claims for past expenses incurred dating back to 2024. (2002 Retiree SPD at 38).

Additionally, placing the burden on class members to submit claims will mitigate Defendants' concerns. As a practical matter, because the proposed injunction requires class members to investigate their expenses and take action to submit a claim, it is unlikely that all outstanding claims will be submitted. *Cf. Hollins v. Church Church Hittle + Antrim*, No. 2:20-CV-304, 2023 WL 2754383, at *3 (N.D. Ind. Apr. 3, 2023) (noting concern with class action settlement requiring class members to submit claims because the "claim rate is almost always well below 100-percent"). As to Defendants' lack of visibility into retirees' individual plans under the HRA Plan, by putting the onus

---

[2] The plans are: Retirees Group Benefit Plan for Certain Hourly Employees of Alcoa USA Corp. and Alcoa Medicare Part B Reimbursement Plan for Certain Medicare Eligible Retirees of Alcoa USA. (Compl. ¶¶ 20–21).
[3] At the time of her deposition, Alcoa's Compensation and Benefits Consultant did not know whether the same claims administrator could adjudicate both retroactive and prospective claims. (Ackerman Dep. at ECF pp. 55–56).

**RSA.48**

on class members to submit claims and the supporting documentation necessary to establish a claim was not covered under the HRA Plan, Alcoa should not need to know what plan each class member selected.  As such, the court is not persuaded that Alcoa will be incapable of or unduly burdened by the requirement that it process claims for retroactive coverage.

Third, Defendants argue that Plaintiffs cannot recover money damages through an injunction.  *See Mondry v. Am. Fam. Mut. Ins.*, 557 F.3d 781, 804 (7th Cir. 2009) ("Almost invariably . . . suits seeking (whether by judgment, injunction or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for 'money damages,' . . . since they seek no more than compensation for loss resulting from the defendant's breach of legal duty." (first omission in original) (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 918–19 (1988) (Scalia, J., dissenting))).  Defendants cite a few ERISA cases for this proposition.  For example, in *Mondry*, the court held that the plaintiff could not recover on her claim for $303.89 that was not paid for speech therapy. *Id.*  Importantly, these ERISA cases all involved claims under 29 U.S.C. § 1132(a)(3), which only authorizes injunctive relief or "other appropriate equitable relief." *Id.*  Thus, the courts concluded that the plaintiffs' requested injunctions, which were really requests for damages, were improper because they brought claims under § 1132(a)(3).  *See id.*; *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255 (1993) (concluding that plaintiffs were in fact seeking compensatory damages and thus their requested relief was not equitable relief permitted under § 1132(a)(3)); *Great-W. Life & Annuity Ins. v. Knudson*, 534 U.S. 204, 210–11 (2002) (holding that plaintiffs could not obtain, under § 1132(a)(3), an

14

**RSA.49**

injunction to compel the payment of money due). By contrast, in *Mondry*, the court

noted that plaintiff could have recovered the $303.89 owed under § 1132(a)(1)(B),

"which expressly authorizes a suit by a plan participant to recover benefits due to him

under the terms of the plan." 557 F.3d at 804–05 (cleaned up). Here, Plaintiffs were

granted summary judgment on their § 1132(a)(1)(B) claim and are seeking an injunction

based on that claim, not a claim under § 1132(a)(3).[4] (*See* Summ. J. Entry at 18–19).

Accordingly, the ERISA cases cited by Defendants involving § 1132(a)(3) claims are not

controlling.

Defendants also cite several out of circuit cases at other procedural stages for the

proposition that monetary damages cannot be recovered through an injunction. *See*

*Jaffee v. United States*, 592 F.2d 712, 714–15 (3d Cir. 1979) (holding that request for

medical care was a claim for damages, not injunctive relief eligible for interlocutory

appeal under 28 U.S.C. § 1292(a)(1)); *Richards v. Delta Air Lines, Inc.*, 453 F.3d 525,

530 (D.C. Cir. 2006) (denying class certification under Rule 23(b)(2) because plaintiff

"effectively [sought] a declaratory judgment that Delta owes monetary damages and an

injunction requiring Delta to pay them"); *Barraza v. C.R. Bard Inc.*, 322 F.R.D. 369, 387

(D. Ariz. 2017) (denying request for class certification under Rule 23(b)(2) because

plaintiffs' requested injunction was really "an order that defendants pay money to

compensate them for an injury"); *Creech v. Emerson Elec. Co.*, No. 3:15-cv-14, 2019 WL

1723716, at *12–13 (S.D. Ohio Apr. 18, 2019) (rejecting class certification under

---

[4] The court granted summary judgment for Defendants on Plaintiffs' §1132(a)(3) claim because
Plaintiffs could adequately obtain relief through § 1132(a)(1)(B). (Summ. J. Entry at 18–19).

