No. 25-1627

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

Lynette J. Kaiser, *on behalf of herself and all persons similarly situated*; United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC; and Aluminum Trades Council of Wenatchee, Washington AFL-CIO,
**Plaintiffs-Appellees,**

v.

Alcoa USA Corp.; Retirees Group Benefits Plan for Certain Hourly Employees of Alcoa USA Corp.; Medicare Exchange Healthcare Reimbursement Plan for Certain Medicare Eligible Retirees of Alcoa; and Alcoa Medicare Part B Reimbursement Plan for Certain Medicare Eligible Retirees of Alcoa USA,
**Defendants-Appellants.**

Appeal from the U.S. District Court for the Southern District of Indiana (Hon. Richard L. Young), Case No. 3:20-cv-278

**RESPONSE BRIEF OF PLAINTIFFS-APPELLEES**

Joel R. Hurt
    *Counsel of Record*
Ruairi McDonnell
**FEINSTEIN DOYLE PAYNE
    & KRAVEC, LLC**
Law & Finance Building, Suite 1300
429 Fourth Avenue
Pittsburgh, PA  15219
Telephone:  412-281-8400

***Counsel for Plaintiffs-Appellees***

Save As          Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>25-1627</u>

Short Caption: <u>LYNNETTE J. KAISER, et al., Plaintiffs-Appellees v. ALCOA U.S. CORP., et al. Defendants-Appellants</u>

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

<div style="border:1px solid black; display:inline-block; width:40px; height:30px;"></div> **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
      <u>Lynnette J. Kaiser; United Steel, Paper and Forestry,Rubber, Manufacturing, Energy, Allied Industrial and Service</u>

      <u>Workers International Union, AFL-CIO/CLC, Aluminum Trades Council of Wenatchee, Washington AFL-CIO</u>

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
      <u>Feinstein Doyle Payne & Kravec, LLC</u>

      <u>Macey Swanson LLP</u>

(3)   If the party, amicus or intervenor is a corporation:

      i)    Identify all its parent corporations, if any; and

            <u>N/A</u>

      ii)   list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

            <u>N/A</u>

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

      <u>N/A</u>

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

      <u>N/A</u>

Attorney's Signature: _____     Date: <u>April 18, 2025</u>

Attorney's Printed Name: <u>Joel R. Hurt</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes <u>✓</u>   No <u> </u>

Address: <u>Feinstein Doyle Payne & Kravec, LLC</u>

         <u>429 Fourth Avenue, Suite 1300, Pittsburgh, PA 15219</u>

Phone Number: <u>412-281-8400</u>                    Fax Number: <u>412-281-1007</u>

E-Mail Address: <u>jhurt@fdpklaw.com</u>

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-1627

Short Caption: LYNNETTE J. KAISER, et al., Plaintiffs-Appellees v. ALCOA U.S. CORP., et al. Defendants-Appellants

  To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

  The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> [ ]  **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

 Lynnette J. Kaiser; United Steel, Paper and Forestry,Rubber, Manufacturing, Energy, Allied Industrial and Service

 Workers International Union, AFL-CIO/CLC, Aluminum Trades Council of Wenatchee, Washington AFL-CIO

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

 Feinstein Doyle Payne & Kravec LLC

 Macey Swanson LLP

(3)  If the party, amicus or intervenor is a corporation:

   i)  Identify all its parent corporations, if any; and

      N/A

   ii)  list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

      N/A

(4)  Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

 N/A

(5)  Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

 N/A

---

Attorney's Signature: _____    Date: April 18, 2025

Attorney's Printed Name: Ruairi McDonnell

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** [ ]  **No** [ ]

Address: Feinstein Doyle Payne & Kravec, LLC

 429 Fourth Avenue, Suite 1300, Pittsburgh, PA 15219

Phone Number: 412-281-8400    Fax Number: 412-281-1007

E-Mail Address: rmcdonnell@fdpklaw.com

rev. 12/19 AK

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................iii

I. INTRODUCTION ............................................................. 1

II. JURISDICTIONAL STATEMENT ................................... 5

III. STATEMENT OF THE ISSUES ..................................... 5

IV. STATEMENT OF THE CASE ......................................... 5

   A. The 1993 Cap Negotiations .......................................... 5

   B. The *Curtis v. Alcoa* Litigation .................................... 14

   C. In 2021, Alcoa unilaterally eliminates the pre-1993
      retirees' plan of benefits, prompting this lawsuit .................... 21

V. STANDARDS OF REVIEW .............................................. 29

VI. SUMMARY OF THE ARGUMENT ................................. 31

   A. Judicial Estoppel ......................................................... 31

   B. Class Certification ........................................................ 34

VII. ARGUMENT ................................................................... 37

   A. The District Court did not abuse its discretion by
      holding that Alcoa was judicially estopped .............................. 37

     1. Alcoa has waived any challenge to the District
        Court's judicial estoppel ruling ......................................... 39

     2. The District Court did not abuse its discretion by
        applying judicial estoppel even though the plaintiffs
        in *Curtis* are post-1993 retirees and the Plaintiffs
        here are pre-1993 retirees ................................................ 41

3. The District Court did not abuse its discretion by judicially estopping Alcoa based upon its successful alternative position in *Curtis* ........................... 44

4. The District Court did not abuse its discretion by finding that Alcoa had argued in *Curtis* that except for the cap, the rights of the pre-1993 retirees and post-1993 retirees were the same. ............... 50

5. The District Court correctly held that *Tackett* does not allow Alcoa to escape the ramifications of *Curtis* ............................................................ 51

6. The District Court's application of judicial estoppel did not impinge upon the truth seeking function of the court because the truth is that Alcoa always understood that pre-1993 retirees had lifetime benefits ............................................................ 53

B. The District Court did not abuse its discretion in certifying the proposed class ............................................................ 58

1. The District Court properly found that the commonality requirements was met ............................... 58

2. The District Court properly found that the typicality requirement was met ...................................... 63

3. The District Court properly certified the class under Rule 23(b)(2) ............................................ 64

V.    CONCLUSION ............................................................ 68

CERTIFICATE OF COMPLIANCE WITH WORD COUNT AND TYPEFACE REQUIREMENTS ............................................ 69

CERTIFICATE OF SERVICE ............................................ 70

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*1st Source Bank v. Neto*,
    861 F.3d 607 (7th Cir. 2017) .................................................. 30, 31, 42

*Alabama v. North Carolina*,
    560 U.S. 330 (2010) ........................................................... 57

*Astor Chauffeured Limousine Co. v. Runnfeldt Inv. Corp.*,
    910 F.2d 1540 (7th Cir. 1990) ............................................... 44, 47, 49

*Beaton v. SpeedyPC Software*,
    907 F.3d 1018 (7th Cir. 2018) ............................................... 67

*Bradley v. Vill. of Univ. Park*,
    59 F.4th 887 (7th Cir. 2023) ................................................. 59-60

*Chaveriat v. Williams Pipe Line Co.*,
    11 F.3d 1420 (7th Cir. 1993) ................................................. 43, 47

*Cherry v. Auburn Gear, Inc.*,
    441 F.3d 476 (7th Cir. 2006) ................................................. *passim*

*Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of Chi.*,
    797 F.3d 426 (7th Cir. 2015) ................................................. 65

*CNH Indus. N.V. v. Reese*,
    583 U.S. 133 (2018) ........................................................... 35

*Commonwealth Ins. Co. v. Titan Tire Corp.*,
    398 F.3d 879 (7th Cir. 2004) ................................................. 41, 49

*Cont'l Ill. Corp. v. Comm'r*,
    998 F.2d 513 (7th Cir. 1993) ................................................. 32, 47

*Cooper v. Lane*,
    969 F.2d 368 (7th Cir. 1992) ................................................. 40

*Curtis v. Alcoa, Inc.*,
    525 F. App'x 371 (6th Cir. 2013) ............................................ 20

*Curtis v. Alcoa, Inc.,* 3:06-CV-448
  2011 U.S. Dist. LEXIS 25023 (E.D. Tenn. Mar. 9, 2011) ........... 17, 45

*Dispatch Automation, Inc. v. Richards,*
  280 F.3d 1116 (7th Cir. 2002) .......................................................... 55

*Domka v. Portage Cty.,*
  523 F.3d 776 (7th Cir. 2008) .................................................... 31, 40

*Frazier-Hill v. Chi. Transit Auth.,*
  75 F.4th 797 (7th Cir. 2023) ...................................................... 49-50

*Gabarick v. Laurin Mar. (Am.) Inc.,*
  753 F.3d 550 (5th Cir. 2014) ...................................................... 47, 48

*Grochocinski v. Mayer Brown Rowe & Maw, LLP,*
  719 F.3d 785 (7th Cir. 2013) ............................................... 30, 31, 41

*Harmon v. Gordon,*
  712 F.3d 1044 (7th Cir. 2013) ........................................................ 30

*Higgins v. Mississippi,*
  217 F.3d 951 (7th Cir. 2000) .......................................................... 55

*Highmark Inc. v. Allcare Health Mgmt. Sys.,*
  572 U.S. 559 (2014) ....................................................................... 29

*In re Airadigm Communs., Inc.,*
  616 F.3d 642 (7th Cir. 2010) .......................................................... 41

*In re Allstate Insurance Co.,*
  400 F.3d 505 (7th Cir. 2005) .................................................... 25, 65

*In re Cassidy,*
  892 F.2d 637 (7th Cir. 1990) .......................................................... 50

*In re Knight-Celotex,*
  695 F.3d 714 (7th Cir. 2012) .................................................... 30, 41

*Int'l Union v. Yard-Man,*
  716 F.2d 1476 (6th Cir. 1983) ........................................................ 28

*Jarrard v. CDI Telecomms., Inc.*
  408 F.3d 905 (7th Cir. 2005) .................................................. *passim*

iv

*Johnson v. Meriter Health Servs. Emp. Ret. Plan*,
    702 F.3d 364 (7th Cir. 2012) ..................................................... 36, 66

*Kale v. Obuchowski*,
    985 F.2d 360 (7th Cir. 1993) ................................................. 33, 48, 49

*Liberles v. County of Cook*,
    709 F.2d 1122 (7th Cir. 1983) ..................................................... 31, 40

*Looper v. Cook Inc.*,
    20 F.4th 387 (7th Cir. 2021) ............................................................ 30

*M&G Polymers USA, LLC v. Tackett*,
    574 U.S. 427 (2015) ......................................................................... 27

*Mulvania v. Sheriff of Rock Island Cty.*,
    850 F.3d 849 (7th Cir. 2017) ........................................................... 67

*New Hampshire v. Maine*,
    532 U.S. 742 (2001) ............................................................... *passim*

*Ogden Martin Sys., Inc. v. Whiting Corp.*
    179 F.3d 523 (7th Cir. 1999) ........................................................... 42

*Old Colony Tr. Co. v. Omaha*,
    230 U.S. 100 (1913) ......................................................................... 57

*Pierce v. Underwood*,
    487 U.S. 552 (1988) ......................................................................... 29

*Prime Eagle Grp. Ltd. v. Steel Dynamics, Inc.*,
    614 F.3d 375 (7th Cir. 2010) ...................................................... 56-57

*Rossetto v. Pabst Brewing Co.*,
    217 F.3d 539 (7th Cir. 2000) ................................................... *passim*

*Skokolik v. Milwaukee Sch. of Eng'g*,
    635 F.3d 261 (7th Cir. 2011) ........................................................... 32

*Stone v. Signode Indus. Grp. LLC*,
    943 F.3d 381 (7th Cir. 2019) ................................................... *passim*

*United States v. Bailin*,
    977 F.2d 270 (7th Cir. 1992) ........................................................... 30

*United States v. Hook*,
195 F.3d 299 (7th Cir. 1999) ...................................................... 30, 31

*United States v. Salerno*,
108 F.3d 730 (7th Cir. 1997) ........................................................... 30

*United States v. Trudeau*,
812 F.3d 578 (7th Cir. 2016) ........................................................... 30

*Witham v. Whiting Corp.*,
975 F.2d 1342 (7th Cir. 1992) ......................................................... 43

*Zedner v. United States*,
547 U.S. 489 (2006) ............................................................ 37-38, 41

## Rules

Fed. R. Civ. P. 23 .......................................................... *passim*

## Other

*Restatement 2d of Contracts*,
§ 201 ............................................................................ 55-56

## I.    INTRODUCTION

Alcoa lost this retiree healthcare class action. For good reason: in a different retiree healthcare class action it litigated a decade earlier called *Curtis v. Alcoa, Inc.*, Alcoa *won* by taking a position that the District Court here would describe as "diametrically opposed" to the one it advances now.