**RSA.50**

23(b)(2) because plaintiff's proposed injunctive remedy was functionally a claim for

money damages). These cases do not persuade the court that Plaintiffs' proposed remedy

is improper in this context, given that this case is not at a procedural stage dependent on

the nature of the requested injunction and in light of the ERISA case law discussed above

authorizing retroactive reinstatement and remand of claims to plan administrators.

Fourth, Defendants contend that Plaintiffs' request for an injunction allowing class

members to submit claims for payment of healthcare expenses is at odds with the

principles of injunctive relief, given that "[t]he basis of injunctive relief in the federal

courts has always been irreparable harm and inadequacy of legal remedies." *Sampson v.*

*Murray*, 415 U.S. 61, 88 (1974). Defendants further argue that injunctions are limited to

prospective relief. *See Swanigan v. City of Chicago*, 881 F.3d 577, 583 (7th Cir. 2018)

("[A]n injunction is a forward-looking remedy."). But as explained above, in the ERISA

context, courts have explicitly retroactively reinstated benefits. *See Hackett*, 315 F.3d at

777.

Lastly, Defendants argue that Plaintiffs' legal authority does not support their

proposed injunction because the cases they cite involved disability benefits. Defendants

contend that, given the nature of disability benefits, retroactive reinstatement of benefits

in that context is simply an award of money damages, not an injunction. But the court

concludes that restoring the status quo remains the goal in the health insurance context,

and retroactive reinstatement is the best way to do that. *See Hatch v. Wolters Kluwer*

*U.S., Inc. Health Plan*, No. 20 C 7168, 2023 WL 4930286, at *20 (N.D. Ill. Aug. 1, 2023)

(applying the status quo standard in the health insurance context and retroactively

**RSA.51**

reinstating benefits).  Moreover, the Seventh Circuit has found remand appropriate in a

case involving denial of health insurance benefits.  *See Huss v. IBM Med. & Dental Plan*,

418 F. App'x 498, 508 (7th Cir. 2011).  Plaintiffs' request that class members be able to

submit claims for payment of health expenses to effectuate retroactive reinstatement is

akin to the remand remedy in ERISA cases.

In sum, the court finds that an injunction enabling class members to submit claims

for medical expenses incurred to Alcoa is an appropriate remedy that will best restore the

status quo.

2.   *Medicare Part B Premiums*

As part of retroactive reinstatement, Plaintiffs' proposed injunction would mandate

that Alcoa pay class members their Medicare Part B premiums from January 1, 2021, to

reinstatement, "less any documented reimbursement Class Members already received

through the HRA for such premiums."  (Pls.' Mot. for Entry of Order of J. ¶ 7).

Defendants object to reimbursement of Medicare Part B premiums, stating that "[t]he

amounts provided under the HRA Plan have always accounted for the Medicare Part B

premium reimbursement," and class members "received a monetary value equivalent to

the Medicare Part B Premium, even if Alcoa did not permit the funds to be used to

reimburse Medicare Part B premiums until 2022."  (Defs.' Resp. at 30–31).  Thus,

according to Defendants, reimbursement of Medicare Part B premiums would result in an

"inequitable windfall and double recovery to Class Members enrolled in the HRA Plan."

(*Id.* at 31); *see Montgomery v. Aetna Plywood, Inc.*, 39 F. Supp. 2d 915, 939 (N.D. Ill.

1998) ("ERISA plaintiffs are not entitled to receive a double recovery of damages.").

**RSA.52**

Defendants only argue that Plaintiffs' proposed remedy is improper with respect to class members enrolled in the HRA Plan.  There are roughly 1,000 class members not enrolled in the HRA Plan who have not received any of the funds Alcoa has contributed. (*See* Ackerman Decl. ¶¶ 13–14; Filing No. 170-4, Second Ackerman Decl. ¶ 7).  These class members are entitled to Medicare Part B premium reimbursement from January 1, 2021, to the time of reinstatement.