In *Curtis*, the plaintiffs were what are colloquially known at Alcoa as the "post-1993 retirees," a group of unionized employees who retired *after* Alcoa first negotiated into its collective bargaining agreements ("CBAs") the right to implement a "Cap" on its spending on retiree healthcare benefits. When Alcoa finally implemented that Cap on the post-1993 retirees in 2007, the *Curtis* plaintiffs sued Alcoa, claiming a right to vested, lifetime uncapped healthcare benefits.

Defending itself, Alcoa characterized the post-1993 *Curtis* plaintiffs as asking to be treated "exactly the same" as their predecessors, the "pre-1993 retiree" group who retired *before* the Cap was negotiated into the CBAs and who Alcoa was continuing to provide uncapped benefits. Alcoa thus clearly explained in *Curtis* that it believed the post-1993 retirees were seeking to vindicate rights that belonged to the pre-1993 retirees

(i.e., lifetime, uncapped benefits). Further, the company committed to the *Curtis* court, prior to its ruling, that it would provide the post-1993 retirees with capped healthcare benefits "for the rest of [their] lives," which meant that the singular difference between the pre- and post-1993 retirees was the Cap. In other words, Alcoa understood that the pre-1993 retirees had lifetime uncapped benefits, whereas the post-1993 retirees had lifetime capped benefits. Alcoa's position that the post-1993 retirees had lifetime capped benefits carried the day. As Alcoa would later describe its victory, "[t]he [*Curtis*] Court agreed with Alcoa—that Plaintiffs' benefits had vested 'subject to the cap[.]'"

Fast forward to 2021, when Alcoa unilaterally terminates the healthcare benefits of all pre-1993 retirees in one fell swoop, prompting *this* litigation. All of a sudden, Alcoa was contending that the pre-1993 retirees' healthcare benefits were limited to the duration of the CBAs in effect when they retired, *see, e.g.,* Alcoa's Opening Brief ("Brief") at p.1, never mind that if this were true the uncapped pre-1993 retirees had a *lesser* right to benefits than the capped post-1993 retirees and there would have been no need for Alcoa to bargain the Cap in the first place.

The District Court certified this case as a class action, finding that

Alcoa's commitment to provide post-1993 retirees with vested, lifetime healthcare benefits subject to the Cap in the 1993 negotiations gave rise to the common question of whether the "uncapped" pre-1993 retirees had lifetime benefits, consistent with the long-standing rule that even if a CBA is "silent on the duration of health benefits" or "makes clear that the entitlement [to such benefits] expires with the agreement," a retiree plaintiff can still show "a latent ambiguity by means of objective evidence" showing that "anyone knowledgeable about the real-world context of the agreement would realize that it might not mean what it says." *Cherry v. Auburn Gear, Inc.*, 441 F.3d 476, 481-82 (7th Cir. 2006). And by the time of summary judgment, Plaintiffs were loaded with such classwide evidence. That included the testimony of Alcoa's veteran labor counsel and chief negotiator in 1993, Russell Porter, who testified that back then he believed Alcoa "couldn't touch" the benefits of the pre-1993 retirees.

That said, the District Court never reached the contractual question. Instead, it adopted an alternative path suggested by Plaintiffs and applied judicial estoppel—the discretionary equitable doctrine designed "to protect the integrity of the judicial process by prohibiting

parties from deliberately changing positions according to the exigencies of the moment," *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001) (cleaned up)—to bar Alcoa from denying that the pre-1993 retirees had lifetime benefits when it won *Curtis* by persuading the court there that the post-1993 retirees had lifetime benefits after arguing that the only difference between the two groups was the Cap.

Unwilling to admit defeat, Alcoa now challenges the District Court's judicial estoppel and class certification rulings, claiming that judicial estoppel should not apply, a common question under Rule 23(a)(2) cannot arise from the negotiation of the Cap, and that Rule 23(b)(2) certification is improper because Plaintiffs originally envisioned classwide damages when they filed their complaint. According to Alcoa, this case has "repeatedly jumped the rails" and ought to be "put back on track[.]" Brief at p. 5.

Nothing could be further from the truth. In reality, the District Court's well-supported findings have simply prevented Alcoa from breaching its well-recognized (until now) contractual commitments with impunity by unilaterally terminating the healthcare benefits of the pre-1993 retirees. The District Court's rulings should therefore be affirmed.

## II.   JURISDICTIONAL STATEMENT

Alcoa's jurisdictional statement is complete and correct.

## III.   STATEMENT OF THE ISSUES

1.     Did the District Court abuse its discretion when it judicially estopped Alcoa from denying that the pre-1993 retiree class members were entitled to lifetime retiree healthcare benefits?

**Suggested Answer: No.**

2.     Did the District Court abuse its discretion by certifying a class of uncapped pre-1993 retirees whose group plan of healthcare benefits was terminated by Alcoa in 2021?

**Suggested Answer: No.**

## IV.   STATEMENT OF THE CASE

### A.   The 1993 Cap Negotiations

For a number of years, Alcoa negotiated "Master CBAs" with the Plaintiff United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union,

AFL-CIO/CLC ("USW"). JA.109 (Material Fact[1] 1); JA.130.[2] Each was effective for a set period of typically three years, after which it would terminate and a new CBA would be negotiated by parties. However, the parties did not start each round of negotiations from scratch; their practice was to start with the old CBA and to negotiate changes to it, with any changes to the old CBA to be reflected in a "Memorandum of Settlement" or "Settlement Agreement." JA.110 (Material Fact 3); JA.150-151, 167-168, 170-171; D.Ct. ECF No. 132-5 at 11-15; D.Ct. ECF No. 132-7 at 11-14; Alcoa Brief at 7. The Master CBAs provided for pension and health insurance benefits for employees and specifically covered most Alcoa facilities. JA.130; JA.157; JA.180. At other facilities, the parties adopted most of the key terms of the Master CBAs. *Id.*

---

[1] "Material Fact" refers to Plaintiffs' Material Facts submitted with their Summary Judgment Motion at JA.109-128.

[2] As Alcoa points out, Brief at 9, n.3, these negotiations were between Alcoa and the Reynolds Metal Company and the USW and the Aluminum, Brick and Glass Workers International Union ("ABG"). In 1997 the ABG merged with the USW and in 2000, Alcoa acquired Reynolds and undertook its retiree benefit obligations under previous CBAs. JA.118 (Material Fact 34). For ease of reference, Plaintiffs will refer to the negotiating parties as the "USW" or "union" and "Alcoa."

For years, Alcoa provided a plan of retiree health benefits which acted as a Medicare supplement once retirees were Medicare-eligible. JA. 110 (Material Fact 4). For the pre-1993 class members here, the CBA in effect when an employee retired governed that employee's rights to healthcare in retirement, and, likewise, Alcoa's obligations. Brief at p. 1, 54; JA.128 (Material Fact 64); JA.150; D.Ct., ECF No. 132-14 at 10.

By 1992, retiree health care was one of Alcoa's largest expenses and addressing those rising costs was the company's top bargaining goal as it entered negotiations. JA.113 (Material Fact 15); JA.131. To do so, it decided upon a two-part strategy. *Id.* The first part was to move employees and retirees to a "managed care" plan which would allow the company to negotiate more favorable rates with providers. JA.113 (Material Fact 16). The second part was to implement a "Cap" on Alcoa's annual contributions for the then-active employees who would retire on or after June 1, 1993 under the new CBAs. JA.113-114 (Material Fact 17). This meant that Alcoa would pay for those "future retirees'" benefits only up to the amount of the Cap and additional costs would be the responsibility of the retiree. *Id.* Alcoa believed that the Cap would "limit growth in retiree medical costs." *Id.*

Around this time, the Financial Accounting Standards Board implemented Financial Accounting Standard 106, which meant that for the first time employers would have to reflect the expected cost of providing those benefits to employees over their lifetimes, similar to the accounting treatment of pension benefits. JA.114 (Material Fact 18). However, Alcoa wanted a Cap to reduce actual spending, not just for accounting purposes. *Id.*

According to Russell Porter, Alcoa's then-Director of Industrial Relations and in-house attorney who served as the lead negotiator in the 1993 negotiations and had attended every Master Agreement negotiations from 1977 onward, JA.117 (Material Fact 31), Alcoa considered the Cap and managed care plan to represent "a fundamental change in the healthcare program in Alcoa." JA.159-160; D.Ct. ECF No. 132-10 at 19-20. However, "the union's position was clearly that they didn't want any change at all. They liked what they had, and they wanted to keep it." *Id.*; JA.160. Thus, when the negotiations began, the union strongly resisted Alcoa's proposals for managed care and a Cap that would be engaged during the term of the 1993 CBA. JA.114-115 (Material Facts 19-20).

Eventually, in February of 1993, Alcoa revised the Cap proposal so that the Cap would not engage until *after* expiration of the 1993 CBA, JA.115 (Material Fact 21), which was something that Alcoa had planned for in its preparation prior to the labor negotiations starting. D.Ct., ECF No. 150-1 at 7-9; D.Ct., ECF No. 132-10 at 15. However, that proposal did not yield an agreement either. JA.115 (Material Fact 21).

Protracted and difficult negotiations continued in May of 1993. JA.115 (Material Fact 22); D.Ct. ECF No. 132-10 at 33, 37. Eventually, Alcoa offered to provide the future retirees significantly increased pension benefits—which Alcoa correctly points out are unlike healthcare benefits in that they vest for life as a matter of statute, Brief at p. 7—if the union would agree those retirees would be covered by the Cap. JA.115 (Material Fact 23); JA.166-168. As Mr. Porter recalled, "it became clear that the Union was under a lot of pressure from their membership to enhance the pensions. We were willing to do it. And we were going to pay for it through the savings we were going to make on the other end [with the Cap]." JA.165-166.

In response, the union offered to agree to a Cap that would be measured by costs in 2000, could not engage until 2001, and would be a

"mandatory subject" of all future negotiations. JA.115 (Material Fact 24). While benefits for employees who have already retired (or "current retirees") are a "permissive subject" under federal labor law (which means that neither side is obligated to bargain over them), mandatory subjects, such as the benefits of active employees, are those which the parties must bargain. *Id.*; Brief at 7. Thus, making the post-CBA expiration Cap a mandatory subject would require Alcoa to bargain with the union before they implemented it. JA.115 (Material Fact 24).