Furthermore, the court finds that class members who enrolled in the HRA are also entitled to payment of their Medicare Part B premiums, less any documented reimbursement through the HRA Plan.  Alcoa certainly represented that "Alcoa's reimbursement of your Medicare Part B premium . . . will end because it is now a part of Alcoa's contribution" through the HRA Plan.  (Enrollment Letter at ECF p. 3). Nonetheless, Alcoa's reimbursement of Medicare Part B premiums was a discrete benefit of the Prior Plan laid out in the applicable SPDs.  (*See, e.g.*, 1979 Retiree SPD at 33–34). And class members were not necessarily receiving reimbursement of those premiums through the HRA Plan until 2022, pursuant to the settlement agreement.  (*See* Order Implementing Settlement Agreement; Allen Decl. ¶ 4 (explaining that retirees could use HRA funds "to pay for any *qualified* medical expense" (emphasis added)).  Accordingly, to make class members whole and restore the status quo, *see Schneider*, 422 F.3d at 629, Alcoa must reimburse class members' Medicare Part B premiums, as it would have under the Prior Plan, less any documented reimbursement they already received through the HRA Plan.  This will not result in an improper double recovery.

18

**RSA.53**

3.    *Prejudgment Interest*

Plaintiffs request that claims for medical expenses and Medicare Part B premiums

paid pursuant to retroactive reinstatement be paid with prejudgment interest.  "Courts

award prejudgment interest because compensation deferred is compensation reduced by

the time value of money, and only prejudgment interest can make the plaintiff whole."

*Frey v. Coleman*, 903 F.3d 671, 682 (7th Cir. 2018) (internal quotation marks omitted).

The Seventh Circuit has held that "prejudgment interest should be presumptively

available to victims of federal law violations.  Without it, compensation of the plaintiff is

incomplete and the defendant has an incentive to delay."  *Fritcher v. Health Care Serv.*

*Corp.*, 301 F.3d 811, 820 (7th Cir. 2002).  The presumption in favor of prejudgment

interest "is specifically applicable to ERISA cases."  *Id.*  District courts have discretion in

whether and how to award prejudgment interest.  *Frey*, 903 F.3d at 682.  The court agrees

that an award of prejudgment interest is appropriate here to make Plaintiffs whole.

The parties disagree about what interest rate should be applied.  Plaintiffs advocate

for the current prime rate, which is now 7.5%.[5]  Defendants believe that the weighted

average prime interest rate from the onset of litigation through judgment should apply.

The Seventh Circuit has explained that, in awarding prejudgment interest, "the best

starting point is to award interest at the market rate, which means an average of the prime

rate for the years in question."  *Cement Div., Nat'l Gypsum Co. v. City of Milwaukee*, 144

F.3d 1111, 1114 (7th Cir. 1998) (emphasis omitted); *see also In re Oil Spill by the Amoco*

---

[5] *Historical Prime Rate*, JPMorganChase, https://www.jpmorganchase.com/legal/historical-prime-rate (last visited Mar. 24, 2025).  All prime rate data is derived from this source.

**RSA.54**

*Cadiz off the Coast of France on March 16, 1978*, 954 F.2d 1279, 1332 (7th Cir. 1992)

("[I]t should be plain that the market rate in question is the one *during* the litigation—

when the defendant had the use of money that the court has decided belongs to the

plaintiff—not the going rate at the end of the case.").  During this litigation, the prime

rate has ranged from 3.25% to 8.5%.  The court concludes that the rate of interest should

account for changes to the prime rate over the years and declines to award interest at the

current prime rate.

Instead, the court finds the approach that best balances equity and workability in

this case is to apply the simple average prime interest rate from the initiation of this

lawsuit to the date of judgment.  During this litigation, interest rates started and stayed

low during the COVID-19 pandemic and then quickly rose in 2022 and have since

remained at the higher end of the range.  Because of the nature of the injunction, class

members' entitlement to payment through claims or premium reimbursement will vary

widely in date, with expenses incurred in early 2021 (while the prime rate was low) and

in 2024 (while the prime rate was relatively high).[6]  It would be unfair for the low interest

rates of the COVID-19 pandemic to unduly drag down the interest rate when a significant

amount of unpaid claims will have accrued in the latter half of this litigation, when the

prime rate was higher.  Accordingly, the court finds it appropriate to apply the simple

---

[6] Technically, to achieve the most precise result, the average prime rate (whether weighted or simple) should be calculated for each and every expense based on the date by which each class member should have been reimbursed for each expense.  But that would be an onerous task for the parties to undertake to only result in potentially negligible differences in interest computation.  It is far more workable to calculate an average based on the duration of the litigation.