In response, shortly after midnight on May 31, 1993 (the expiration date of the 1988 CBA) Alcoa presented a "last, best, and final offer" which included a Cap which would be measured by costs in 1997 and could not engage until 1998, and which would be a mandatory subject in the next round of bargaining only. JA.116 (Material Fact 25). Alcoa was prepared to weather a strike if the union did not accept this offer. *Id.*

On June 1, 1993, the union accepted the proposal, reaching a compromise whereby the union agreed to the Cap in exchange for increased pension benefits for future retirees and the company's agreement to make the Cap a mandatory subject in the next bargaining. JA.116 (Material Fact 26). The Cap agreement was reflected in the

parties' Memoranda of Settlement and a "Cap letter" in the 1993 CBAs which were effective from June 1, 1993 to May 31, 1996. *Id.*; JA.169-171; D.Ct. ECF No. 132-9 at 2-3. The letter stated that the Cap would be measured by Alcoa's spending "during calendar year 1997," and could not be engaged "until January 1, 1998." JA.116-117 (Material Fact 27). Thus, as Alcoa would later characterize it in *Curtis*, the Cap agreement "acted as a limited reservation of rights" that "permitted Alcoa to limit its financial contributions only after the conclusion of the term of [the] CBA, and only according to the formula set forth in the agreement." JA.117 (Material Fact 28); JA.244-245.

As a result of the 1993 Master Agreement negotiations, Alcoa implemented a managed care program which applied to active employees and current retirees. JA.117 (Material Fact 30). And following the negotiations, a Cap for future retirees was negotiated at other non-Master Agreement locations. JA.117 (Material Fact 29); JA.130; JA.157-158; JA.180; Alcoa Brief at 12, n.4. Alcoa also implemented a Cap on salaried retirees in early 1994, which impacted both future and current retirees. *Id.*

Tellingly, Alcoa addresses only two sentences in its Statement of Facts to the Cap negotiations. Brief at p. 9. No doubt, this is because the fact that Alcoa wanted a Cap that could only be implemented on the future retirees *after* the 1993 CBA expired and was willing to trade increased *lifetime* pension benefits to get it shows that the status quo before the 1993 CBA went into effect was that upon retirement, employees were entitled to lifetime healthcare benefits that could not be unilaterally terminated or reduced. This was confirmed by Russell Porter, who testified in this case that his understanding at the time of the Cap negotiations was that Alcoa legally "couldn't touch" the benefits of the then-current pre-1993 retirees:

> Q    And do you recall the prior agreement that had been in effect prior to the 1993 agreement?
>
> A    Generally.
>
> Q.    Okay.   So if someone retired under the terms of that agreement, let's say they retired in the year 1990, when the parties negotiated the 1993 agreement, and we[']re now in 1994 let's say, what happens to the person who retired in 1990 with respect to their healthcare benefits?
>
> A    In '93 we did not negotiate about them.
>
> . . .

Q.    Was Alcoa permitted in 1994, for example, to terminate the benefits of that person?

A.    Would have depended on the state of the law in 1994.

Q.    Okay.  And what do you mean by that?

A    Well, back then I was very aware of various cases, don't really remember names, that generally governed an employer's ability to change plans. *And at that time I believe the state of the law was we couldn't touch them.* And therefore, we didn't even try to negotiate these changes for the currently retired people. I understand since I've retired that law may have gone back and forth. So that's why I keep stressing it would depend on whatever the state of the law was at the time.

Q    Okay. And you mean case law, court decisions?

A    Yes.

Q    *And so just to be clear, in 1993 your understanding was that you couldn't touch the benefits of the people who had already retired?*

A    *Yes.*

Q    *When you say you couldn't touch them, does that mean they had to stay the same as what they retired with?*

A    *We couldn't change them.*

Q    *Unilaterally, you couldn't change them unilaterally?*

A    *Yes.*

JA.151-154 (emphasis added).

## B.    The *Curtis v. Alcoa* litigation

In the next two rounds of bargaining, the parties agreed to defer the Cap, each time putting its engagement date after the term of the CBA, as they had in 1993. JA.118 (Material Fact 33). But in bargaining in 2005-2006, Alcoa insisted that the Cap could not be deferred again, and the parties agreed to engage the Cap on January 1, 2007. *Id.* (Material Fact 35). The agreement was reflected in a new letter titled "Retiree Health Care," which was made part of the 2006 CBAs and provided that the post-1993 retirees' healthcare benefits would continue to be a mandatory subject. JA.119 (Material Facts 36-37); Brief at p. 9. Healthcare benefits for the post-1993 retirees have remained a mandatory subject under subsequent CBAs ever since. Brief at 9; JA.128 (Material Fact 64).

On January 1, 2007, Alcoa engaged the Cap as to the post-1993 retirees, leaving the pre-1993 retirees' healthcare benefits uncapped. JA120 (Material Fact 38). Shortly before the Cap engaged, on November 17, 2006, a group of post-1993 retirees, including Charles Curtis, sued Alcoa in federal court in the Eastern District of Tennessee to stop the company from implementing the Cap. JA120 (Material Fact 39). No

union joined as a plaintiff. JA.249-250 ¶¶ 2, 4, 5; JA.184. The *Curtis* plaintiffs asserted that their retiree health benefits "vested" prior to the signing of the 2006 CBA. JA120 (Material Fact 39). Specifically, they alleged that their health benefits vested when they vested in their pension benefits (*i.e.*, after either ten or five years of service), or alternatively, that their health benefits vested at retirement. *Id.*

On March 16, 2007, the *Curtis* plaintiffs sought a preliminary injunction reinstating their pre-Cap coverage. JA120 (Material Fact 40). Alcoa opposed on May 29, 2007, arguing "Plaintiffs here seek to receive benefits as if they had retired before June 1, 1993. By definition however, they did not. Employees have no right to the benefits under a CBA that expired prior to the date of their retirement." *Id.*; JA.184.

On August 27, 2008, following discovery, the parties argued cross motions for summary judgment before Judge Thomas W. Phillips. JA120 (Material Fact 41). Counsel for plaintiffs, Gregory Coleman, argued that upon meeting the necessary age and years of service for a pension, the plaintiffs vested in their future retiree health benefits, and that the Cap letter in the 1993, 1996, and 2001 CBAs was a "cap with a wink." JA120-121 (Material Fact 41). In other words, while Alcoa used the Cap to

reduce balance sheet liabilities, the parties never actually intended the Cap to be engaged.  JA121 (Material Fact 41).

Attorney Evan Chesler argued for Alcoa with respect to vesting-related issues and attorney Daniel Slifkin argued for Alcoa with respect to the Cap. JA.259, 261, 262-263; JA.121 (Material Facts 42-43). Mr. Chesler first argued that the company and the non-party USW agreed about the meaning of the Cap, that all plaintiffs retired under CBAs with a Cap, and that while Alcoa believed that the benefits were not vested, if they vested at all, they did so at retirement. JA.121 (Material Fact 42); JA.262-265, 267-270. When it was his turn, Mr. Slifkin again characterized the *Curtis* plaintiffs as claiming the same rights as the pre-1993 retirees, stating "Plaintiff's theory is that this cap letter had no effect whatsoever, that the rights of the people who retired after 1993 are exactly the same as the rights of people who retired before 1993. They say the fact that you have attached this [cap letter] to the back of the CBA is irrelevant; the rights are the same as if it had never been there at all." JA.121 (Material Fact 43); JA.272. He also contended that the Cap was "real" and told the court that Alcoa would provide capped benefits to the plaintiffs "for the rest of [their] lives." JA.121 (Material Fact 44);

JA.274. Later, Mr. Slifkin reiterated, "Alcoa's paying almost $8,000 per person [*i.e.*, the Cap amount] pre-Medicare. We'll continue to do that for the rest of their lives." JA.122 (Material Fact 44); JA.275.

On March 19, 2009, Judge Phillips denied the summary judgment motions and a nonjury trial was held. JA.122 (Material Fact 45). Following the trial, on November 16, 2009, Alcoa submitted Proposed Findings of Fact and Conclusions of Law, in which, among other things, it asked the court to find that the Cap was not an accounting gimmick. JA.123 (Material Fact 48); JA.188-232). In its conclusions of law, Alcoa first proposed "[i]f Plaintiffs' retiree medical benefits vested at all, they did not vest prior to retirement." JA.196. Alcoa also contended that "even if Plaintiff's benefits vested upon retirement, the benefits would have vested with the cap already in place." JA.197.

On March 9, 2011, Judge Phillips adopted one of Alcoa's alternative arguments, holding that the post-1993 plaintiffs were entitled to lifetime retiree benefits under the CBAs in effect when they retired, subject to the Cap. JA.123 (Material Fact 51); *Curtis v. Alcoa, Inc.*, No. 3:06-CV-448, 2011 U.S. Dist. LEXIS 25023, at *120, ¶ 237 (E.D. Tenn. Mar. 9, 2011). The court separately entered a judgment ordering that the *Curtis*

plaintiffs "take nothing" and dismissing the case with prejudice. JA.123-124 (Material Fact 51).

Having lost, the *Curtis* plaintiffs tried to turn lemons into lemonade. On March 23, 2011, they asked for the court's judgment order to be clarified or amended to declare that the plaintiffs' benefits had vested subject to the Cap, JA.124 (Material Fact 52); JA.277-283, and that same day, filed a motion for attorneys' fees. JA.124 (Material Fact 52); JA.285-288. In support, the *Curtis* plaintiffs argued, "while finding against Plaintiffs with regard to their claims on the merits for vested uncapped benefits, the Court did find that Plaintiffs have a right to vested benefits subject to a cap. This was a disputed issue in that Alcoa denied that Plaintiffs had any right to vested benefits whatsoever, while Plaintiffs contended that their benefits were vested." JA.285.

Alcoa was having none of it. JA.124 (Material Fact 53); JA.290-302. In opposition to the clarification motion, Alcoa reminded the *Curtis* court that it had "agreed with Alcoa," not the *Curtis* plaintiffs:

> Throughout this litigation, Plaintiffs have taken the position that they are entitled to unlimited healthcare for life because they retired with vested, uncapped benefits. Alcoa, by contrast, has argued that Plaintiffs were not entitled to more than what they were receiving under the 2006 CBA because either they did not have vested right to retiree benefits or

> their benefits had vested subject to the earlier cap
> agreements. The Court agreed with Alcoa—that Plaintiff's
> benefits had vested 'subject to the cap'—and dismissed the
> lawsuit[.]

JA.292-293 (internal citations omitted; underlining in original). The company further argued that "[e]ven before this Court's ruling, Alcoa was committed to providing benefits to members of the plaintiff class at the 2006 cap level; as such, a formal order that those benefits are vested would provide members of the class with nothing more than what Alcoa has agreed to give them." JA.291. And it pointed out that "Alcoa's counsel represented that Alcoa had no intention to fall short of its contractual obligation to provide benefits at the capped level[,]" citing Mr. Slifkin's statement that Alcoa would pay "almost $8,000 per person pre-Medicare . . . for the rest of [Plaintiffs'] lives." JA.294.

On June 11, 2012, the *Curtis* court denied the motion for clarification, essentially adopting Alcoa's argument word-for-word when it wrote that "Plaintiffs argued throughout this litigation that they were entitled to unlimited healthcare for life because they retired with vested, uncapped benefits. . . . Alcoa, on the other hand, argued that plaintiffs were not entitled to more than what they were receiving under the 2006 CBA because either they did not have a vested right to retiree healthcare

benefits <u>or</u> their benefits had vested subject to the earlier cap agreements.  The court agreed with Alcoa that plaintiffs' benefits had vested subject to the cap agreements[.]"D.Ct. ECF No. 189-14 at 4-5; *compare* id. *with* JA.292-293.