**RSA.55**

average prime rate that prevailed from the time suit commenced to judgment.  *See J.K.J.*

*v. Polk County*, Nos. 15-cv-428, 15-cv-433, 2018 WL 2271166, at *2 (W.D. Wis. May

17, 2018) (explaining that the simple average prime rate, as opposed to the weighted

average prime rate, "not only seems more practical, it appears to be more widely accepted

by the Seventh Circuit"); *see Cement Div.*, 144 F.3d at 1114 ("[T]he best starting point is

to award interest" by using the "average of the prime rate for the years in question."

(emphasis omitted)).  By the court's calculation, that figure is 6.5%.

    Courts in the Seventh Circuit typically compound interest either annually or

monthly.  *Allen v. Int'l Truck & Engine Corp.*, No. 1:02-cv-00902-RLY-MJD, 2017 WL

1382610, at *10 (S.D. Ind. Apr. 18, 2017).  "Compound interest generally more fully

compensates a plaintiff . . . ."  *Am. Nat'l Fire Ins. ex rel. Tabacalera Contreras Cigar Co.*

*v. Yellow Freight Sys., Inc.*, 325 F.3d 924, 938 (7th Cir. 2003).  The court finds that

compounding interest monthly is appropriate.  As one court put it:

> Because monthly compounding of interest is standard on everything from
> mortgages to credit cards to car loans, such compounding is appropriate here.
> By compounding the interest at a lesser frequency, Defendants would be
> profiting from their wrong and Plaintiff would not be compensated fully for
> the lost value of her money in the marketplace.

*Cabernoch v. Union Lab. Life Ins.*, No. 06 C 1515, 2009 WL 2497669, at *4 (N.D. Ill.

Aug. 14, 2009).  Monthly compounding is appropriate because it will better compensate

class members and ensure Alcoa "does not benefit from what amounts to an interest-free

loan obtained as a result of illegal activity."  *Allen*, 2017 WL 1382610, at *10.

    In sum, the court concludes that class members are entitled to prejudgment

interest, at the average prime rate of 6.5%, compounded monthly, on claims for medical

**RSA.56**

expenses and Medicare Part B premiums paid to class members pursuant to retroactive
reinstatement.

### C.    Decertification

Defendants contend that Plaintiffs' proposed injunction allowing class members to
submit claims for medical expenses incurred is a request for damages improperly
disguised as an injunction.  Defendants therefore request that the court decertify the class
with respect to individualized retrospective damages.  As explained above, Plaintiffs'
proposed remedy regarding claim submission is appropriate injunctive relief that applies
to all class members.  Because the court is entering a permanent injunction that applies to
all class members, and Plaintiffs are no longer seeking damages, decertification is
unwarranted.

### D.    Plaintiffs' Motion to Strike Defendants' Surreply

In Defendants' response in opposition to Plaintiffs' Motion for Entry of Order of
Judgment, Defendants rely on two declarations by Tiffany Ackerman, a Compensation
and Benefits Consultant for Alcoa.  (*See* Defs.' Resp. at 3, 10, 26).  The parties
subsequently filed a Joint Motion for Extension of Time to File Reply to Motion for
Entry of Order of Judgment and for Surreply.  (Filing No. 171).  The parties requested an
extension of time for Plaintiffs to file their reply, taking into account that Plaintiffs would
depose Ackerman.  (*Id.* ¶ 4).  Additionally, the parties "agreed that Defendants should be
permitted to file a surreply to address any arguments by Plaintiffs regarding Ms.
Ackerman's deposition testimony."  (*Id.* ¶ 6).  The court granted the motion, which
ordered that Defendants must "file any surreply by August 5, 2024."  (Filing No. 174

22

**RSA.57**

(emphasis omitted)).  Defendants filed a surreply.  (Filing No. 176).  Plaintiffs move to strike the surreply, asserting that Defendants' surreply went beyond the parties' agreement to "argue a second time about the same issues that were raised by Plaintiffs' motion." (Filing No. 177, Pls.' Mot. to Strike at 4).