On May 9, 2013, the Sixth Circuit affirmed the *Curtis* court's ruling. *Curtis v. Alcoa, Inc.*, 525 F. App'x 371, 373, 381 (6th Cir. 2013). Afterwards, the *Curtis* plaintiffs renewed their fee motion, and Alcoa opposed. JA.125 (Material Fact 55); JA.297-302. Responding to the plaintiffs' contention that they achieved "success on the merits," Alcoa yet again countered that *it* was the one that had succeeded because the *Curtis* court "agreed with Alcoa's position" when it found that the plaintiffs' benefits were vested subject to the Cap:

> Plaintiffs never asked for a ruling that their benefits were merely vested; they argued that they were vested <u>uncapped</u>, as was required to support their claim that the 2006 cap agreement was unlawful. By contrast, it was <u>Alcoa</u> that had argued that, if Plaintiffs' benefits were vested at all, they vested <u>subject to the cap</u>, and this Court agreed with Alcoa's position.

JA.298 (underlining in original). Alcoa also pointed out that "[t]hough Plaintiffs focus on one of two alternative legal arguments that Alcoa advanced to respond to Plaintiffs' attempt to secure uncapped healthcare

benefits—that Plaintiffs' benefits' had not vested at all—in practice, Alcoa has never suggested that it would reduce Plaintiffs' benefits below their vested level." JA.299. Again, Alcoa pointed the court to Mr. Slifkin's commitment that "Alcoa's paying almost $8,000 per person pre-Medicare. We'll continue to do that for the rest of [Plaintiffs'] lives." JA.299. And rejecting the notion that the *Curtis* plaintiffs had achieved a benefit for the post-1993 retirees, Alcoa said, "maintaining retiree healthcare benefits at the capped level was neither a benefit sought nor achieved by Plaintiffs through litigation, but was rather a benefit that Alcoa had committed to provide, pursuant to its contractual obligations under the 2006 CBA, before the lawsuit was ever brought." JA.300.

## C.    In 2021, Alcoa unilaterally eliminates the pre-1993 retirees' plan of benefits, prompting this lawsuit

Years passed until January 1, 2021, when Alcoa unilaterally eliminated the health plan it had long provided to the Medicare-eligible pre-1993 retirees (the "Prior Plan"). D.Ct., ECF No. 42 (Alcoa's Answer) at 2 at ¶ 1 and 3 at ¶ 8; D.Ct., ECF No. 90 at 9-10, 12 (citing D.Ct., ECF No. 90-1); Brief at pp. 12-13. Prior to this, Alcoa had never unilaterally reduced or terminated the pre-1993 retirees' healthcare benefits. JA.127 (Material Fact 62).

Instead of the Prior Plan, Alcoa offered pre-1993 retirees a one-time opportunity to enroll in a Health Reimbursement Arrangement (or "HRA"), whereby they could receive reimbursement towards individually purchased health and prescription drug plans. D.Ct., ECF No. 42 (Alcoa's Answer) at 3, ¶ 8; Brief at pp. 12-13. If a pre-1993 retiree did not enroll when they were first eligible to do so, they were not able to enroll later. D.Ct. ECF No. 90 at 10-12; ECF No. 1-7 at 4; ECF No. 49-1 at 5. Approximately one third of the over 3,000 pre-1993 retirees in the class lost eligibility as a result. D.Ct. ECF No. 170-4 at 4, ¶¶ 6-7; No. 90 at 10-12. In addition, the HRA plan document included an unlimited reservation of rights clause which stated that Alcoa "can amend, modify, suspend, or terminate all or part of the plan at any time." D.Ct. ECF No. 49-1 at 3.

On December 10, 2020, Plaintiffs filed this lawsuit, alleging that Alcoa would breach its CBAs by unilaterally terminating the Prior Plan and asserting a claim under the Labor Management Relations Act ("LMRA") and Employee Retirement Income Security Act ("ERISA"). JA.029-056. In response, Alcoa denied the allegations and countered that the putative class members' rights to healthcare benefits were

contractually limited to the term of the CBA in effect when they retired and thus had expired decades ago. D.Ct., ECF No. 30 at 13, 16-17, D.Ct., ECF No. 42 at 26; *see also* Brief at p. 1.

In other words, after almost three decades, Alcoa had turned the long-standing pre-1993 retiree/post-1993 retiree dichotomy upside down. According to an Alcoa witness in this case, retired in-house attorney Nick Storm—who notably was not at the 1993 negotiations or involved in any prior negotiations, JA.176-177, D.Ct. ECF No. 132-14 at 9—in 1993 Alcoa prospectively *increased* its retiree healthcare spending obligation when it negotiated the Cap because it gave the post-1993 retirees a *better* healthcare package than the one available to the pre-1993 retirees:

> Q.    Okay.  So is it your position that the cap agreement that was put into the contract in 1993 obligated Alcoa to provide retirees that were subject to that agreement with a longer duration of benefits than what it had previously undertaken to provide to pre-June 1, 1993 retirees?
>
> A.    Yes.
>
> Q.    And the retirees under the 1993 agreement, in your view, were actually getting a greater right to benefits than their predecessors under the 1988 agreement?
>
> A.    Yes.

D.Ct., ECF No. 132-14 at 17-18. Similarly ironic was an internal "Question & Answers" document in which Alcoa conceded that it was not able to unilaterally move the post-1993 retirees to the HRA because that group's "medical coverage is subject to the current bargaining agreement." D.Ct., ECF No. 132-39 at 3.

On September 29, 2022, the District Court granted Plaintiff Lynette Kaiser's[3] class certification motion, certifying a class of pre-1993 Alcoa retirees whose benefits were terminated in 2021 and "who as of December 31 ,2020, were eligible to receive uncapped health care benefits from Alcoa[.]" RSA.01-15. Noting that Plaintiff Kaiser supported her claim by "point[ing] to bargaining between Alcoa and the Unions in 1993 which, for the first time, gave Alcoa the right to unilaterally terminate benefits [*i.e.*, the Cap,]" RSA.01-02, the court held that "whether the 1993 agreement gave Alcoa the new power to terminate or diminish health insurance is a common question[,]" RSA.06, and rejected Alcoa's argument that this theory "improperly focuses on evidence extrinsic" because this Court's precedent holds that a party may prove a breach of

---

[3] Ms. Kaiser is a surviving spouse of Alcoa retiree who retired under the 1988 Master CBA. D.Ct., ECF No. 12-2 at 2.

contract by way of objective evidence that establishes a latent ambiguity. RSA.08. The court also rejected Alcoa's contention that Rule 23(b)(2) was inapplicable because class members would be entitled to individualized money damages, reasoning that a single injunction or declaratory judgment would provide relief to each class member and the past benefits to which they would be thereafter entitled could be "read off from the plan[.]" RSA.13-14 (citing *In re Allstate Insurance Co.*, 400 F.3d 505, 508 (7th Cir. 2005)).

After discovery ended, the parties filed cross-motions for summary judgment. While Plaintiffs primarily focused on their breach of contract claim, arguing that the parties' agreements were both patently and latently ambiguous, they also argued that the District Court could and should judicially estop Alcoa from pursuing its "self-serving about-face" in this case when compared to its positions in *Curtis*. D.Ct., ECF No. 132 at 35-36. In its own motion and response, Alcoa, while purporting to address Plaintiffs' reliance on the *Curtis* record, did not address the judicial estoppel doctrine or the cases applying it that Plaintiffs cited. D.Ct., ECF No. 146 at 48-50.

On March 25, 2024, the District Court entered summary judgment

as to liability in favor of Plaintiffs. RSA.16-35. It judicially estopped Alcoa from denying the pre-1993 retirees had lifetime benefits, observing that Alcoa had argued the post-1993 *Curtis* plaintiffs (1) had benefits that were guaranteed "for the rest of these people's lives," RSA.25 (citing JA.274, JA.294, JA.299), and (2) were seeking the same rights as the pre-1993 retirees, necessarily implying that the rights of both groups were the same (aside from the Cap) and the pre-1993 retirees had lifetime, uncapped benefits. RSA.24-25 (citing JA.184 and JA.272). The District Court thus found that the company's successful position in *Curtis* that the post-1993 retirees had lifetime, capped healthcare benefits was "diametrically opposed" to and "clearly inconsistent" with its position in this litigation that the pre-1993 retirees' right to benefits expired with the CBA in place when they retired. RSA.24, 26.

Next, the District Court found that the *Curtis* court adopted Alcoa's inconsistent position that the post-1993 retirees were "entitled to lifetime, capped healthcare benefits[,]"additionally noting that Alcoa took that ruling as a victory in its post-judgment briefing and had even defeated the plaintiffs' motion for clarification of the judgment to include an explicit finding that the post-1993 retirees' benefits had vested by

arguing that such a declaration would be duplicative of what Alcoa had already agreed to provide. RSA.26.

The court concluded "allowing Alcoa to reverse course and argue that pre-1993 employees have no guaranteed lifetime retiree healthcare benefits would provide Alcoa an unfair advantage." RSA.27. It also found that judicial estoppel was particularly apt because "allowing Alcoa to reverse its position would give the impression that Alcoa hoodwinked the *Curtis* court instead of assisting it in sifting through the voluminous record and lengthy bargaining history" at issue in that case. RSA.27-28.

While Alcoa did not actually address judicial estoppel as a doctrine in its summary judgment papers, the District Court nevertheless responded to the company's arguments about the import of the *Curtis* record. It rejected the notion that judicial estoppel could not apply because Alcoa's "position in *Curtis* was actually that no retiree received lifetime healthcare benefits" since Alcoa had maintained, and won, on the alternative position that retirees had lifetime, capped healthcare benefits. RSA.28-30. The court also rejected the idea that judicial estoppel could not apply because the Supreme Court's decision in *M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427 (2015) overruled the so-

called *Yard-Man* inferences originating from *Int'l Union v. Yard-Man*, 716 F.2d 1476 (6th Cir. 1983) which had applied in the Sixth Circuit at the time *Curtis* was decided. RSA.28, 30-31. Noting that "judicial estoppel is about the fact of inconsistency itself, rather than the fact of adjudication" and that while it may not appropriate to apply it in cases where the party's position "resulted from circumstances outside their control" such as a "a change in controlling law," the District Court reasoned that any change in Sixth Circuit precedent was "essentially evidentiary, not substantive." RSA.30 (cleaned up). As the court put it, "[j]ust because the method the Sixth Circuit uses to interpret the parties' intentions changed, does not mean the parties intentions actually changed or that the parties are no longer permitted to agree to vest benefits." RSA.30-31. The District Court also concluded that even though the two cases involved different groups of retirees, "the legal issues and the specific plaintiffs are not germane to the issue of estoppel." RSA.31.

Following the liability ruling, Plaintiffs abandoned their request for damages, and instead asked the Court to order Alcoa to reinstate the Prior Plan retroactive to January 1, 2021, which would allow retirees the ability to make claims for benefits back to that date if they chose to do so

and thus "place Class Members in the position they would have been in but for Alcoa's violation, however imperfectly." D.Ct., ECF No. 167. On March 28, 2025, the Court entered that judgment for Plaintiffs, RSA.36-62, holding that allowing class members to submit claims for post-January 1, 2021 expenses "will best restore the status quo" that existed prior to Alcoa's termination of the Prior Plan. RSA.46.

Alcoa's appeal to this Court followed.