The court finds that Defendants' surreply is an appropriate response to new evidence and argument raised in Plaintiffs' reply.  "The decision to permit the filing of a surreply is purely discretionary and should generally be allowed only for valid reasons, such as when the movant raises new arguments in a reply brief."  *Meraz-Camacho v. United States*, 417 F. App'x 558, 559 (7th Cir. 2011); *see also Miller v. Madison Cnty. Bd. of Comm'rs*, No. 1:21-cv-02609-JMS-MJD, 2023 WL 2837867, at *5 (S.D. Ind. Apr. 7, 2023) (explaining that a surreply may be filed "when it is necessary to address new arguments or evidence raised in the reply brief" (internal quotation marks omitted)). Plaintiffs acknowledge that Ackerman's deposition testimony is new evidence cited in their reply.  (Pls.' Mot. to Strike at 3).  Plaintiffs also raise a new argument in analogizing their requested injunction to remand.  (*See* Pls.' Reply at ECF pp. 13–16 (discussing remand); Pls.' Mot. for Entry of Order of J. (not mentioning remand)).  Accordingly, the court **DENIES** Plaintiffs' motion to strike.[7]

---

[7] Because the court concludes that Defendants' surreply was proper based on new evidence and argument raised in Plaintiffs' reply, the court need not address Plaintiffs' argument that Defendants' surreply exceeded the terms of the parties' agreement.

**RSA.58**

## IV.  Conclusion

For the foregoing reasons, Plaintiffs' Motion to Strike Alcoa's Surreply (Filing No.

177) is **DENIED**.  Plaintiffs' Motion for Entry of Order of Judgment (Filing No. 167) is

**GRANTED**, except to the extent the court in its discretion awards prejudgment interest

at the average prime rate.  Plaintiffs shall have **45 days** from the date of this Entry to file

a motion for attorney's fees, costs, and expenses.  The injunction shall be set forth in a

separate order.  Additionally, final judgment shall follow by separate order.

**IT IS SO ORDERED** this 28th day of March 2025.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.

**RSA.59**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| LYNNETTE J. KAISER, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:20-cv-00278-RLY-CSW |
| | ) | |
| ALCOA USA CORP., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING PERMANENT INJUNCTION**

Consistent with the court's summary judgment entry concluding that class

members had a right to lifetime healthcare benefits from Alcoa and that Alcoa breached

their collective bargaining agreements by unilaterally reducing their healthcare benefits,

the court **DECLARES** that class members are entitled to lifetime healthcare benefits

from Alcoa and issues the following permanent injunction:

1. Consistent with this declaration of rights, Alcoa must promptly reinstate and

   maintain for the lifetime of all class members the fixed group health and

   prescription drug benefit plan, including Medicare Part B premium

   reimbursement ("the Prior Plan"), provided to class members before January 1,

   2021, and notify class members that the Prior Plan has been reinstated pursuant

   to this Order.

2. The Prior Plan shall be reinstated retroactive to January 1, 2021.  Class

   members are entitled to submit for payment claims for health and prescription

   drug expenses incurred from January 1, 2021, through the time Alcoa reinstates

1

**RSA.60**

the Prior Plan.  Alcoa must notify class members of their right, pursuant to this

Order, to submit claims for health and prescription drug expenses incurred

from January 1, 2021.

3.  Alcoa shall pay to class members the standard Medicare Part B premium

amounts from January 1, 2021, through the time Alcoa reinstates the Prior

Plan, less any documented payment through which a class member has already

received reimbursement for those Medicare Part B premiums through Alcoa's

healthcare reimbursement account ("HRA") arrangement.

4.  All claims paid pursuant to paragraph 2 and all Medicare Part B premiums paid

pursuant to paragraph 3 shall be paid with prejudgment interest to class

members at a rate of 6.5%, compounded monthly.

5.  No later than sixty days after entry of this Order, Alcoa must file with the court

a detailed explanation of its actions pursuant to paragraphs 1, 2, 3, and 4.  In

addition, Alcoa must meet and confer with Plaintiffs to the extent Plaintiffs

have any questions about the reinstatement of coverage, the claims process, or

the payment of Medicare Part B premiums.

**IT IS SO ORDERED** this 28th day of March 2025.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.

2

**RSA.61**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| LYNNETTE J. KAISER, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:20-cv-00278-RLY-CSW |
| | ) | |
| ALCOA USA CORP., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**FINAL JUDGMENT**

The court has granted summary judgment for Plaintiffs and issued a permanent

injunction.  Accordingly, the court now enters final judgment in favor of the Plaintiffs and

against the Defendants.

**IT IS SO ORDERED** this 28th day of March 2025.


_____
RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Kristine L. Seufert, Clerk


BY: _____
Deputy Clerk, U.S. District Court


Distributed Electronically to Registered Counsel of Record.

1

**RSA.62**