## V.    STANDARDS OF REVIEW

Alcoa is correct when it says that the District Court's class certification ruling is to be reviewed under an abuse of discretion standard. Brief at p. 21. But when it suggests this Court may apply *either* a de novo or an abuse of discretion standard to the judicial estoppel ruling, *id.*, Alcoa is wrong. "[J]udicial estoppel is an equitable doctrine invoked by a court at its discretion," *New Hampshire*, 532 U.S. at 750 (2001) (internal citations omitted), and "[t]raditionally . . . decisions on 'matters of discretion' are 'reviewable for abuse of discretion.'" *Highmark Inc. v. Allcare Health Mgmt. Sys.*, 572 U.S. 559, 563 (2014) (citing *Pierce* v. *Underwood*, 487 U.S. 552, 558 (1988)). Consistent with this, most authority from this Circuit holds that an abuse of discretion standard

- 29 -

applies. *See Looper v. Cook Inc.*, 20 F.4th 387, 399 (7th Cir. 2021); *United States v. Trudeau*, 812 F.3d 578, 584 (7th Cir. 2016); *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 795 (7th Cir. 2013); *Harmon v. Gordon*, 712 F.3d 1044, 1054 (7th Cir. 2013); *In re Knight-Celotex*, 695 F.3d 714, 721 (7th Cir. 2012).

To support the proposition that a de novo standard may apply, Alcoa relies upon one case: *1st Source Bank v. Neto*, 861 F.3d 607, 611 (7th Cir. 2017). Brief at p. 21. But *Neto*'s statement on the standard of review is dicta since the Court there quickly concluded that the appellee had forfeited the judicial estoppel argument by failing to raise it before the District Court (*i.e.*, there was no district court decision to review). 861 F.3d at 611. Moreover, *Neto* cites *United States v. Hook*, 195 F.3d 299, 305 (7th Cir. 1999) for the applicable standard of review, and, in turn, *Hook* cites only *United States v. Salerno*, 108 F.3d 730 (7th Cir. 1997) and *United States v. Bailin*, 977 F.2d 270 (7th Cir. 1992), both of which applied the de novo standard to *issue preclusion*, not judicial estoppel. *Salerno*, 108 F.3d at 740; *Bailin*, 977 F.2d at 281. This is important, because "[j]udicial estoppel is a doctrine distinct from the res judicata doctrines of claim and issue preclusion." *New Hampshire*, 532 U.S. at

745. *See also Grochocinski*, 719 F.3d at 796 ("[j]udicial estoppel is more flexible than the claim and issue preclusion doctrines") (citing *New Hampshire*, 532 U.S. at 750). Thus, *Hook* and *Neto* misstate the standard of review.

## VI.   SUMMARY OF THE ARGUMENT

### A.   Judicial Estoppel

As an initial matter, by failing to argue that the application of the judicial estoppel doctrine was inappropriate before the District Court after Plaintiffs raised it in their opening summary judgment brief, Alcoa has waived its challenge to the issue now. *See Domka v. Portage Cty.*, 523 F.3d 776, 783 (7th Cir. 2008) ("It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered. If it does not do so, and loses the motion, it cannot raise such reasons on appeal.") (quoting *Liberles v. County of Cook*, 709 F.2d 1122, 1126 (7th Cir. 1983)). Even if it did not waive its challenge, however, Alcoa's attacks on the District Court's judicial estoppel ruling cannot establish *any* error, much less the sort necessary to vacate the ruling. *See Grochocinski*, 719 F.3d at 800 ("abuse of discretion . . . occurs only when a court has acted

contrary to the law or reached an unreasonable result") (quoting *Skokolik v. Milwaukee Sch. of Eng'g*, 635 F.3d 261, 269 (7th Cir. 2011)).

*First*, Alcoa contends that judicial estoppel *ipso facto* cannot apply because the rights of the pre-1993 retirees were not at stake in *Curtis*. Brief at pp. 32-34. This fails because the controlling precedent does not require that the parties or precise legal issues in both cases be the same. Instead, what matters is that Alcoa's winning position in *Curtis* is completely incompatible with the position it takes here.

*Second*, Alcoa attempts to dodge responsibility for the *Curtis* holding, incoherently claiming both that it did not advance the position the *Curtis* court adopted and that it only did so as an "*arguendo*" position. Brief at pp. 34-39. These arguments go nowhere because Alcoa's own words make clear that it took the position the *Curtis* court adopted, *see, e.g.,* JA.298 ("this Court agreed with Alcoa's position"), and this Court long ago held "[a] party can argue inconsistent positions in the alternative, but once it has sold one to the court it cannot turn around and repudiate it in order to have a second victory[.]" *Cont'l Ill. Corp. v. Comm'r*, 998 F.2d 513, 518 (7th Cir. 1993). Trying for a different angle, Alcoa also tries to disclaim responsibility for its first victory by

suggesting the *Curtis* court persuaded itself that the post-1993 retirees had lifetime benefits under the *Yard-Man* precedent in effect at that time. Brief at p. 35. But since a party can be estopped by an earlier position even without the first court adopting that position *at all* so long as the first case was a win, *see Kale v. Obuchowski*, 985 F.2d 360, 62 (7th Cir. 1993), this argument is another non-starter.

*Third*, the company argues that the District Court misinterpreted its statements in *Curtis* that the post-1993 retiree plaintiffs there were seeking to treated the same as the pre-1993 retirees because those statements were only the company's "descriptions" of the *Curtis* plaintiffs' claims. Brief at p. 45. But the fact that these statements were *Alcoa's* descriptions of the plaintiffs' claims is exactly the point. They show that *Alcoa* understood that the pre-1993 retirees had what the post-1993 plaintiffs were asking for: uncapped, lifetime healthcare benefits.

*Fourth*, Alcoa half-heartedly argues that it cannot be estopped because *Tackett* represented a "substantive change in the law" compared to the *Yard-Man* precedent in effect during *Curtis*. Brief at p. 47. However, *Jarrard v. CDI Telecomms., Inc.*, 408 F.3d 905 (7th Cir. 2005), the authority upon which Alcoa relies, makes clear that *Tackett* is not the

"get out of jail free" card Alcoa now hopes to play. Because the pre-*Tackett* law in effect during *Curtis* did not preclude Alcoa from denying that benefits were vested then (as it did), and the post-*Tackett* law does not preclude it from acknowledging that benefits are vested now, Alcoa's inconsistent position here did not "result[] from circumstances outside [its] control" in the same way the defendants' second position did in *Jarrard.  See id.* at 915.

*Finally*, notwithstanding Alcoa's suggestion to the contrary, there is no risk here that the application of judicial estoppel could have thwarted "the truth seeking function of the court[.]" Brief at pp. 29-30. The truth—as evidenced by the negotiation of the Cap, Alcoa's statements in *Curtis*, the testimony of Russell Porter, and Alcoa's multi-decade course of performance—is that the pre-1993 retirees here have lifetime benefits that are not subject to unilateral reduction or termination by Alcoa.

## B.    Class Certification

Alcoa's objections to class certification are equally misguided.

Alcoa argues that Rule 23(a)'s commonality (and by extension, typicality) requirements are lacking because the class's claims arise from

a variety of different CBAs. Brief at pp. 53-63. But this fails. For one thing, Alcoa's argument ignores that the District Court's judicial estoppel ruling decided an issue that was common to the class irrespective of differences in CBAs. And since Alcoa does not contend that the judicial estoppel ruling fails to satisfy the commonality requirement, that means that if the ruling is affirmed (as it ought to be), the commonality challenge raised by Alcoa is effectively moot.

Setting that point aside, the District Court's commonality ruling stands on its own. Indeed, it is telling that Alcoa never confronts the controlling authority in this Circuit which holds that even if a CBA is patently unambiguous in favor of the employer in a case like this, a retiree plaintiff may prove their claims with extrinsic "objective evidence" that establishes a latent, as opposed to patent, ambiguity in the contract. *See Cherry*, 441 F.3d at 481-82 (setting forth the four-step standards for contract interpretation in retiree healthcare cases laid down in *Rossetto v. Pabst Brewing Co.*, 217 F.3d 539, 544 (7th Cir. 2000)). *See also Stone v. Signode Indus. Grp. LLC*, 943 F.3d 381, 384-85 (7th Cir. 2019) (holding that the Supreme Court's decisions in *Tackett* and its successor *CNH Indus. N.V. v. Reese*, 583 U.S. 133 (2018) "are consistent with the

approach we have taken for decades" in this Circuit). Consistent with this, the District Court correctly held that the negotiation of the Cap—objective evidence that is common to all of the uncapped pre-1993 retirees in the class—implicated a common question that both *created* an ambiguity in the terms of each pre-1993 CBA and had the capacity to *resolve* it.

Alcoa's complaints about the District Court's finding that this case fit within the confines of Rule 23(b)(2) are equally uncompelling. Alcoa repurposes its attack on the commonality finding as an assertion that the class's claims lacked "cohesiveness," Brief at pp. 64-66, but this argument fails for the same reasons that Alcoa's challenge to commonality does. Other than that, the company's only substantive objection is that Plaintiffs' request in their complaint for class damages rendered Rule 23(b)(2) inapplicable because the damages calculation would be too "individualized" and thus not "incidental" to the injunctive relief. *Id.* at pp. 67-71. But this argument ignores that this Court held that a similar sort of ostensibly individualized damages may nevertheless be "incidental" in *Johnson v. Meriter Health Servs. Emp. Ret. Plan*, 702 F.3d 364 (7th Cir. 2012). More importantly, it ignores that because Plaintiffs

have since abandoned their request for damages, any impediment that damages could have provided to certification is now gone and thus any error on this point was harmless.

## VII. ARGUMENT

### A. The District Court did not abuse its discretion by holding that Alcoa was judicially estopped

Judicial estoppel "protect[s] the integrity of the judicial process, by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire*, 532 U.S. at 749-50 (citations and internal quotation marks omitted). The doctrine is "typically" applied when: (1) the party's later position is "clearly inconsistent" with its earlier position, (2) the party "succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled," and (3) the party would "derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *See id.* at 750-51 (cleaned up). That said, there are no "inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel." *Id.* at 751 (2001). *See also Zedner v.*

*United States*, 547 U.S. 489, 504 (2006) (the "doctrine is equitable and thus cannot be reduced to a precise formula or test").

The District Court's decision to judicially estop Alcoa was well within the general three-step framework set forth in *New Hampshire*. *First*, Alcoa's prior position in *Curtis* that the post-1993 retirees had a right to benefits "for the rest of [their] lives" subject to the Cap is "clearly inconsistent" with its current position that the pre-1993 retirees' benefits expired with the pre-1993 CBAs. This is true even though, strictly speaking, the pre-1993 retirees' rights were not at issue in *Curtis* because in taking that prior position, Alcoa represented that by seeking lifetime, uncapped benefits, the *Curtis* plaintiffs were seeking to be treated "the same" as the pre-1993 retirees, necessarily implying that the rights of both groups were the same (aside from the Cap) and that the pre-1993 retiree therefore had lifetime, uncapped benefits. RSA24-25 (citing JA.184 and JA.272).

*Second*, Alcoa succeeded in getting the *Curtis* court to accept that "clearly inconsistent" position. In fact, Alcoa succeeded *twice*, once when it won the *Curtis* case and a second time when it defeated the plaintiff's

motion to amend the judgment by arguing that an explicit ruling that the post-1993 retirees had lifetime benefits was unnecessary. RSA.26-27.

*Third*, it is self-evident that allowing the company to take an inconsistent position concerning the lifetime benefits of the pre-1993 retirees now and upend the pre-1993/post-1993 dichotomy that Alcoa used to its rhetorical advantage in *Curtis* would be unfair. RSA. 27.

As discussed below, Alcoa offers no reason for this Court to conclude that the District Court abused its discretion.

> ## 1.     Alcoa has waived any challenge to the District Court's judicial estoppel ruling.

As an initial matter, Alcoa has waived the right to make any challenge to the application of judicial estoppel to this Court.  Plaintiffs argued that the District Court should judicially estop Alcoa in their summary judgment briefing. *See* D.Ct. ECF No. 132 at 35-36 (arguing that the court could "reject Alcoa's self-serving about-face" by "apply[ing] the equitable doctrine of judicial estoppel, which is designed to protect the integrity of the judicial process against the sort of chameleonic litigant that, like Alcoa does here, seeks to prevail twice, on opposite theories.  The doctrine is particularly apt given that Alcoa defeated the *Curtis* plaintiffs' claims by highlighting the distinction between the pre-

1993 retirees and the post-1993 retirees[.]") (cleaned up). But Alcoa never addressed the judicial estoppel doctrine in its response brief or addressed the judicial estoppel cases Plaintiffs cited. *See generally* D.Ct. ECF No. 146. Accordingly, by failing to argue to the District Court that judicial estoppel did not apply after Plaintiffs had clearly raised it,[4] Alcoa has waived its challenge to the issue now. *See Domka*, 523 F.3d at 783 ("[A] party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered. If it does not do so, and loses the motion, it cannot raise such reasons on appeal.") (quoting *Liberles*, 709 F.2d at 1126); *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992) ("we will not consider arguments which were not presented to the district court in response to a summary judgment motion").

---

[4] This was not the first time Plaintiffs raised judicial estoppel. Plaintiffs had previously raised it in their Statement of Claims. *See* JA.103 ("This and other undisputed statements made by Alcoa in the course of litigating against the post-1993 'capped' retirees in the *Curtis* case . . . operate to 'judicially estop' the company from taking a position in this case that is in direct opposition to the one it took in *Curtis*, as it seeks to do now.") (citing *Jarrard*, 408 F.3d at 914).

2.    **The District Court did not abuse its discretion by applying judicial estoppel even though the plaintiffs in *Curtis* are post-1993 retirees and the Plaintiffs here are pre-1993 retirees.**

Alcoa's topline criticism is that the company's successful position in *Curtis* cannot be "clearly inconsistent" with its position here because the cases did not address "the same issue on 'identical' facts." *See* Brief at p. 34. In effect, according to the Alcoa, the first judicial estoppel factor from *New Hampshire* cannot be met because the rights of the pre-1993 retirees were "simply not issue in *Curtis*." *See id.* at p. 32.

This argument fails. *First*, it rests on the premise that a *prerequisite* to applying judicial estoppel is that the underlying facts, legal issues, and/or parties must be identical between the two cases. But this premise is contrary to the Supreme Court's holding, well recognized by this Court, there are *no* prerequisites for the application of judicial estoppel, even the "typically" implicated inquiry into whether the party's two positions are "clearly inconsistent." *See New Hampshire*, 532 U.S. at 751; *Zedner*, 547 U.S. at 504. *See also Grochocinski*, 719 F.3d at 796; *In re Knight-Celotex*, 695 F.3d at 721-22; *In re Airadigm Communs., Inc.*, 616 F.3d 642, 661 (7th Cir. 2010); *Jarrard*, 408 F.3d at 914; *Commonwealth Ins. Co. v. Titan Tire Corp.*, 398 F.3d 879, 887 (7th Cir. 2004). Therefore, the

fact that the rights of the pre-1993 retirees were not actually being litigated in *Curtis* does not mean that judicial estoppel cannot apply.

*Second*, to the extent Alcoa points to some of this Court's authority that suggests that the "facts" in both cases should be "the same" for judicial estoppel to apply, *see Neto*, 861 F.3d at 612, *Ogden Martin Sys., Inc. v. Whiting Corp.*, 179 F.3d 523, 528 (7th Cir. 1999), the underlying facts in *Curtis* and this case *are* the same because both cases are about whether Alcoa's retirees are entitled to lifetime benefits in light of the facts surrounding the negotiation of the Cap in 1993. Indeed, the company's claim that the two cases are "fundamentally different," Brief at pp. 2, 31, is belied by the fact that Alcoa chose to use the pre-1993 retirees in *Curtis* as a foil to persuade that court that the post-1993 retirees were seeking to vindicate the rights their predecessors had but they did not. *See* JA.184 ("Plaintiffs here seek to receive benefits as if they had retired before June 1, 1993."); JA.272 ("Plaintiff's theory is . . . that the rights of the people who retired after 1993 are exactly the same as the rights of people who retired before 1993.").

*Third*, Alcoa's argument sidesteps the fact that the purpose of judicial estoppel is to avoid situations where a party, having succeeded

in one case, is able to succeed in a later case based on an incompatible position. *See, e.g., New Hampshire*, 532 U.S. at 750-51 (judicial estoppel applies when "judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled"); *Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1427 (7th Cir. 1993) ("judicial estoppel . . . prevent[s] situations from arising in which one of two related decisions has to be wrong because a party took opposite positions and won both times"); *Witham v. Whiting Corp.*, 975 F.2d 1342, 1345 (7th Cir. 1992) ("it would be an error of law for a district court to allow a winning party to win twice on the basis of incompatible positions"). Thus, when Alcoa says it could not have won *Curtis* by persuading the court that pre-1993 retirees had lifetime benefits, Brief at p. 31, it is missing the point and asking this Court to endorse an overly technical and cramped reading of *New Hampshire*. The fact remains that Alcoa's winning position in *Curtis* that the capped post-1993 retirees had lifetime benefits is inconsistent with its present position that the uncapped pre-1993 retirees' rights to benefits expired with the CBAs in effect when they retired because Alcoa's prior position took for granted that the pre-1993 retirees had lifetime, uncapped

benefits. Thus, Alcoa was trying to win this case by "establishing not-A" when it had already "w[o]n the first suit by demonstrating A[.]" *See Astor Chauffeured Limousine Co. v. Runnfeldt Inv. Corp.*, 910 F.2d 1540, 1548 (7th Cir. 1990). That is why judicial estoppel was appropriate here, as the District Court recognized.

### 3. The District Court did not abuse its discretion by judicially estopping Alcoa based upon its successful alternative position in *Curtis*.

Perhaps recognizing that the *Curtis* court's holding *is* "clearly inconsistent" with its position here, Alcoa seeks to disclaim responsibility for it, arguing that the District Court "[m]isunderstood" its position in *Curtis*. Brief at pp. 34-44. Rather than address each of Alcoa's myriad criticisms of the District Court's reasoning, however, we will get straight to the point. At its core, Alcoa's argument only works if one of the following three propositions it advances is correct: (1) Alcoa never advocated the position the *Curtis* court adopted, *see, e.g., id.* at p. 35; p. 11; (2) to the extent Alcoa *did* take that position it did so only as an alternative "arguendo" argument to which judicial estoppel should not apply, *see id.* at 36-37; and (3) while the *Curtis* court found that the post-1993 retirees had vested benefits, *Alcoa* was not responsible for that

because the *Curtis* court reached that decision on its own by applying the then-governing *Yard-Man* precedent. *See id.* at p. 35.

Each proposition is meritless. *First*, the notion that Alcoa did not advocate the position adopted by the *Curtis* court is frivolous—obviously, an "arguendo" position is a position—and belied by the record. Alcoa argued "even if [the *Curtis*] Plaintiffs benefits vested upon retirement, the benefits would have vested with the caps already in place[,]" JA.197, and the *Curtis* court found "that plaintiffs' health benefits vested at time of their retirement, subject to the cap." *Curtis*, 2011 U.S. Dist. LEXIS 25023, at *120, ¶ 237.

Of course, if that were not enough, after the judgment in *Curtis*, the company was more than happy to trumpet that the *Curtis* court "agreed with Alcoa" when it ruled the post-1993 retirees had lifetime capped benefits when doing so served Alcoa's interest in defeating the plaintiffs' motions. *See* JA.292-293; *see also* JA.298. Alcoa spends several pages trying to explain away its post-judgment briefing in *Curtis*, Brief at pp. 39-43, but never responds to the fundamental fact that it took credit for the ruling in that case and thus cannot now credibly claim otherwise. Likewise, it misses the point when it argues that it could not have been

faulted for failing to appeal the *Curtis* ruling because judicial estoppel cannot be triggered by a "failure to object[.]" *Id.* at pp. 43-44. Alcoa was not estopped by its failure to object to the *Curtis* ruling; rather, its failure to object to the *Curtis* ruling was simply more evidence that the position the *Curtis* court adopted was the one that Alcoa advocated.

For what it is worth, Alcoa's statements in *Curtis* also strongly suggest that as a practical matter, its *primary* argument was that the post-1993 retirees had lifetime, capped benefits. *Before* the court ruled, Alcoa characterized the post-1993 retiree plaintiffs there as seeking the same rights as the pre-1993 retirees, JA.184, JA.272, which necessarily implies that the pre-1993 retirees have lifetime, uncapped benefits and the post-1993 retirees have lifetime, capped benefits. Alcoa also argued, again, *before* the ruling, that it would provide benefits for "the rest of these [post-1993 retirees'] lives." JA.274. And after the *Curtis* ruling, Alcoa explained, "in practice, Alcoa has never suggested that it would reduce Plaintiffs' benefits below their vested levels." JA.299. These statements show that Alcoa did not have any intention to *actually* act as though the post-1993 retirees' benefits were not lifetime.

In any event, whether as a primary or a back-up position, Alcoa clearly advocated to the *Curtis* court that the post-1993 retirees had lifetime, capped benefits.

*Second*, the proposition that an *arguendo*-style argument cannot be subject to judicial estoppel once successful has been repeatedly rejected by this Court. For example, *Chaveriat* held "[a]lternative pleading is permitted, so a party does not have to make a binding election of positions until the first suit goes to judgment. *But he is forbidden to equivocate beyond that point.*" *See* 11 F.3d at 1428 (emphasis added). The same point was made in *Cont'l Ill. Corp.*, where the Court held "*[a] party can argue inconsistent positions in the alternative, but once it has sold one to the court it cannot turn around and repudiate it in order to have a second victory[.]*" 998 F.2d at 518 (emphasis added). And *Astor* says that while a party can "take inconsistent positions in a single suit . . . *[i]nconsistent positions in different suits are much harder to justify.*"  *See* 910 F.2d at 1548 (emphasis added). The District Court correctly followed this logic when it held that Alcoa was "lock[ed] into" its successful position and cited *Gabarick v. Laurin Mar. (Am.) Inc.*, 753 F.3d 550, 554 (5th Cir. 2014) for the proposition that "once a court has accepted and relied upon

one of a party's several alternative positions, any argument inconsistent with that position may be subject to judicial estoppel." RSA.28-29. Indeed, as *Gabarick* pointed out, in *New Hampshire*, New Hampshire was judicially estopped based on an "alternate position" that it had taken in the past because "the relevant focus was that" the first court "accepted New Hampshire's position." *See* 753 F.3d at 554-55. Thus, this argument is dead in the water too.

*Third*, Alcoa's unsupported suggestion that the ruling in *Curtis* cannot estop it because the *Curtis* court reached its vesting decision on its own is utterly without merit because nothing about the judicial estoppel doctrine requires an inquiry into the court's *reasons* for finding that the party prevailed. In fact, judicial estoppel can apply to a position taken in an earlier proceeding even when that proceeding resulted in a *settlement* rather than a court ruling at all, if that settlement represents the party having prevailed. *See Kale*, 985 F.2d at 361-62 (judicial estoppel "speaks of *prevailing* in the first case, not of obtaining a judicial decision. . . . No case appellants have cited to us, and none we could find, makes application of judicial estoppel depend on the existence of a judicial opinion adopting the litigant's position; it is enough that the litigant

win."); *Commonwealth Ins.*, 398 F.3d at 887 (holding that a ruling that a party could not be judicially estopped because the party "never won a favorable ruling" was contrary to *Kale*). *Cf. Astor*, 910 F.2d at 1548 ("[t]he offense" judicial estoppel prevents "is not taking inconsistent positions so much as it is *winning*, twice, on the basis of incompatible positions") (emphasis in original). Since a court ruling is not even required for judicial estoppel to apply, a court ruling stating that it was the party to be estopped that persuaded the court is certainly not required either. This makes sense, since judicial estoppel is concerned with avoiding "the *perception* that either the first or the second court was misled[.]" *See New Hampshire*, 532 U.S. at 750 (emphasis added). If Alcoa were permitted to proceed with its position in this case and win, that ruling would be clearly inconsistent with the ruling in *Curtis* regardless of the *Curtis* court's underlying reasoning.

Moreover, we must return to the fact that in *Curtis* Alcoa took full credit for that court's ruling. *See* JA.292-293 ("The Court agreed with Alcoa"); JA.298. And even in its brief to this Court, Alcoa concedes that *Curtis* was "a victory." Brief at p. 44. That is the end of it: judicial estoppel prevents Alcoa "from having it both ways." *See Frazier-Hill v. Chi.*

*Transit Auth.*, 75 F.4th 797, 804 (7th Cir. 2023). *See also In re Cassidy*, 892 F.2d 637, 641 (7th Cir. 1990) (applying judicial estoppel to bar party from his "present position [] that it was error for the court [in the first case] to give him what he then wanted").

> **4.    The District Court did not abuse its discretion by finding that Alcoa had argued in *Curtis* that except for the cap, the rights of the pre-1993 retirees and post-1993 retirees were the same.**

Next, Alcoa takes issue with the District Court's take on its statements in *Curtis* that the post-1993 retirees plaintiffs there "seek to receive benefits as if they had retired before June 1, 1993" and that their "theory is . . . that the rights of the people who retired after 1993 are exactly the same as the rights of people who retired before 1993." Brief at p. 45. According to the company, these statements did not imply that the pre-1993 retirees had lifetime benefits or that the only difference between the pre and post-1993 retirees was the Cap because they were nothing more than "straightforward descriptions *of the plaintiffs'* claim[.]" *Id.* (emphasis in original).

This is a non sequitur. It is precisely *because* these statements were *Alcoa's* descriptions of *Curtis* plaintiff's claims that they reveal what *Alcoa* believed that those claims signified. Needless to say, the *Curtis*

plaintiffs would not have been making a very persuasive argument if they argued, "we seek to receive benefits as if we retired before 1993."

Moreover, it is notable that in its post-hoc attempt to explain away these statements, Alcoa says that they represented only "the implausibility of any argument that would render the Cap agreement a dead letter, as the *Curtis* plaintiffs were explicitly arguing." Brief at pp. 45-46. But if one accepts that the pre-1993 retirees' rights to *any* healthcare benefits at all (capped or uncapped) was long expired by the time of the *Curtis* litigation, that would make the Cap agreement something *far more* implausible than just a dead letter: it would mean that in bargaining for the Cap Alcoa actually agreed to a brand new *lifetime* retiree healthcare spending obligation that had previously been limited by the duration of the CBA in effect when an employee retired. This notion makes no economic sense, which is precisely why all evidence in the record concerning the 1993 negotiations makes clear it did not happen.

> **5.** **The District Court correctly held that *Tackett* does not allow Alcoa to escape the ramifications of *Curtis*.**

Alcoa's final argument is that judicial estoppel should not apply

because *Tackett's* overruling of the Sixth Circuit's retiree-friendly *Yard-Man* inferences amounted to a "substantive change in the law" that should permit it to change course without being estopped now. Brief at p. 47.

Alcoa relies on *Jarrard*, *see id.* at pp. 47-48, but *Jarrard* does not support Alcoa, as the District Court recognized. In *Jarrard*, this Court declined to judicially estop a party that had successfully litigated two opposite positions because "the defendants could not have argued their prior position without running afoul of controlling Indiana caselaw" that had changed after the first proceeding and held "[j]udicial estoppel should not be used to work an injustice, particularly when the defendants' change in position resulted from circumstances outside their control—namely, a change in controlling state law[.]" 408 F.3d at 915. That rationale does not apply here, as the District Court held. Nothing about *Yard-Man required* Alcoa to take the position that retiree benefits were vested in *Curtis*; indeed, as Alcoa emphasizes, it made the alternative argument to the *Curtis* court that benefits were *not* vested. *See, e.g.,* Brief at p. 35. And likewise, nothing about *Tackett prevents* a party from acknowledging that benefits *are* vested, which means that

Alcoa cannot claim that its flip-flopped litigation position in this case is *required* to avoid "running afoul" of the controlling law. *See Jarrard*, 408 F.3d at 915.

> **6.    The District Court's application of judicial estoppel did not impinge upon the truth seeking function of the court because the truth is that Alcoa always understood that pre-1993 retirees had lifetime benefits.**

As a final matter, Alcoa is barking up the wrong tree when it invokes the principle that judicial estoppel "must be 'applied with caution to avoid impinging on the truth seeking function of the court[.]'" *See* Brief at pp. 29-30 (quoting *Levinson v. United States*, 969 F.2d 260, 265 (7th Cir. 1992)).

As discussed above, the contractual dispute here is governed by the well-established framework in *Rossetto*, *Cherry*, and *Stone*. These authorities make clear that even if a CBA "makes clear that the entitlement [to retiree healthcare] expires with the agreement," retirees can demonstrate a latent ambiguity with "objective evidence" showing that "anyone knowledgeable about the real-world context of the agreement would realize that it might not mean what it says." *Cherry*, 441 F.3d at 481-82; *Rossetto*, 217 F.3d at 547. "Objective evidence" is

either "established by disinterested witnesses," "uncontested," or both, as opposed to "the self-serving testimony of one party to the contract[.]" *See Rossetto*, 217 F.3d at 546-547 (citations omitted). And if retiree plaintiffs can show latent ambiguity, then extrinsic evidence, "objective" or otherwise, is admissible. *See Stone*, 943 F.3d at 385; *Cherry*, 441 F.3d at 482; *Rossetto*, 217 F.3d at 547.

Here, a veritable mountain of objective evidence both establishes an ambiguity and conclusively resolves it in favor of Plaintiffs' position. The first piece of such evidence is the negotiation of the Cap in 1993, which *unambiguously* granted post-1993 retirees healthcare benefits *beyond* the term of the CBA in effect when they retired. JA.116-117 (Material Facts 27-28); JA.244-245. Therefore, as Nick Storm acknowledged, Alcoa's current litigation position is premised on the notion that in 1993 it sought to change a regime in which benefits for retiring employees were guaranteed only for the term of the CBA in effect when they retired, to one in which benefits for retiring employees were guaranteed at an uncapped level for a year and a half *beyond* the term of the CBA in effect when they retired, and *thereafter*, at a capped level. *See* D.Ct., ECF No. 132-14 at 17-18. But this notion simply cannot be squared

with the fact that Alcoa wanted the Cap to "*limit* growth in retiree medical costs[,]" JA.114 (Material Fact 17), JA.132, and agreed to "significant[ly]" increase the *lifetime* pensions for the capped post-1993 retirees to get it. JA.115 (Material Fact 23); JA.165-168. *See Dispatch Automation, Inc. v. Richards*, 280 F.3d 1116, 1119 (7th Cir. 2002) ("When a contractual interpretation makes no economic sense, that's an admissible and, in the limit, a compelling reason for rejecting it") (citations omitted).

The second type of objective evidence is Alcoa's own statements in *Curtis*, which are evidentiary admissions regarding its contractual obligations. *See, e.g., Higgins v. Mississippi*, 217 F.3d 951, 955 (7th Cir. 2000). As discussed above, Alcoa represented to the *Curtis* court—*prior* to the judgment—that it would provide the post-1993 retirees with *lifetime*, capped benefits, JA.274; JA.275. And Alcoa characterized the post-1993 *Curtis* plaintiffs who claimed a contractual right to vested, lifetime uncapped benefits as seeking benefits "as if they retired before June 1, 1993." JA.184; *see also* JA.272. These are admissions by Alcoa that while the post-1993 retirees did *not* have a right to lifetime, uncapped benefits, the pre-1993 retirees *did*, just as Plaintiffs argue now. *See*

*Restatement 2d of Contracts*, § 201 ("Where the parties have attached the same meaning to a promise or agreement or a term thereof, it is interpreted in accordance with that meaning.").

The third type of objective evidence includes Russell Porter's sworn testimony. Again, Mr. Porter testified that at the time of the 1993 negotiations "I believed the state of the law was we couldn't touch [the pre-1993 retirees.]" JA.150-154. And in the *Curtis* trial, he likewise explained that while, in his view, retiree health benefits did not "vest" in the sense that they could never be changed, Alcoa could *not* take away retiree medical benefits altogether and instead "could negotiate changes" with the union because retiree benefits were a permissive subject. *See* JA.240-241 (emphasis added). One would be hard pressed to find a witness less inclined to willingly give testimony unfavorable to Alcoa and more "knowledgeable about the real world context" of the pre-1993 CBAs than Mr. Porter. His testimony is yet another set of admissions by Alcoa. *See Stone*, 943 F.3d at 389-90 (statement by manager who negotiated on behalf of employer that he understood CBA to provide lifetime benefits was "powerful" extrinsic evidence supporting retirees' claims); *Prime Eagle Grp. Ltd. v. Steel Dynamics, Inc.*, 614 F.3d 375, 378 (7th Cir. 2010)

("corporations 'know' what their employees know . . . about subjects that are within the scope of their duties").

The final piece of objective evidence is the fact is that in the decades prior to 2021 Alcoa had not made *any* unilateral reductions to benefits provided to pre-1993 retirees, much less terminated them upon CBA expiration. JA.127 (Material Fact 62). Moreover, it is not like changing retiree benefits never occurred to the company because: (1) Alcoa capped its spending on the salaried retirees (future and current) shortly after the 1993 negotiations, JA.117 (Material Fact 29); (2) Alcoa imposed the cap in 2007 on the post-1993 retirees, JA120 (Material Fact 38); and (3) Alcoa changed the benefits for a different group of current (union and non-union) retirees in 2015. JA.126 (Material Fact 58). In any other retiree health case, evidence like this would likely get top billing. *Cf. Alabama v. North Carolina*, 560 U.S. 330, 346 (2010) (the parties' course of performance under a contract "is highly significant"); *Old Colony Tr. Co. v. Omaha*, 230 U.S. 100, 118 (1913) ("the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence"); *Rossetto*, 217 F.3d at 546 (latent ambiguity was

shown because another employer with identical CBA had continued to provide benefits for the past 19 years). That in this case the company's course of performance is perhaps the least dramatic evidence in favor of retirees says something.

In short, the truth is simple. Alcoa's current litigation position is nothing more than a post hoc contrivance, one presumably generated when someone at the company decided that *Tackett* opened an escape hatch through which it could it break free of a long recognized contractual commitment the company decided it would rather be rid of.

## B.  The District Court did not abuse its discretion in certifying the proposed class.

Alcoa's attacks on the District Court's class certification ruling fail too.

### 1.  The District Court properly found that the commonality requirement was met

The District Court's commonality finding was well supported and consistent with this Circuit's retiree healthcare precedent. As discussed in the preceding section, even if a CBA is (1) "completely silent" on retiree healthcare or (2) "makes clear that the entitlement [to retiree healthcare] expires with the agreement," retirees can demonstrate a latent ambiguity

with objective evidence. *Cherry*, 441 F.3d at 481-82; *Rossetto*, 217 F.3d at 547. *See also Stone*, 943 F.3d at 385. And if a CBA is patently or latently ambiguous, any extrinsic evidence, objective or otherwise, can be admitted to resolve the ambiguity. *See id.* Here, the District Court correctly held that Plaintiffs' claims arose from a *common* question regarding the meaning of objective extrinsic evidence that was *common* to all pre-1993 retirees: the negotiation of the Cap *after* all of them had retired. RSA.06-08. And as it noted, Alcoa not only treated the impacted retirees as a "single group of 'Uncapped' retirees," RSA.03 (citing JA.079), but it terminated the group's benefits at the same time and in the same way. *Id.*

Alcoa fails to identify any reason that the Court should disturb class certification. As an initial matter, Alcoa totally ignores the fact the District Court's *subsequent* judicial estoppel ruling decided liability on a question that was common to the class, and Alcoa does not contend that the judicial estoppel ruling, if this Court is to bless it, cannot apply to any portion of the class. Thus, Alcoa has waived any challenge to the judicial estoppel ruling serving as the common answer for the class. *See Bradley v. Vill. of Univ. Park*, 59 F.4th 887, 897 (7th Cir. 2023) ("An appellant

may waive a non-jurisdictional issue or argument in many ways, such as
. . . by failing to raise it at all in the party's opening brief on appeal"). In
turn, that means that if the Court finds no abuse of discretion as to
judicial estoppel, that finding should dispense with Alcoa's challenge to
the District Court's *prior* commonality finding too.

In any case, the company's criticisms of the District Court's class
certification decision at the time it was made are not well taken either.
To start, Alcoa initially avoids the ruling altogether, spending several
pages arguing that the CBAs at issue are "distinct[,]" "diverse[,]" and did
not contain "materially identical language[.]" Brief at pp. 53-56.
Likewise, it points out that some of the applicable CBAs were never
located by the parties. *Id.* at p. 56.  But setting aside the accuracy of these
claims, Alcoa is asking the Court to miss the forest for the trees. Under
Plaintiffs' theory of the case, the key to commonality is common objective
extrinsic evidence: *all* class members retired under a CBA which *did not
have a Cap*. And as objective evidence, the Cap negotiations were
admissible to prove the meaning of each of those CBAs whether the
language was patently ambiguous on vesting, silent on the question, or
(at worst for the retiree) patently unambiguous in Alcoa's favor. *See, e.g.,*

*Cherry*, 441 F.3d at 481-82. In other words, any potential differences in the language of the pre-1993 CBAs did not preclude a finding of commonality.

When it finally confronts the District Court's holding that the negotiation of the Cap created a common question, Alcoa simply dismisses it, contending that the common question identified by the court is really "an aggregate of many individualized questions," "not itself 'central' to any claims[,]" and merely a "common *argument*" that the District Court "rubber-stamped[.]" *See* Brief at pp. 58-59. But this part of the company's brief is not really an argument at all. Instead, it is a just conclusion that presupposes the premise that Alcoa seeks to prove, *i.e.*, that the Cap negotiations are not relevant to the meaning of the pre-1993 CBAs without a Cap. Moreover, Alcoa's own representations in *Curtis* make clear the company always understood that the negotiation of the Cap says something about the meaning of the pre-1993 CBAs, contrary to its current effort to bury its head in the sand. *See, e.g.,* JA.184 ("[*Curtis*] Plaintiffs here seek to receive benefits as if they had retired before June 1, 1993.").

Alcoa also fails to properly understand this Circuit's four-step retiree healthcare analysis when it complains that the Cap, as "extrinsic evidence," could only come into play upon *after* a finding that the CBAs are ambiguous, Brief at p. 59, and when it asserts that whether each pre-1993 CBA was ambiguous would require consideration of "the language of the contract itself."[5] *Id.* at 60. This Court's caselaw clearly holds that there is a difference between the objective evidence that can be used to *demonstrate* a latent ambiguity in what would otherwise be a patently silent or unambiguous contract after a review of the language of that contract, and the more general sort of extrinsic evidence that only becomes admissible after an ambiguity—either patent or latent—is shown. *See Cherry*, 441 F.3d at 481-82; *Rossetto*, 217 F.3d at 547. Here, Plaintiffs' theory of the case rested on the former.

Finally, Alcoa asserts that the "universe of relevant extrinsic evidence is not identical for each pre-1993 CBA. . . . in different negotiations, different things might have been said, different documents

---

[5] Alcoa, in fact, completely disregards this Court's standards for contract interpretation in retiree healthcare cases and never even cites *Rossetto* or *Stone*, relying instead on cases from the Fourth, Sixth and Eleventh Circuits. *See, e.g.,* Brief at pp. 54-55.

might have been generated, and so on." Brief at p. 61. But again, this ignores that the key evidence—the Cap and Alcoa's admissions in *Curtis* about what the Cap meant—*is* identical for each class member. And since Alcoa did not and has not identified any *other* relevant extrinsic evidence in the record that would destroy the commonality, its speculation about what sort of extrinsic evidence "might" be out there cannot establish an error in the Court's holding.

## 2. The District Court properly found that the typicality requirement was met.

Alcoa's attack on the District Court's typicality finding is little more than a rehashing of its argument that different CBAs dictate different outcomes, *see id.* at pp. 62-63, and thus it fails for the reasons as discussed in the prior section. Strangely, Alcoa also suggests that if someone other than Plaintiff Kaiser had sued, they might have advanced a different theory in which *only* the language of the CBA would be relevant. *Id.* at p. 63. What this has to do with typicality is anyone's guess; needless to say, it does not establish an abuse of discretion.

### 3.    The District Court properly certified the class under Rule 23(b)(2)

Finally, Alcoa argues that the class did "not fit" Rule 23(b)(2) for two reasons. *Id.* at p. 64. First, it says "[t]he class here does not possess the inherent and indivisible cohesiveness that Rule 23(b)(2) presumes." *Id.* at p. 66. Second, Alcoa argues that at that time of class certification, Plaintiffs were seeking money damages and such damages could never have been considered "incidental" to the injunctive relief, a problem it contends was acknowledged by Plaintiffs and the District Court when Plaintiffs asked for, and the Court granted, the retroactive reinstatement of the Prior Plan. *Id.* at p. 67.

Neither argument suffices to reverse the class certification ruling. To start, the only support Alcoa musters for first its argument that the class lacks "cohesiveness" is its assertion that "[i]t is entirely conceivable that Alcoa's conduct was lawful as to some class members and unlawful as to others" which, in turn, is based upon its argument that different CBAs would have provided for different rights to retiree healthcare. *Id.* at p. 66. But again, this yet another example of Alcoa begging the question by presuming that the common question identified by Plaintiffs and the District Court is incapable of yielding a common answer. For the

reasons discussed in response to Alcoa's commonality argument, Alcoa's argument that the certified class is not "cohesive" therefore fails.

Alcoa's claim that Plaintiffs' original request for damages means that Rule 23(b)(2) certification is improper fails too. While at the time of certification briefing Plaintiffs did contemplate seeking money damages, the principal relief sought by Plaintiffs was always a declaration that Alcoa could not unilaterally terminate or modify class members' retiree medical benefits and an order requiring Alcoa to reinstate the Prior Plan. JA.054. Thus, this case did not present "a claim for money damages . . . in injunctive clothing" such that Rule 23(b)(2) would be inappropriate. *See Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of Chi.*, 797 F.3d 426, 443 (7th Cir. 2015).

Moreover, the District Court correctly held that any such damages would have been "incidental" because those damages would have been a matter of "read[ing] off from the" Prior Plan the benefits to which the retirees would have been entitled. RSA.13-14 (citing *In re Allstate Insurance Co.*, 400 F.3d at 508). Alcoa argues that the damages could not have been "incidental" because calculating them would require an analysis of each individual class member's medical records and expenses.

*See* Brief at pp. 67-68. But this Court has recognized that damages may be individualized in the sense that they vary from person to person yet still "incidental" in *Johnson v. Meriter Health Servs. Emp. Ret. Plan*. There, the plaintiffs were alleging that they were not credited with the pension benefits to which they were entitled, and the pension plan provided participants with a retirement benefits that took into account the employee's "salary each year," *see Meriter*, 702 F.3d at 365-366, a factor would naturally vary from person to person. Yet, the Court found that if once the defendant was required to conform the plan to the declaration the plaintiffs sought "the award of monetary relief will just be a matter of laying each class member's pension-related employment records alongside the text of the reformed plan and computing the employee's entitlement . . . the monetary relief will truly be merely 'incidental'" to the declaratory and injunctive relief. *See id.* at 371. The damages contemplated by Plaintiffs here were similar in kind to those in *Meriter*. Yes, the amounts would vary from person to person, but the calculation would be a matter of laying the retiree's bills alongside the text of the Prior Plan and figuring out what was owed.

In any event, the question of whether the damages Plaintiffs contemplated at the time of class certification are "incidental" was rendered moot when Plaintiffs abandoned that request and simply sought an injunction whereby Alcoa would retroactively reinstate the Prior Plan, and Alcoa does not challenge the injunction itself.[6] In other words, while the District Court was correct in certifying this class under Rule 23(b)(2) at the time it did so, the damages request upon which Alcoa has hung its Rule 23(b)(2) objection is long gone anyway. Thus, it cannot now provide a basis to disturb class certification. *See Mulvania v. Sheriff of Rock Island Cty.*, 850 F.3d 849, 859 (7th Cir. 2017) (error on class certification did not provide grounds to disturb the ruling because the error was "harmless"); *see also Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1027 (7th Cir. 2018).

---

[6] Alcoa mischaracterizes the injunctive relief the Court granted as enjoining Alcoa "to compensate class members' retroactive monetary losses, with the amounts to be determined out of court by Alcoa and individual class members." Brief at pp. 68-69. The Court actually ordered Alcoa to reinstate the Prior Plan retroactive to January 1, 2021, and to notify class members of their right to submit claims for benefits under the Prior Plan for health and prescription drug expenses incurred from January 1, 2021. RSA.60-61.

## V.    CONCLUSION

For these reasons, the District Court's rulings should be affirmed.

Dated:  July 28, 2025                     Respectfully submitted,

                                          _s/  Joel R. Hurt_____
                                             Joel R. Hurt

                                          **FEINSTEIN DOYLE PAYNE**
                                             **& KRAVEC, LLC**
                                          Joel R. Hurt
                                             *Counsel of Record*
                                          Ruairi McDonnell
                                          429 Fourth Avenue
                                          Law & Finance Building, Suite 1300
                                          Pittsburgh, Pennsylvania 15219
                                          Telephone: (412) 281-8400
                                          Facsimile: (412) 281-1007
                                          jhurt@fdpklaw.com
                                          rmcdonnell@fdpklaw.com

                                          ***Counsel for Plaintiffs-Appellees***

## <u>CERTIFICATE OF COMPLIANCE WITH WORD COUNT AND TYPEFACE REQUIREMENTS</u>

This brief complies with the word count and typeface requirements of Federal Rule of Appellate Procedure 32 and Circuit Rule 32 because it contains 13,939 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) as calculated by Microsoft Office Word, and has been prepared in a proportionally spaced typeface using 14-Point Century Schoolbook Style font.

Date:  July 28, 2025                    *s/ Joel R. Hurt*
                                                      Joel R. Hurt

                                                      *Counsel for Plaintiffs-Appellees*

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Federal Rule of Appellate Procedure 25 and Circuit Rule 25, I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Seventh Circuit by using the Court's CM/ECF system on July 28, 2025 which will effect service on all counsel of record.

Date: July 28, 2025　　　　　　　 *s/ Joel R. Hurt*
　　　　　　　　　　　　　　　　 Joel R. Hurt

　　　　　　　　　　　　　　　　 *Counsel for Plaintiffs-Appellees*